# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

FREDRIC RUSSELL MANCE, JR; TRACEY AMBEAU HANSON;
ANDREW HANSON; CITIZENS COMMITTEE FOR THE
RIGHT TO KEEP AND BEAR ARMS,

Plaintiffs-Appellees,

v.

LORETTA LYNCH, U.S. ATTORNEY GENERAL; THOMAS E. BRANDON,
Acting Director, Bureau of Alcohol, Tobacco, Firearms & Explosives,

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Civil Action No. 4:14-cv-539

## BRIEF FOR APPELLANTS

BENJAMIN C. MIZER
  *Principal Deputy Assistant Attorney General*

JOHN R. PARKER
  *Acting United States Attorney*

MARK B. STERN
  (202) 514-5089
MICHAEL S. RAAB
  (202) 514-4053
TARA S. MORRISSEY
  (202) 353-9018
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7261*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

# CERTIFICATE OF INTERESTED PERSONS

*Mance, et al. v. Lynch, et al.*, No. 15-10311

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs:**

Fredric Russell Mance, Jr.
Tracey Ambeau Hanson
Andrew Hanson
Citizens Committee For The Right To Keep And Bear Arms

**Defendants:**

Loretta Lynch
Thomas E. Brandon

**Counsel:**

Alan Gura
Gura & Possessky

William B. Mateja
Michael D. Nammar
Fish & Richardson PC

Benjamin C. Mizer
Beth S. Brinkmann
John R. Parker
Mark B. Stern
Michael S. Raab
Tara S. Morrissey
Lesley R. Farby

Daniel M. Riess
U.S. Department of Justice

/s/ Tara S. Morrissey
Tara S. Morrissey
Counsel for Appellees

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests oral argument in this case. The district court held that federal requirements concerning the sale of handguns violate the Second and Fifth Amendments of the U.S. Constitution. The government believes oral argument could provide substantial assistance to this Court in understanding the important issues in the case.

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF JURISDICTION ..................................................................1

STATEMENT OF THE ISSUES.......................................................................2

STATEMENT OF THE CASE...........................................................................2

A.  STATUTORY AND REGULATORY BACKGROUND ...................................2

B.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY....................9

SUMMARY OF ARGUMENT........................................................................14

STANDARD OF REVIEW ..............................................................................16

ARGUMENT ...................................................................................................16

I.  THE CHALLENGED LAWS ARE CONSISTENT WITH
THE SECOND AMENDMENT........................................................................16

    A.  The Challenged Laws Do Not Burden Second
      Amendment Rights.....................................................................17

    B.  Even If The Challenged Laws Implicate Second
      Amendment Rights, They Are Constitutional.............................22

        1.  Intermediate Scrutiny Is The Proper Standard
          Of Review..........................................................................22

        2.  The In-State Sales Requirements Satisfy Intermediate
          Scrutiny .............................................................................28

II.    THE CHALLENGED LAWS ARE CONSISTENT WITH
THE RIGHT TO EQUAL PROTECTION OF THE LAWS
UNDER THE FIFTH AMENDMENT ............................................................38

CONCLUSION ..............................................................................................42

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Attorney General of New York v. Soto-Lopez,*
    476 U.S. 898 (1986) ..................................................................41

*Bolling v. Sharpe,*
    347 U.S. 497 (1954) ..................................................................38

*Carey v. Population Services International,*
    431 U.S. 678 (1977) ..................................................................27

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................................*passim*

*Doe v. Bolton,*
    410 U.S. 179 (1973) .............................................................27, 28

*Gallegos-Hernandez v. United States,*
    688 F.3d 190 (5th Cir. 2012) .....................................................38

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) .................................................21

*Hernandez v. Reno,*
    91 F.3d 776 (5th Cir. 1996) .......................................................14

*Huddleston v. United States,*
    415 U.S. 814 (1974) ..................................................................29

*Kimel v. Florida Bd. of Regents,*
    528 U.S. 62 (2000) ...............................................................38, 41

*Kwong v. Bloomberg,*
    723 F.3d 160 (2d Cir. 2013) ......................................................26

*Martinez v. Bynum,*
    461 U.S. 321 (1983) .............................................................41, 42

*Massachusetts Bd. of Ret. v. Murgia,*
  427 U.S. 307 (1976) ...................................................................................38

*Memorial Hosp. v. Maricopa Cnty.,*
  415 U.S. 250 (1974) ...................................................................................41

*National Fed'n of the Blind of Tex., Inc. v. Abbott,*
  647 F.3d 202 (5th Cir. 2011) ......................................................................39

*National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms,*
  *& Explosives,* 700 F.3d 185 (5th Cir. 2012) ........................................*passim*

*National Rifle Ass'n of Am., Inc. v. McCraw,*
  719 F.3d 338 (5th Cir. 2013) ...................................... 13, 23, 33, 34, 38, 40

*Peterson v. LaCabe,*
  783 F. Supp. 2d 1167 (D. Colo. 2011),
  *aff'd sub nom. Peterson v. Martinez,* 707 F.3d 1197 (10th Cir. 2013) ....................... 36, 40

*Planned Parenthood of Se. Pa. v. Casey,*
  505 U.S. 833 (1992) ...................................................................................26

*Schall v. Martin,*
  467 U.S. 253 (1984) ...................................................................................28

*United States v. Biswell,*
  406 U.S. 311 (1972) ...................................................................................29

*United States v. Decastro,*
  682 F.3d 160 (2d Cir. 2012) ...................................... 24, 25, 26, 27

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ...................................................................................31

*Williams-Yulee v. Florida Bar,*
  135 S. Ct. 1656 (2015) ...............................................................................34

**Statutes:**

Brady Handgun Violence Prevention Act,
Pub. L. No. 103-159, 107 Stat. 1536 (1993) ......................................................6

Gun Control Act of 1968,
Pub. L. No. 90-618, 82 Stat. 1213 ............................................................ 2, 3

Omnibus Crime Control and Safe Streets Act of 1968,
Pub. L. No. 90-351, 82 Stat. 197 ...........................................2, 4, 29, 30, 33

18 U.S.C. § 922(a)(3) ...............................................4, 5, 10, 14, 24, 25

18 U.S.C. § 922(a)(3)(B) .....................................................................5

18 U.S.C. § 922(b) ..............................................................................6

18 U.S.C. § 922(b)(3) .............................................4, 5, 6, 10, 14, 31

18 U.S.C. § 922(b)(3)(A) ............................................................. 5, 36

18 U.S.C. § 922(b)(3)(B) ..................................................................32

18 U.S.C. § 922(g) ...............................................................................7

18 U.S.C. § 922(n) ...............................................................................7

18 U.S.C. § 922(t)(1) ....................................................................... 6, 7

18 U.S.C. § 922(t)(2) ..................................................................... 7, 34

18 U.S.C. § 926(a) ..............................................................................6

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1343 .................................................................................1

28 U.S.C. § 2201 .................................................................................1

Fla. Const. art. I, § 8(b) .................................................................37

Act of April 7, 1921, 1921 Mo. Laws 692 ...................................20

Act of June 2, 1927, ch. 372, 1927 Mich. Acts 887 ....................20

Cal. Penal Code § 27535 .............................................................37

Cal. Penal Code § 27540(f) ..........................................................37

Fla. Stat. § 790.0655(1) ................................................................37

Md. Code Ann., Crim. Law § 4-303 .............................................37

Md. Code Ann., Pub. Safety § 5-101 ...........................................37

Md. Code Ann., Pub. Safety § 5-123 ...........................................37

Md. Code Ann., Pub. Safety § 5-128(a), (b) ................................37

Md. Code Ann., Pub. Safety § 5-129 ...........................................37

N.J. Stat. Ann. § 2C:58-2(a)(7) ....................................................37

N.J. Stat. Ann. § 2C:58-3(i) ..........................................................37

N.J. Stat. Ann. § 2C:58-3.4 ..........................................................37

Wis. Stat. § 175.35(2)(d) ...............................................................37

**Regulatory Materials:**

27 C.F.R. § 478.99 .......................................................................10

27 C.F.R. § 478.99(a) ............................................................ 6, 14

27 C.F.R. § 478.124(c) ...................................................................6

28 C.F.R. § 0.130(a)(1) ...................................................................6

28 C.F.R. § 25.2 ...................................................................................8

28 C.F.R. § 25.3 ...................................................................................7

28 C.F.R. § 25.4 ...................................................................................7

28 C.F.R. § 25.6(c)(iii) ........................................................................7

28 C.F.R. § 25.6(d) ..............................................................................8

28 C.F.R. § 25.6(e) ...............................................................................8

28 C.F.R. § 25.6(f) ...............................................................................7

*Improving Availability of Relevant Executive Branch Records to the
   National Instant Criminal Background Check System,*
   78 Fed. Reg. 4297 (Jan. 16, 2013) ..................................................35

## Legislative Materials:

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile
   Delinquency of the S. Comm. on the Judiciary,* 90th Cong. 873 (1967) ..........................32, 33

*Gun Control: Improving the National Instant Criminal Background Check System:
   Testimony Before the S. Comm. on the Judiciary,* 106th Cong. (2000) ..................7, 8, 35, 36

H.R. Rep. No. 90-1577 (1968) ........................................................ 3, 4, 22, 29, 31

S. Rep. No. 89-1866 (1966) ........................................................2, 3, 29, 30, 32, 37

S. Rep. No. 90-1097 (1968) ........................................................3, 4, 22, 29, 30, 31

*The Fix Gun Checks Act: Hearing before the Subcomm. on Crime & Terrorism of the
   S. Comm. of the Judiciary,* 112th Cong. (2011) ......................................7, 35, 36

## Other Authorities:

Crim. Justice Info. Servs. Div., FBI,
   *2013 Law Enforcement Officers Killed and Assaulted* ..............................................33

Crim. Justice Info. Servs. Div., FBI, *Crime in the United States 2013: Expanded Homicide Data* (2013) ..........................................................33

Crim. Justice Info. Servs. Div., FBI, *National Instant Criminal Background Check System (NICS) Operations* (2014)........................................ 8, 35

U.S. Gen. Accounting Office, GAO-01-427, *Firearms Purchased From Federal Firearm Licensees Using Bogus Identification* (Mar. 2001)...........................................8, 9, 35

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

FREDRIC RUSSELL MANCE, JR; TRACEY AMBEAU HANSON;
ANDREW HANSON; CITIZENS COMMITTEE FOR THE
RIGHT TO KEEP AND BEAR ARMS,

Plaintiffs-Appellees,

v.

LORETTA LYNCH, U.S. ATTORNEY GENERAL; THOMAS E.
BRANDON, Acting Director, Bureau of Alcohol, Tobacco, Firearms &
Explosives,

Defendants-Appellants.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Civil Action No. 4:14-cv-539

———————————

BRIEF FOR APPELLANTS

———————————

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201. ROA.448, GRE42. The district court entered summary judgment against the government on February 11, 2015. ROA.491, GRE11. The government filed a timely notice of appeal on April 10, 2015. ROA.541, GRE9. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Federal law requires that handgun sales occur in a prospective purchaser's state of residence. If an individual desires to purchase a handgun from a different state, the out-of-state handgun must be transferred to a federal firearms dealer in the purchaser's home state. The issues presented are whether this requirement is consistent with the Second Amendment and the equal protection component of the Fifth Amendment.

## STATEMENT OF THE CASE

### A. STATUTORY AND REGULATORY BACKGROUND

**1.** Congress has "impos[ed] conditions and qualifications on the commercial sale of arms," *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008), as part of its regulation of interstate commerce in firearms. Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (Omnibus Crime Control Act), following a multi-year investigation of violent crime that revealed "the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." S. Rep. No. 89-1866, at 19 (1966) (reproduced at ROA.110-210). Congress determined that "the existing Federal controls over [firearms] traffic do not adequately enable the States to control this traffic within their own borders." Omnibus Crime Control Act § 901(a)(1), 82 Stat. at 225. Later in the same year, Congress enacted the Gun Control Act of 1968, Pub. L. No. 90-618, 82

Stat. 1213, the "principal purpose" of which was "to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577, at 6 (1968).

The evidence before Congress showed that the "interstate, nonresident purchases of firearms for criminal purposes" caused "the laws of our States and their political subdivisions [to be] circumvented, contravened, and rendered ineffective." S. Rep. No. 90-1097, at 77 (1968); *see also* S. Rep. No. 89-1866, at 3 ("[T]he over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business" permitted dealers and purchasers to "circumvent[] State and local law.").

Sales to non-residents were "a serious contributing factor to crime." S. Rep. No. 90-1097, at 80 (1968). Testimony "indicate[d] that large numbers of criminals and juveniles" purchased firearms out of state "in order to circumvent the laws of their respective jurisdictions." *Id.* For example, records showed that interstate transfers of handguns led to "[c]ircumvention of the laws of the District of Columbia" because many individuals with criminal records in the District of Columbia purchased handguns in a nearby Maryland county with "minimal" sales regulations. S. Rep. No. 89-1866, at 61. Similarly, Massachusetts authorities testified "that 87 percent of the 4,506 crime guns misused in that State were purchased outside of Massachusetts in neighboring States," thereby hampering the effectiveness of Massachusetts's "stringent controls [on] the sale of firearms and primarily handguns."

3

S. Rep. No. 90-1097, at 77. And Michigan authorities testified that "90 out of every 100 crime guns confiscated in Detroit are not purchased and registered in Michigan and that the prime source of these crime guns is by purchases [in] neighboring Ohio, where controls on firearms are minimal." *Id.*

Congress thus concluded that "the sale or other disposition of concealable weapons . . . to nonresidents . . . has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions." Omnibus Crime Control Act § 901(a)(5), 82 Stat. at 225. Congress found "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." *Id.* § 901(a)(3), 82 Stat. at 225.

To that end, Congress included in both the Omnibus Crime Control Act and the Gun Control Act statutory provisions "designed to prevent the avoidance of State and local laws controlling firearms by the simple expediency of crossing a State line to purchase one." H.R. Rep. No. 90-1577, at 14; *see also* S. Rep. No. 90-1097, at 114. These provisions include restrictions on the sale and delivery of handguns to out-of-state residents, *see* 18 U.S.C. § 922(b)(3), and restrictions on transporting or receiving handguns purchased outside of one's state of residence, *id.* § 922(a)(3). Together, these provisions—referred to here as the "in-state sales requirements"—ensure that prospective buyers receive handguns in their state of residence.

4

Section 922(b)(3) applies to federal firearms licensees, which include licensed importers, manufacturers, dealers, and collectors of firearms. 18 U.S.C. § 922(b)(3); s*ee also id.* § 923(a)-(b) (federal license requirements). This provision makes it unlawful for a federal firearms licensee "to sell or deliver . . . any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located." *Id.* § 922(b)(3). It restricts the sale of handguns, but not the sale of rifles or shotguns. *Id.* § 922(b)(3)(A) (creating exception for "the sale or delivery of any rifle or shotgun . . . if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States"). Section 922(b)(3) does not apply to "the loan or rental of a firearm . . . for temporary use for lawful sporting purposes." *Id.* § 922(b)(3)(B).

The statute also imposes related restrictions on purchasers. Section 922(a)(3) makes it unlawful for "any person, other than a [federal firearms licensee,] to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State." 18 U.S.C. § 922(a)(3). This provision does not apply if the firearm was purchased or obtained in conformity with subsection (b)(3). *Id.* § 922(a)(3)(B).

To obtain a handgun from an out-of-state source, a purchaser may arrange for the handgun to be delivered to an in-state firearms dealer, from whom the purchaser may retrieve the handgun directly. *See* 18 U.S.C. § 922(a)(3) (restriction does not apply

to federal firearms licensees); *id.* § 922(b) (transactions between federal firearms licensees are exempt). The in-state firearms dealer may charge a fee for the service of receiving the firearm and completing the transaction. The in-state dealer is responsible for verifying the purchaser's identity and initiating the background check process. *See* 27 C.F.R. § 478.124(c).

**2.** The Bureau of Alcohol, Tobacco, Firearms and Explosives is authorized to issue "such rules and regulations as are necessary to carry out" Title 18's provisions relating to firearms. 18 U.S.C. § 926(a); 28 C.F.R. § 0.130(a)(1). One such implementing regulation is 27 C.F.R. § 478.99(a), which closely tracks Congress's restrictions on interstate sales and delivery of firearms by firearms licensees, *see* 18 U.S.C. § 922(b)(3). The regulation provides that a federal firearms licensee "shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business or activity is located." 27 C.F.R. § 478.99(a). Like its statutory counterpart, the regulation includes an exception for the sales or delivery of rifles or shotguns under certain conditions, as well as an exception for the loan or rental of a firearm for temporary use for lawful sporting purposes. *Id.*

**3.** The Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993) (Brady Act), required the Attorney General to establish a "national instant criminal background check system" to search the backgrounds of prospective purchasers of firearms. *Id.* § 103(b); *see also* 18 U.S.C. § 922(t)(1). This federal

background check system, which is operated by the FBI, searches available records in three databases to determine whether a prospective purchaser is prohibited from receiving or possessing a firearm under 18 U.S.C. § 922(g) or (n), or state law. 18 U.S.C. § 922(t)(2); 28 C.F.R. §§ 25.3, 25.6(c)(iii), 25.6(f). All federal firearms licensees must initiate a background check prior to transferring a firearm to a prospective purchaser. 18 U.S.C. § 922(t)(1).

States and localities voluntarily contribute information to the federal background check system. 28 C.F.R. § 25.4. But states face significant obstacles to contributing information to the system, including logistical and budgetary constraints involved in submitting information, as well as state privacy laws that may prevent sharing of certain records, such as mental health records. *The Fix Gun Checks Act: Hearing before the Subcomm. on Crime & Terrorism of the S. Comm. of the Judiciary*, 112th Cong. (2011) (statement of David Cuthbertson, Assistant Director, Criminal Justice Information Services Division, Fed. Bureau of Investigation) (FBI Statement) (discussing "continuing challenges").[1] Therefore, states often have information about individuals that would disqualify them from purchasing a firearm, but that is not flagged in the federal background check process. *See id.*; *see also Gun Control: Improving the National Instant Criminal Background Check System: Testimony Before the S. Comm. on the Judiciary*, 106th Cong. 5-6 (2000) (Statement for the Record of Laurie E. Ekstrand,

---

[1] *Available at* https://www.fbi.gov/news/testimony/the-fix-gun-checks-act-better-state-and-federal-compliance-smarter-enforcement (last visited July 9, 2015).

Director, Administration of Justice Issues, General Government Division, U.S. Gen. Accounting Office) (GAO Testimony)[2].

States have the option to rely entirely on the federal background check system or to conduct their own background checks with the assistance of the federal system. States that conduct their own background checks in consultation with the federal system are known as "Point of Contact" states. *See* 28 C.F.R. § 25.2 (defining "Point of Contact"). In Point of Contact states, a firearms dealer contacts the designated state or local agency, which first consults the federal system and then typically reviews additional internal databases in an effort to make a more comprehensive decision on whether the transaction is prohibited by federal law or the laws of that individual jurisdiction. *See* 28 C.F.R. § 25.6(d)-(e). These internal databases are generally unavailable to the federal background check system or to any other jurisdiction.

States may have additional requirements for purchasing or possessing a firearm, such as training and special permits for purchasers or residents in that state. *See* U.S. Gen. Accounting Office, GAO-01-427, *Firearms Purchased From Federal Firearm Licensees Using Bogus Identification* 1-2 (Mar. 2001) (GAO Firearms Identification Report).[3] The federal background check system is unable to determine whether a prospective purchaser satisfies these requirements. *See* Crim. Justice Info. Servs. Div., FBI,

_____

[2] *Available at* http://gao.gov/assets/90/81660.pdf (last visited July 9, 2015).

[3] *Available at* http://www.gpo.gov/fdsys/pkg/GAOREPORTS-GAO-01-427/pdf/GAOREPORTS-GAO-01-427.pdf (last visited July 9, 2015).

*National Instant Criminal Background Check System (NICS) Operations* 1-2 (2014)

(Operations Report) (describing data in each federal database).[4]  Nor does the federal

background check system provide information regarding the legality of a particular

type of firearm in a given state.  *See id.*  States also may require additional procedures

or mandatory waiting periods before a transaction may occur.   GAO Firearms

Identification Report 1-2.  It is the individual dealer's responsibility to ensure that all

of these requirements are satisfied.

### B.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Fredric Russell Mance, Jr., is a Texas resident and a federal firearms

licensee who retails firearms at his business in Arlington, Texas.   ROA.447, 453,

GRE41, 47.   Plaintiffs Andrew Hanson and Tracey Ambeau Hanson, who are

husband and wife, reside in the District of Columbia.   ROA.447, GRE41.   The

Citizens Committee for the Right to Keep and Bear Arms is a pro-firearms

organization that claims plaintiffs Mance and the Hansons as members.  ROA.447-48,

GRE41-42.

In 2014, the Hansons visited Mance's place of business in Arlington, Texas,

and each identified a handgun that they wished to purchase.  ROA.453, GRE47.  The

Hansons would have purchased the handguns directly from Mance if the sale had

complied with federal law.   ROA.453-54, GRE47-48. The Hansons could have

---

[4]      *Available      at*      https://www.fbi.gov/about-us/cjis/nics/reports/2014-
operations-report (last visited July 9, 2015).

arranged to purchase Mance's handguns through a federally licensed firearms dealer in the District of Columbia. *See* ROA.454, GRE48. Charles Sykes, who is currently the only federally licensed firearms dealer in the District of Columbia, facilitates the transfer of handguns from other dealers for a fee of $125 plus shipping costs. *Id.* The Hansons did not purchase the handguns through Sykes because they did not wish to incur these fees. *Id.*

Plaintiffs filed suit in the Northern District of Texas. Their Second Amended Complaint alleges that the in-state sales requirements—namely, 18 U.S.C. § 922(a)(3), (b)(3), and 27 C.F.R. § 478.99—violate the Second Amendment and the equal protection guarantee of the Fifth Amendment's Due Process Clause. ROA.455, GRE49. Plaintiffs sought injunctive relief prohibiting the government from enforcing these requirements. ROA.456, GRE50.

The government filed a motion to dismiss or, in the alternative, to enter summary judgment, and the plaintiffs filed a cross-motion for summary judgment. The district court granted plaintiffs' motion for summary judgment and denied the government's motion, holding that the in-state sales requirements are unconstitutional on their face and as applied to plaintiffs.[5]

---

[5] The court also held that the plaintiffs had standing to bring the present action. ROA.470-71, GRE19-20. The government does not press the standing argument on appeal.

Analyzing plaintiffs' Second Amendment claim, the court applied the two-step inquiry adopted by this Court and other courts of appeals. "[T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment," and "the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) (*ATF*); *see also* ROA.473, GRE22.

At the first step, the court held that the in-state sales requirements burden conduct within the scope of the Second Amendment. ROA.474-76, GRE23-25. It rejected the government's argument that the requirements merely impose "conditions and qualifications on the commercial sale of arms," which the Supreme Court has deemed "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26; *compare* ROA.91-94, *with* ROA.474-75, GRE23-24. The court also rejected the government's contention that the laws are "firmly historically rooted" and thus fall outside the Second Amendment, ROA.93 (quoting *ATF*, 700 F.3d at 204), a contention that the government supported with historical evidence of early 20th-century state residency restrictions on the purchase or possession of firearms, ROA.93-94, 364; ROA.212-17, 393-97, GRE52-62. The district court believed that such evidence was not germane to a historical inquiry, stating that only "evidence of founding-era thinking" was pertinent. ROA.474-75, GRE23-24. The court declared that the government's

historical evidence does "not date back quite far enough to be considered longstanding." ROA.475, GRE24.

At the second step, the court stated that the laws impose "substantial additional time and expense" on "law-abiding, responsible citizens," and thus implicate the core of the Second Amendment. ROA.477-78, GRE26-27 (emphasis omitted). The court then applied strict scrutiny to the requirements, and held that the laws were not narrowly tailored to serve the government's compelling interest in preventing handgun crime. ROA.479-86, GRE28-35. The court acknowledged that evidence before Congress supported the need for these laws in 1968, but it demanded "reasonably current figures" to show that the restrictions are still necessary under the "modern regime" of national criminal background checks under the Brady Act. ROA.480-82, GRE29-31 (emphasis omitted). The court recognized the possibility that the in-state sales requirements "may . . . remain[] justified because the Brady Act fails to prevent prohibited individuals from crossing state lines to illegally acquire and possess handguns they otherwise would not obtain," or because "the Brady Act fails to provide notice to those states who desire it." ROA.483, GRE32. Nevertheless, the district court concluded that the government "failed to carry [its] burden" to make that showing and held that the in-state sales requirements violate the Second Amendment, both facially and as applied to the plaintiffs. ROA.483, 486, GRE32, 35.

The district court further concluded that the laws fail to satisfy even intermediate scrutiny, which requires that the laws be substantially related to an

important government interest.  ROA.486, GRE35 (citing *National Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 348-49 (5th Cir. 2013)).  The court reasoned that the laws do not target discrete categories of people, conduct, or classes of firearms, but rather "target[] the entire national market of handgun sales and directly burden[] law-abiding, responsible citizens who seek to complete otherwise lawful transactions for handguns."  ROA.487, GRE36.  The court recognized the possibility that the laws "may . . . provide[] a reasonable fit to prevent prohibited individuals from crossing state lines to illegally acquire and possess handguns they otherwise would not obtain, even in light of the Brady Act[]."  ROA.488, GRE37.  Nevertheless, the court determined that the government failed to satisfy its burden and held that even under intermediate scrutiny, the in-state sales requirements are unconstitutional on their face and as applied to the plaintiffs.  *Id.*

Finally, the district court held that the laws violate plaintiffs' right to equal protection of the laws under the Fifth Amendment's Due Process Clause.  ROA.489-90, GRE38-39.  The court concluded that the in-state sales requirements are subject to strict scrutiny because they "interfere[] with the exercise of a fundamental right" and "impinge[] on residency."  ROA.489, GRE38.  Relying entirely on its strict-scrutiny analysis under the Second Amendment, the court held that the challenged laws also violate the Fifth Amendment.  ROA.490, GRE39.

The district court's final judgment enjoined the government from enforcing 18 U.S.C. § 922(a)(3), (b)(3), and 27 C.F.R. § 478.99(a) against the plaintiffs with respect to their desired transaction. ROA.491, GRE11.[6]

## SUMMARY OF ARGUMENT

The district court's decision strikes down federal firearms provisions that do not implicate the Second Amendment's central right to use firearms for self-defense in the home, and that impose no substantial burden on the right to keep and bear arms. The challenged laws do not prohibit the possession, carrying, or use of a firearm by anyone, anywhere. Indeed, they do not even ban the sale of firearms. The relevant provisions simply require that the final steps of a handgun sale occur in an individual purchaser's state of residence. In this case, the Hansons need only pay a $125 transaction fee, plus shipping costs, to transfer their firearm of choice to an in-state dealer.

The in-state sales requirements fall outside the scope of the Second Amendment. They do not implicate the core Second Amendment right of self-defense in the home, and they are the very sort of "conditions and qualifications on the commercial sale of arms" that are "presumptively lawful." *District of Columbia v.*

<hr>

[6] As the government explained in briefing on its motion to stay the district court's order, the injunction properly extends "only to the named plaintiffs and the transaction upon which they based their claimed injury." ROA.514; *see also Hernandez v. Reno*, 91 F.3d 776, 781 (5th Cir. 1996) (in the absence of class certification, injunctive relief extended only to the named plaintiff). The court's order denying the stay motion did not dispute this interpretation of the injunction. ROA.517-18.

*Heller*, 554 U.S. 570, 626-27 & n.26 (2008). Indeed, historical evidence demonstrates that states have long imposed restrictions on the purchase or possession of firearms by non-residents.

If the restrictions fall within the scope of the Second Amendment, they are subject at most to intermediate scrutiny because the in-state sales requirements "do[] not encroach on the core of the Second Amendment," and they do not impose a substantial burden on Second Amendment rights. *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012). The challenged laws simply require a prospective handgun buyer to receive a handgun from a dealer in his or her state of residence, which may involve a transaction fee, plus shipping costs. Such incidental costs are typical of "conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 627, and they are hardly a substantial burden that triggers strict scrutiny.

The in-state sales requirements easily satisfy intermediate scrutiny, because they are reasonably related to the government's important interests in preventing handgun crime and ensuring the effectiveness of state and local firearms regulations. The requirements are designed to prevent the serious problem of individuals circumventing state and local laws by crossing state lines to purchase a handgun. Requiring prospective buyers to receive handguns in their state of residence allows states to ensure enforcement of their own laws regarding the purchase and possession of handguns. Therefore, this Court should reverse the district court's decision and

hold that the in-state sales requirements are constitutional, both facially and as applied to the plaintiffs in this case.

The district court also erred in holding that the in-state sales requirements violate the equal protection guarantee of the Fifth Amendment's Due Process Clause. The requirements do not discriminate based on individual purchasers' residency: They treat all citizens the same by requiring them to purchase firearms through an in-state dealer. In any event, given the highly regulated context of firearms, residents and non-residents of any given state are not similarly situated. Rational-basis review, rather than strict scrutiny, applies, and the in-state sales requirements should be upheld under that standard.

## STANDARD OF REVIEW

This Court reviews the constitutionality of federal statutes de novo. *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 192 (5th Cir. 2012).

## ARGUMENT

## I. THE CHALLENGED LAWS ARE CONSISTENT WITH THE SECOND AMENDMENT.

This Court has adopted a two-step approach for determining whether a law comports with the Second Amendment. First, the Court asks "whether the conduct at issue falls within the scope of the Second Amendment right." *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir.

2012) (*ATF*).  If the law falls within the scope of the Second Amendment, then the Court applies the appropriate level of scrutiny, which "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right."  *Id.* at 195 (internal quotation marks omitted).

The district court erred at both steps of this analysis.  The in-state sales requirements are "conditions . . . on the commercial sale of arms" that are "presumptively lawful," and thus fall outside the scope of the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008).  Even if they are subject to Second Amendment analysis, however, only intermediate scrutiny is appropriate, because they do not burden the core Second Amendment right "to use arms in defense of hearth and home."  *ATF*, 700 F.3d at 205 (quoting *Heller*, 554 U.S. at 635).  The in-state sales requirements easily survive intermediate scrutiny because they are reasonably adapted to the important government interests of protecting the community from crime and ensuring the effectiveness of state and local firearms regulations.

### A.     The Challenged Laws Do Not Burden Second Amendment Rights.

In *Heller*, the Supreme Court made clear that the Second Amendment right to keep and bear arms is "not unlimited"; it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  554 U.S. at 626. The Court "identified the Second Amendment's central right as the right to defend oneself in one's home."  *ATF*, 700 F.3d at 194; *see also id.* at 193 (describing the

"central right" of the Second Amendment as "the 'right of law-abiding, responsible citizens to use arms in defense of hearth and home'") (quoting *Heller*, 554 U.S. at 635) (emphasis omitted). Applying this reasoning, the Court struck down a District of Columbia prohibition on the possession of usable handguns in the home. *Heller*, 554 U.S. at 574. The *Heller* Court was careful to note the limitations of its opinion, clarifying that that "nothing . . . should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. Such measures, the Court explained, are "presumptively lawful." *Id.* at 627 n.26.

The district court fundamentally misunderstood *Heller* in holding that the in-state sales requirements burden a Second Amendment right. The requirements do not implicate the core of the Second Amendment, and they are the very sort of "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms" that the Supreme Court deemed "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. Longstanding state laws confirm the historical pedigree of similar residency-based restrictions. Therefore, the in-state sales requirements should be upheld at step one of this Court's analysis. *ATF*, 700 F.3d at 196.

**1.** Plaintiffs identify no respect in which the in-state sales requirements implicate a Second Amendment right. The challenged laws in no way infringe the core

Second Amendment right "to use arms in defense of hearth and home." *ATF*, 700 F.3d at 193 (quoting *Heller*, 554 U.S. at 635). The in-state sales requirements do not prohibit anyone from possessing, carrying, or using firearms for self-defense anywhere, whether inside or outside the home. There is no support for the district court's conclusion that the laws implicate the "core" of the Second Amendment. ROA.477, GRE26.

The in-state sales requirements merely regulate the manner in which individuals purchase firearms. They allow buyers to purchase their firearms of choice, even if those firearms are sold by an out-of-state dealer. Buyers simply must complete the sales transaction through an in-state dealer. This is not a sales ban, but a condition on the commercial sale of firearms. Indeed, this is the very sort of "longstanding . . . condition[] and qualification[] on the commercial sale of arms" that the *Heller* Court deemed "presumptively lawful." 554 U.S. at 626-27 & n.26. The Court was no doubt aware that firearms sales conditions typically involve incidental costs, such as licensing fees or the $125 transfer fee of which plaintiffs complain. As this Court has explained, such "longstanding, presumptively lawful regulatory measure[s]" "likely fall outside the ambit of the Second Amendment," and thus may be upheld at step one of this Court's analysis. *ATF*, 700 F.3d at 196.

**2.** Historical evidence confirms that the challenged laws fall outside the scope of the Second Amendment, because the laws "harmonize[] with the historical traditions associated with the Second Amendment guarantee." *ATF*, 700 F.3d at 194.

Between 1909 and 1939, at least 16 states enacted laws restricting the acquisition, possession, or carrying of one or more types of firearms to state residents.[7] For example, a Michigan law provided that "[n]o person shall purchase a pistol" without a license, which was available only to individuals who had "resided in this state six months or more." Act of June 2, 1927, ch. 372, §§ 2, 6, 1927 Mich. Acts 887, 887-89 (reproduced at ROA.216-17, GRE56-57). Similarly, a Missouri law provided that "[n]o person . . . shall directly or indirectly buy, sell, borrow, loan, give away, trade, barter, deliver or receive, in this state, any pistol, revolver or other firearm of a size which may be concealed upon the person" unless such person had a permit authorizing the acquisition of the firearm. Act of April 7, 1921, § 2, 1921 Mo. Laws 692 (reproduced at ROA.215, GRE55). The permit was issued by "the circuit clerk of the county in which the applicant for a permit resides in this state," thereby making residency a precondition for a permit to purchase a firearm. *Id.*

The district court dismissed the relevance of this historical evidence, reasoning that "these early twentieth century state residency restrictions do not date back quite far enough to be considered longstanding." ROA.475, GRE24. Instead, the district court insisted upon "evidence of founding-era thinking that contemplated that

---

[7] West Virginia (1909); Georgia and Rhode Island (1910); New York and Oregon (1913); Montana (1919); Illinois and North Carolina (1919); Missouri (1921); Massachusetts (1922); Arkansas (1923); New Jersey (1924); Michigan (1927); Indiana (1935); Alabama (1937); and Maine (1939). *See* ROA.212-17, 393-97, GRE52-62 (reproducing text of laws).

interstate, geography-based, or residency-based firearm restrictions would be acceptable." *Id.* The district court's reasoning is mistaken for two reasons.

*First*, the Supreme Court and this Court have made clear that "evidence of founding-era thinking" is not required. As this Court has explained, "a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *ATF*, 700 F.3d at 196. Thus, in *Heller*, the Supreme Court described "prohibitions on the possession of firearms by felons" as "longstanding prohibitions" that are "presumptively lawful," 554 U.S. at 626-27 & n.26, even though "states did not start to enact [such laws] until the early 20th century," *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (*Heller II*); *see also ATF*, 700 F.3d at 196 ("*Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage."). Similarly, as this Court observed in *ATF*, the D.C. Circuit in *Heller II* "rel[ied] on early 20th-century state statutes to show that [a] D.C. handgun registration requirement was 'longstanding' and did not 'impinge upon the right protected by the Second Amendment.'" *ATF*, 700 F.3d at 196 (quoting *Heller II*, 670 F.3d at 1253-54). The district court's refusal to consider early-20th century laws is at odds with these decisions, which considered laws of the same vintage to be longstanding, presumptively lawful measures.

*Second*, the district court overlooked evidence from the founding era that supports the historical basis for the challenged laws. As this Court has observed, "gun

safety regulation was commonplace in the colonies." *ATF*, 700 F.3d at 200. Around the time of the founding, there were a variety of gun safety regulations in effect, including "laws keeping track of who in the community had guns" and "laws disarming certain groups and restricting sales to certain groups." *Id.* The in-state sales requirements protect the efficacy of such longstanding regulations by ensuring that individuals—including criminals and juveniles—cannot avoid the laws of their own state through "the simple expediency of crossing a State line to purchase one." H.R. Rep. No. 90-1577, at 14; *see also* S. Rep. No. 90-1097, at 80, 114. The challenged laws plainly "harmonize[] with the historical traditions associated with the Second Amendment guarantee." *ATF*, 700 F.3d at 194.

## B. Even If The Challenged Laws Implicate Second Amendment Rights, They Are Constitutional.

Even assuming that the challenged laws impinge upon a Second Amendment right, they easily satisfy intermediate scrutiny. The district court erred in applying strict scrutiny, because the in-state sales requirements do not infringe the central right of the Second Amendment and do not impose a substantial burden on Second Amendment rights. The district court also erred in holding that the laws fail intermediate and strict scrutiny.

### 1. Intermediate Scrutiny Is The Proper Standard Of Review.

This Court has squarely "reject[ed] the contention that every regulation impinging upon the Second Amendment right must trigger strict scrutiny." *ATF*, 700

F.3d at 198. The appropriate level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* at 195 (internal quotation marks omitted). Strict scrutiny applies to laws "that burden[] the core of the Second Amendment guarantee." *Id.* at 205. By contrast, regulations that "do[] not encroach on the core of the Second Amendment" are reviewed under intermediate scrutiny. *Id.* at 195.

The in-state sales requirements do not interfere with "the core of the Second Amendment," and thus are subject to only intermediate scrutiny. *ATF*, 700 F.3d at 195. As this Court has explained, the "central right" of the Second Amendment is "the right to defend oneself in one's home," *id.* at 194—or, stated differently, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 205 (quoting *Heller*, 554 U.S. at 635). The district court properly did not suggest that the challenged laws impede the ability of citizens to defend themselves in their own homes. *See National Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 348 (5th Cir. 2013) (applying intermediate scrutiny to Texas laws that prohibit those under 21 from carrying handguns in public, reasoning that the scheme "does not prevent those under 21 from using guns in defense of hearth and home" and "is not a complete ban on handgun use"). The in-state sales requirements do not prohibit the use or carrying of firearms inside (or outside) the home, but only impose a condition on the acquisition of firearms. Individuals remain free to purchase their handgun of choice "in [their] home state, which is presumptively the most convenient place to buy anything."

*United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (upholding constitutionality of 18 U.S.C. § 922(a)(3)). Potential buyers simply must arrange to transfer the firearms to an in-state dealer. *See id.* ("[Section] 922(a)(3) does not bar purchases from an out-of-state supplier if the gun is first transferred to a licensed gun dealer in the purchaser's home state."). These requirements "resemble 'laws imposing conditions and qualifications on the commercial sale of arms,' which *Heller* deemed 'presumptively lawful,'" and therefore "they must not trigger strict scrutiny." *ATF*, 700 F.3d at 206 (quoting *Heller*, 554 U.S. at 626-27 & n.26).

In *ATF*, this Court held that intermediate scrutiny "[u]nquestionably" applied to laws restricting the ability to acquire firearms, 700 F.3d at 205, and upheld federal prohibitions on the commercial sale of handguns to persons under the age of 21. *See id.* at 188. The Court reasoned that the restrictions "resemble 'laws imposing conditions and qualifications on the commercial sale of arms,' which *Heller* deemed 'presumptively lawful,'" and therefore "they must not trigger strict scrutiny." *Id.* at 206 (quoting *Heller*, 554 U.S. at 626-27 & n.26). This Court further explained that the laws "do not strike the core of the Second Amendment because they do not prevent 18-to-20-year-olds from possessing and using handguns 'in defense of hearth and home.'" *Id.* (quoting *Heller*, 554 U.S. at 628-30, 635). Although the laws surely made it more difficult for this age range to acquire handguns, the Court concluded that the individuals still "may possess and use handguns for self-defense, hunting, or any other

lawful purpose; they may acquire handguns from responsible parents or guardians; and they may possess, use, and purchase long-guns." *Id.* at 207. "Accordingly," this Court concluded, "the scheme is sufficiently bounded to avoid strict scrutiny." *Id.*

The conditions of commercial sale of firearms at issue here only modestly affect an individual's ability to acquire handguns, and they certainly "do not strike the core of the Second Amendment." *ATF*, 700 F.3d at 206. Individuals have ample alternative means to acquire a handgun—they simply must complete the transaction through an in-state dealer. *See id.* at 207 (reasoning that 18-to-20-year-olds still may acquire handguns from a parent or guardian). Moreover, the in-state sales requirements prevent no one "from possessing and using handguns 'in defense of hearth and home,'" and individuals still "may possess and use handguns for self-defense, hunting, or any other lawful purpose," as well as "possess, use, and purchase long-guns." *Id.* at 206-07 (quoting *Heller*, 554 U.S. at 628-30, 635).

As the Second Circuit held in *Decastro*, in upholding the constitutionality of the in-state sales requirement in § 922(a)(3), the need to transfer a firearm to one's home state is not a substantial burden. The court concluded that the statute "only minimally affects the ability to acquire a firearm" and declined to apply "any form of heightened scrutiny." 682 F.3d at 164. The court explained that the prohibition on transporting out-of-state firearms merely "requir[es] state residents to comply with conditions of sale and similar requirements in their home state." *Id.* at 168. Purchases from out-of-state suppliers are permitted, so long as "the gun is first transferred to a licensed gun

dealer in the purchaser's home state." *Id.* "In light of the ample alternative means of acquiring firearms for self-defense purposes," explained the court, "§ 922(a)(3) does not impose a substantial burden on the exercise of Decastro's Second Amendment rights." *Id.* The same reasoning applies here.

Plaintiffs do not argue that the challenged laws actually prevent them from acquiring firearms; they merely complain that the laws result in a transaction fee of $125 plus shipping costs. *See, e.g.*, ROA.249 (plaintiffs arguing that "[b]ecause they cannot directly access the national handgun market outside of Washington, D.C., the Hansons face higher costs in purchasing handguns"); ROA.250 (plaintiffs arguing that "the federal interstate handgun transfer ban . . . causes [plaintiffs] to sustain shipping and transfer fees when buying handguns"). This is not the sort of "substantial burden" that warrants strict scrutiny. A federal law that "makes the exercise of one's Second Amendment rights more expensive does not necessarily mean that it 'substantially burdens' that right." *Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013) (holding that a firearms licensing fee of just over $100 per year is not a substantial burden); *cf. Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 874 (1992) (plurality op.) ("The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.").

The district court incorrectly suggested that strict scrutiny is appropriate whenever challenged laws affect "law-abiding, responsible citizens." ROA.477-78,

GRE26-27.  Under that reasoning, all laws applicable to the general population would be subject to strict scrutiny, including licensing laws and restrictions on where firearms may be carried or used.  Such an approach cannot be reconciled with *Heller*, which described as "presumptively lawful" generally applicable laws such as prohibitions on "the carrying of firearms in sensitive places such as schools and government buildings."  554 U.S. at 626-27 & n.26.

The circumstances here bear no resemblance to those in *Carey v. Population Services International*, 431 U.S. 678 (1977), in which the Court struck down a New York law that limited the distribution of non-prescription contraceptives to licensed pharmacists who constituted "a small fraction of the total number of possible retail outlets," *id.* at 689, thereby eliminating some of the most convenient and private retail outlets for purchasing contraceptives, *see id.* (explaining that the law "reduce[d] the opportunity for privacy of selection and purchase"); *id.* at 689 n.7 (noting the limitation on "the number of regularly available, easily accessible retail outlets").  Here, by contrast, any burden on Second Amendment rights is insubstantial because individuals may purchase a handgun from any dealer in their state of residence, "which is presumptively the most convenient place to buy anything."  *Decastro*, 682 F.3d at 168.  The Court in *Carey* emphasized that the regulation was not related to the State's interest in protecting health.  431 U.S. at 689-90; *see also id.* at 689 (finding particularly relevant *Doe v. Bolton*, 410 U.S. 179 (1973), in which the Court struck down "a statute requiring that abortions be performed only in accredited hospitals, in the

absence of proof that the requirement was substantially related to the State's interest in protecting the patient's health").  Here, for the reasons already indicated and those discussed below, the challenged provision is plainly "substantially related," *id.* at 689, to the government's interests in preventing crime and ensuring the effectiveness of state and local firearms regulations.

## 2. The In-State Sales Requirements Satisfy Intermediate Scrutiny.

When applying intermediate scrutiny, this Court asks "whether there is a reasonable fit between the law and an important government objective." *ATF*, 700 F.3d at 207.  In other words, "the government must show that the law is reasonably adapted to an important government interest." *Id.*  The in-state sales requirements easily satisfy this standard, because they are reasonably adapted to the important government interests of preventing crime and ensuring the effectiveness of state and local firearms regulations.

**a.**  The government unquestionably has an important interest in protecting the community from crime.  *See Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.") (internal quotation marks omitted); *ATF*, 700 F.3d at 209 (recognizing the importance of "curbing violent crime").  As the district court recognized, "preventing handgun crime is a compelling interest."  ROA.479, GRE28.  The in-state sales requirements are key provisions of the Omnibus Crime Control Act and the Gun Control Act, which responded to the problem of "the rise in lawlessness and violent

crime in the United States," S. Rep. No. 89-1866, at 3—and, specifically, to "[t]he problem of firearms misuse in crimes of violence," S. Rep. No. 90-1097, at 76; *see also Huddleston v. United States*, 415 U.S. 814, 824 (1974) ("The principal purpose of the [1968] federal gun control legislation, therefore, was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.") (internal quotation marks omitted).

Ensuring the effectiveness of state and local laws aimed at crime prevention is likewise an important government interest. *Cf. United States v. Biswell*, 406 U.S. 311, 315 (1972) ("[S]crutiny of [interstate firearms] traffic is undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders."). Congress recognized that "existing Federal controls over [firearms] traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power." Omnibus Crime Control Act § 901(a)(1), 82 Stat. at 225. It thus sought to strengthen the ability of states and localities to effectively regulate firearms within their jurisdictions. *See id.* § 901(a)(3), 82 Stat. at 225 ("[O]nly through adequate Federal control over interstate and foreign commerce in these weapons . . . can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible."); H.R. Rep. No. 90-1577, at 6 (1968) (stating that the "principal purpose" of the Gun Control Act was "to strengthen Federal controls over

interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders").

**b.** The in-state sales requirements directly advance the government's interests in preventing crime and ensuring the effectiveness of state and local firearms regulations. After extensive investigation into firearms crime, Congress concluded that out-of-state handgun sales undermine state and local firearms laws and significantly contribute to crime. *See* Omnibus Crime Control Act § 901(a)(5), 82 Stat. at 225 ("[T]he sale or other disposition of concealable weapons . . . to nonresidents . . . has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions . . . ."); S. Rep. No. 90-1097, at 80 ("[T]he purchase of [handguns] by persons in other than their residence State is a serious contributing factor to crime."). Before 1968, there was a "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." S. Rep. No. 89-1866, at 19. These individuals included "large numbers of criminals and juveniles" who sought "to circumvent the laws of their respective jurisdictions." S. Rep. No. 90-1097, at 80. For example, many individuals with criminal records in the District of Columbia purchased handguns in a nearby Maryland county with "minimal" sales regulations. S. Rep. No. 89-1866, at 61. An overwhelming 87 percent of crime guns in Massachusetts were purchased out of state, thereby avoiding the Commonwealth's "stringent controls [on] the sale of firearms

and primarily handguns." S. Rep. No. 90-1097, at 77. In Michigan, 90 percent of crime guns confiscated in Detroit were "not purchased and registered in Michigan," and "the prime source of these crime guns [wa]s by purchases [in] neighboring Ohio, where controls on firearms [we]re minimal." *Id.*

In response to the problem of out-of-state handgun sales, Congress enacted the in-state sales requirements, which were "designed to prevent the avoidance of State and local laws controlling firearms by the simple expediency of crossing a State line to purchase one." H.R. Rep. No. 90-1577, at 14 (discussing 18 U.S.C. § 922(b)(3)); *see also* S. Rep. No. 90-1097, at 114 (same). These requirements ensure that handgun sales are finalized in a prospective purchaser's state of residence, thereby allowing the state to ensure enforcement of its own laws regarding the purchase and possession of handguns. These federal requirements are reasonably related to the government's important interest in protecting against crime and ensuring the effectiveness of state and local firearms regulations, because the government's interests "would be achieved less effectively absent [these laws]." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (internal quotation marks omitted) (applying intermediate scrutiny in First Amendment context).

Moreover, the "means chosen are not substantially broader than necessary to achieve" this important government interest. *Ward*, 491 U.S. at 800. The in-state sales requirements do not regulate the possession or use of a gun, but instead regulate the *sale* of out-of-state handguns. The restrictions continue to allow individuals to

purchase their firearm of choice; a buyer simply must arrange to transfer the firearm to an in-state dealer. Furthermore, the restrictions include an exception for the temporary loan or rental of firearms for lawful sporting purposes. 18 U.S.C. § 922(b)(3)(B).

In addition, the challenged laws do not "indiscriminately [restrict] the acquisition of all types of firearms," but instead target the handgun, which Congress found is "the most formidable and most frequently used tool of the criminal." S. Rep. No. 89-1866, at 4. "[I]n seeking to reduce the criminal use of firearms," Congress explained, "the legislation should especially concern itself with the particular type of weapon that is predominantly used by the criminal." *Id.* The "size, weight, and compactness" of the handgun "make it easy to carry, to conceal, to dispose of, or to transport." *Id.* "All these factors," Congress found, "make it the weapon most susceptible to criminal use." *Id.* Congress explained that the dangerousness of the handgun is underscored by the existence of many state laws controlling the handgun, as well as statistics "showing its dominance as the weapon used in unlawful activities." *Id.* For example, statistics showed that handguns were used in 70 percent of murders committed with firearms, *id.* at 5, and in 78 percent of the firearm-related homicides of police officers killed in the line of duty, *see Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 873

(1967).[8]  Congress thus concluded that "concealable weapons" presented a particular challenge for state and local law enforcement authorities.  Omnibus Crime Control Act § 901(a)(2), (4), (5), (6), 82 Stat. at 225.

Today, handguns continue to pose a disproportionate threat to public safety.  According to FBI homicide statistics, handguns were the weapon involved in at least 70 percent of firearm homicides from 2009 to 2013.  *See* Crim. Justice Info. Servs. Div., FBI, *Crime in the United States 2013: Expanded Homicide Data*, tbl. 8.[9]  And handguns were used in 73 percent of firearm-related felony homicides of law enforcement officers killed in the line of duty from 2004 to 2013.  *See* Crim. Justice Info. Servs. Div., FBI, *2013 Law Enforcement Officers Killed and Assaulted*, tbl. 27.[10]

**c.**  The district court's application of intermediate and strict scrutiny turned largely on its assumption that less restrictive means are available to achieve the government's interests.  But under intermediate scrutiny, the law at issue "must merely be reasonably adapted to its [important] objective."  *McCraw*, 719 F.3d at 349.

---

[8] *Available at* http://congressional.proquest.com/congressional/result /pqpresultpage.gispdfhitspanel.pdflink/http%3A$2f$2fprod.cosmos.dc4.bowker-dmz.com$2fapp-bin$2fgis-hearing$2fb$2f9$2fc$2fc$2fhrg-1967-sjs-0031_from_1_to_1190.pdf/entitlementkeys=1234%7Capp-gis%7Chearing%7Chrg-1967-sjs-0031 (last visited July 9, 2015).

[9]    *Available    at*    https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/offenses-known-to-law-enforcement/expanded-homicide/expanded_homicide_data_table_8_murder_victims_by_weapon_2009-2013.xls (last visited July 9, 2015).

[10]    *Available    at*    https://www.fbi.gov/about-us/cjis/ucr/leoka/2013/ tables/table_27_leos_fk_type_of_weapon_2004-2013.xls (last visited July 9, 2015).

The government "need not employ the least restrictive means to achieve its goal." *Id.* In any event, as discussed below, the district court's other suggested means would not effectively achieve the government's goals, and thus would not even suffice to invalidate the laws under strict scrutiny. *See Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1671-72 (2015) (holding that state judicial-conduct rule survives strict scrutiny in First Amendment context where less restrictive means would be unworkable, and noting that laws need only be "narrowly tailored, not . . . perfectly tailored") (internal quotation marks omitted).

The district court questioned whether the in-state sales requirements are still "necessary" in light of the development of the National Instant Criminal Background Check System (the "federal background check system"), ROA.482-83 & n.10, GRE31-32—an issue that was barely mentioned in plaintiffs' briefing below, *see* ROA.275, ROA.441. The court's skepticism was based on the false assumption that the federal background check system ensures full compliance with state and federal law. *See, e.g.*, ROA.482, GRE31 ("Current law . . . ensures potential purchasers can legally acquire and possess a firearm under state and federal law.").

But many state firearms requirements are neither included in, nor verified by, the federal background check system. The federal system reveals only whether federal or state law prohibits an individual from receiving or possessing a firearm. 18 U.S.C. § 922(t)(2). States may impose additional requirements for purchasing or possessing a firearm, such as training and special permits for purchasers or residents in that state.

GAO Firearms Identification Report 1-2. The federal background check system is unable to determine whether a prospective purchaser satisfies these requirements. *See* Operations Report 1-2 (describing data included in each federal database). Nor does the federal background check system provide information regarding the legality of a particular type of firearm in a given state. *See id.* States also may require additional procedures and mandatory waiting periods before a transaction may occur. GAO Firearms Identification Report 1-2. The individual dealer is responsible for ensuring that all of these requirements are satisfied. Requiring a handgun to be purchased in the buyer's state of residence allows states to police dealers' compliance with a host of state regulations.

Moreover, the federal background check system reveals disqualifying information only "to the extent automated records are available." *See* GAO Testimony 5; *see also* Presidential Memorandum, *Improving Availability of Relevant Executive Branch Records to the National Instant Criminal Background Check System*, 78 Fed. Reg. 4297, 4297 (Jan. 16, 2013) ("The ability of the [federal background check system] to determine quickly and effectively whether an individual is prohibited from possessing or receiving a firearm depends on the completeness and accuracy of the information made available to it by Federal, State, and tribal authorities."). The system may not include all information that is available in the prospective purchaser's home state. *See* FBI Statement; GAO Testimony 5-6. Some states have "additional databases or records available within their state, which cannot be accessed by or

shared with other states or the FBI" for a variety of reasons. GAO Testimony 7. For example, states may face logistical and budgetary constraints in submitting information, and they may have privacy laws that prevent sharing of certain records. *See* FBI Statement. Therefore, "[i]nformation about a person's contacts with law enforcement, mental health status, alcohol and drug use, and domestic violence history is simply more likely to be found in the jurisdiction where that person resides." *Peterson v. LaCabe*, 783 F. Supp. 2d 1167, 1175 (D. Colo. 2011), *aff'd sub nom. Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013). Particularly when a purchaser lives in a Point of Contact state, which conducts its own search of state records, the in-state sales requirements ensure that a background check examines all available state and local records in the purchaser's home state, where such records are most likely to exist.

The district court erroneously assumed that it would be feasible and effective for out-of-state dealers to research the handgun laws of a buyer's home state and ensure that the sale complies with the home state's laws. As an initial matter, if the district court's decision were upheld, there would be no federal requirement that handgun sales comply with the laws of the purchaser's state of residence; section 922(b)(3), which was invalidated by the district court, imposes this requirement with respect to long guns only. 18 U.S.C. § 922(b)(3)(A). Even assuming the existence of such a requirement for handguns, it is unrealistic to expect dealers to research and correctly apply the various laws of 49 states, the District of Columbia,

and U.S. territories—including the frequent amendments to those laws—in addition to their own state firearms regulations. The district court noted that dealers have been responsible for "verify[ing] and conform[ing] to numerous state firearms laws for rifles and shotguns," ROA.484 n.12, GRE33, but handgun regulations are far more extensive and varied than long gun laws. For example, several states require a mandatory waiting period for the purchase of handguns, but not for long guns. *See, e.g.*, Fla. Const. art. I, § 8(b); Fla. Stat. § 790.0655(1); Md. Code Ann., Pub. Safety § 5-123;[11] Wis. Stat. § 175.35(2)(d). Additionally, several jurisdictions limit the number of handgun purchases to one per month, but impose no such restriction on the purchase of long guns. *See, e.g.* Cal. Penal Code §§ 27535, 27540(f); Md. Code Ann., Pub. Safety §§ 5-128(a), (b), 5-129; N.J. Stat. Ann. §§ 2C:58-2(a)(7), 2C:58-3(i), 2C:58-3.4. Ensuring compliance with such laws is critical, particularly in light of the "dominance" of the handgun as "the weapon used in unlawful activities," S. Rep. No. 89-1866, at 4.

\* \* \*

In sum, the in-state sales requirements do not burden a core Second Amendment right, but rather are "presumptively lawful" "conditions . . . on the commercial sale of arms." *Heller*, 554 U.S. at 626-27 & n.26. Even assuming that these requirements fall within the scope of the Second Amendment, they easily satisfy

---

[11] The Maryland waiting period applies to the transfer of "regulated firearms," which are defined as handguns and assault weapons, Md. Code Ann., Pub. Safety § 5-101, but the transfer of assault weapons is generally banned, Md. Code Ann., Crim. Law § 4-303.

intermediate scrutiny, because they are reasonably adapted to the government's important interests in preventing crime and ensuring the effectiveness of state and local firearms regulations. The requirements are constitutional, both facially and as applied to the plaintiffs in this case.

## II. THE CHALLENGED LAWS ARE CONSISTENT WITH THE RIGHT TO EQUAL PROTECTION OF THE LAWS UNDER THE FIFTH AMENDMENT.

The district court erred in holding that the in-state sales requirements violate the equal protection component of the Fifth Amendment. ROA.490, GRE39; *see also Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). To establish an equal protection claim, a plaintiff "must show that two or more classifications of similarly situated persons [are] treated differently." *Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012). "Once this element is established, the court must then determine the appropriate level of scrutiny." *Id.* Strict scrutiny applies "only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar advantage of a suspect class." *ATF*, 700 F.3d at 211 (quoting *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976)). Otherwise, courts ask only whether the "classification in question is rationally related to a legitimate state interest." *Id.* at 212 (quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83 (2000)); *McCraw*, 719 F.3d at 350. The district court erroneously assumed that the in-state sales requirements discriminate between similarly situated individuals. In addition, the district court should have applied rational-basis review, rather than strict scrutiny, because the

restrictions do not impermissibly interfere with a fundamental right or implicate a suspect class.

Plaintiffs claim that the in-state sales requirements discriminate against handgun purchasers based on their residence. *See* ROA.455, GRE49 (alleging that the challenged laws "ban the sale and keeping of handguns to otherwise qualified individuals solely on account of their residence, while allowing other equally-qualified individuals to purchase and keep the same handguns"). But as an initial matter, the federal requirements do not discriminate based on residency at all. Any differential treatment between residents and non-residents of a particular state is the product of state, rather than federal law; all individuals are treated the same with respect to federal law. A resident of any state can purchase from an in-state firearms dealer or order a firearm to be transferred to an in-state firearms dealer.

Even accepting plaintiffs' characterization of the law, however, prospective handgun purchasers who reside in one state are not similarly situated to those who reside in a different state. *See National Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 215 (5th Cir. 2011) ("[Equal protection] does not require classes of people different in fact or opinion to be treated in law as though they were the same.") (internal quotation marks omitted). Different laws govern the purchase, use, and possession of handguns in each state, and it cannot be presumed that out-of-state dealers will accurately interpret the complex laws of other states where buyers reside. *See supra* pp. 36-37. In addition, states have greater access to information regarding

39

their own residents, and this information is highly relevant to determining whether an individual is eligible to purchase a handgun. *See Peterson*, 783 F. Supp. 2d at 1178 (rejecting plaintiff's equal-protection challenge to residency requirement for a concealed weapons permit because "residents and non-residents are not similarly situated in terms of the state's ability to obtain information about and monitor the potential licensee's eligibility for a concealed weapons permit"); *see also supra* pp. 35-36. In this highly regulated context, residents and non-residents of any given state are not similarly situated.

Even assuming that residents and non-residents are similarly situated, however, the challenged laws would be subject only to rational-basis review. As discussed above, the restrictions "do not impermissibly interfere with Second Amendment rights," and thus do not "interfere[] with the exercise of a fundamental right." *ATF*, 700 F.3d at 211-12 (rejecting equal protection challenge to federal prohibition on the sale of handguns to persons under the age of 21); *see also McCraw*, 719 F.3d at 350 (rejecting equal protection challenge to Texas laws prohibiting 18- to 20-year-olds from carrying handguns in public).

Nor do the residency restrictions draw classifications based on a suspect class. The district court erred in concluding that all residency-based distinctions are inherently suspect, ROA.489-90, GRE38-39, even though plaintiffs explicitly declared that they "do not contend that non-state residents constitute a suspect class for purposes of equal protection analysis," ROA.276; *see, e.g., Martinez v. Bynum*, 461 U.S.

321, 328 n.7 (1983) ("A bona fide residence requirement implicates no 'suspect' classification, and therefore is not subject to strict scrutiny.").  In the cases cited by the district court, residency-based distinctions were subject to strict scrutiny only because they interfered with the "right to migrate" to and settle in a state.  *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 911 (1986); *Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 261-62 (1974).  No such right is at issue in this case.  The in-state sales requirements simply require individuals to purchase handguns in their state of residence, wherever that state may be.

Under rational-basis review, legislation is constitutional "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the government's actions were irrational." *ATF*, 700 F.3d at 212 (quoting *Kimel*, 528 U.S. at 84).  Here, as discussed above, the in-state sales requirements are directly related to the government's important goals of crime prevention and ensuring the effectiveness of state and local firearms laws.  *See supra* pp. 28-37.  It follows that the requirements "are rationally related to . . . legitimate state interest[s]." *ATF*, 700 F.3d at 212 (concluding that federal age restrictions survive rational-basis review "[f]or the same reasons that the challenged laws are reasonably adapted to an important state interest").  This Court should reverse the district court's decision that the in-state sales requirements violate the Fifth Amendment.

# CONCLUSION

For the foregoing reasons, the district court's order granting summary judgment to plaintiffs and denying summary judgment to the government should be reversed.

Respectfully submitted,

BENJAMIN C. MIZER
   *Principal Deputy Assistant Attorney*
    *General*

JOHN R. PARKER
   *Acting United States Attorney*

MARK B. STERN
   (202) 514-5089
MICHAEL S. RAAB
   (202) 514-4053
TARA S. MORRISSEY
   (202) 353-9018
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7261*
   *U.S. Department of Justice*
   *950 Pennsylvania Ave., N.W.*
   *Washington, D.C.  20530*

JULY 2015

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2015, I filed the foregoing Brief by causing a digital version to be filed electronically via the ECF system. The participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*/s/ Tara S. Morrissey*
Tara S. Morrissey
Tara.S.Morrissey@usdoj.gov
Counsel for Appellants

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that the foregoing brief was prepared using Microsoft Word 2010 and complies with the type and volume limitations set forth in Rule 32 of the Federal Rules of Appellate Procedure. I further certify that the font used is 14 point Garamond, for text and footnotes, and that the computerized word count for the foregoing brief (excluding exempt material) is 10,093.

I further certify that 1) all required privacy redactions have been made; 2) the electronic submission is an exact copy of the paper copy; and 3) the document is free from viruses and has been scanned by Microsoft Forefront Endpoint Protection, version 1.201.1583.0.


*/s/ Tara S. Morrissey*
Tara S. Morrissey
Tara.S.Morrissey@usdoj.gov
Counsel for Appellants

# ADDENDUM

# ADDENDUM CONTENTS

18 U.S.C. § 922(a)(3) ................................................................. ADD-1

18 U.S.C. § 922(b)(3) ................................................................. ADD-1

27 C.F.R. § 478.99(a) ................................................................. ADD-2

## 18 U.S.C. § 922 – Unlawful Acts

(a) It shall be unlawful—

* * * *

(3) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter;

* * * *

(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver—

* * * *

(3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

* * * *

**27 C.F.R. § 478.99 – Certain prohibited sales or deliveries.**

(a)   *Interstate sales or deliveries.* A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in (or if a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business or activity is located: *Provided*, That the foregoing provisions of this paragraph (1) shall not apply to the sale or delivery of a rifle or shotgun (curio or relic, in the case of a licensed collector) to a resident of a State other than the State in which the licensee's place of business or collection premises is located if the requirements of § 478.96(c) are fully met, and (2) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes (see § 478.97).

* * * *