No. 15-10311

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

FREDERIC RUSSELL MANCE, JR.; TRACEY AMBEAU HANSON; ANDREW HANSON; CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS,

Plaintiffs-Appellees,

v.

LORETTA LYNCH, U.S. ATTORNEY GENERAL; THOMAS E. BRANDON, ACTING DIRECTOR, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES,

Defendants-Appellants.

On Appeal from the United States District Court for the Northern District of Texas, Civil Action No. 4:14-cv-539

## BRIEF OF *AMICUS CURIAE* THE LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF APPELLANTS AND REVERSAL

JOHN W. SORRENTI
COVINGTON & BURLING LLP
ONE CITYCENTER
850 TENTH STREET NW
WASHINGTON, DC 20001
TELEPHONE: 202-662-6000

Attorney for *Amicus Curiae* the Law Center to Prevent Gun Violence

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, the Law Center to Prevent Gun Violence states that it has no parent corporations.  It has no stock, and therefore no publicly held company owns 10% or more of its stock.

**Table of Contents**

Page

INTEREST OF *AMICUS CURIAE*............................................................. 1

INTRODUCTION ................................................................................. 2

ARGUMENT ....................................................................................... 3

I.    THE DISTRICT COURT'S ANALYSIS FAILED TO CONSIDER CRITICAL DATA SUPPORTING THE IN-STATE FFL REQUIREMENT.......................................................................... 3

    A.    The In-State FFL Requirement Is Important in the Face of Ongoing Interstate Crime Gun Trafficking.......................................... 4

    B.    Eliminating the In-State FFL Requirement Would Significantly Undermine State Efforts to Combat Illegal Gun Sales and Trafficking............................................................................ 8

        1.    Laws allowing or requiring state officials to inspect FFLs ....... 8

        2.    Laws allowing for state-level prosecution of gun trafficking activities ............................................................... 10

    C.    The Inconsistency of Gun Laws in Different States Further Highlights the Importance of the In-State FFL Requirement. ........... 12

    D.    The District Court Erred in Assuming that Out-Of-State FFLs Have the Capacity to Research and Accurately Apply Unfamiliar Gun Laws from Every Other State. ................................. 14

II.    THE CHALLENGED LAWS DO NOT FALL WITHIN THE SCOPE OF THE SECOND AMENDMENT. .......................................................... 18

    A.    The Challenged Laws Do Not Burden Second Amendment Rights.............................................................................. 19

    B.    The Challenged Laws are Presumptively Valid and Harmonize with the History of Arms Regulation in this Country....................... 22

i

III. EVEN IF THE CHALLENGED LAWS IMPLICATE THE SECOND AMENDMENT, THEY REMAIN CONSTITUTIONAL. .......................... 25

    A.    If Heightened Scrutiny is Necessary in Evaluating This Challenge, Strict Scrutiny is Not Appropriate. ................................... 25

    B.    Intermediate Scrutiny Was the Appropriate Level of Review and is Generally Applicable in the Second Amendment Context. ............................................................................................ 28

    C.    The Challenged Laws Satisfy Intermediate Scrutiny......................... 29

CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bauer v. Harris*,
--- F. Supp. 3d ---, 2015 WL 881515 (E.D. Cal. Mar. 2, 2015) ........................22

*Bonidy v. U. S. Postal Serv.*,
--- F.3d ----, 2015 WL 3916547 (10th Cir. June 26, 2015) ...............................26

*Dearth v. Lynch*,
 --- F.3d ----, 2015 WL 3851905 (D.C. Cir. June 23, 2015)..............................24

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................................*passim*

*Drake v. Filko*,
724 F.3d 426 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2134 (2014)...................23

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011)..................................................................23, 26

*Heller v. District of Columbia*,
698 F. Supp. 2d 179 (D.D.C. 2010)..................................................................27

*Jackson v. City & Cnty. of San Francisco*,
746 F.3d 953 (9th Cir. 2014), *cert. denied*, --- S. Ct. --- (June 8,
2015) .................................................................................................................26

*Kachalsky v. Cnty. of Westchester*,
701 F.3d 81 (2d Cir. 2012) ..............................................................................26

*Kelley v. Johnson*,
425 U.S. 238 (1976)..........................................................................................26

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001)..........................................................................................30

*Mance v. Holder*,
    --- F. Supp. 3d ----, 2015 WL 567302, at *11 (N.D. Tex. Feb. 11,
    2015) ................................................................................................*passim*

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ................................................................1, 26

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,*
    *Firearms, & Explosives ("NRA v. ATF"),*
    700 F.3d 185 (5th Cir. 2012) ................................................*passim*

*NRA v. McCraw*,
    719 F.3d 338 (5th Cir. 2013) ............................................................29

*Peña v. Lindley*,
    No. 2:09–CV–01185–KJM–CKD, 2015 WL 854684 (E.D. Cal.
    Feb. 27, 2015) ..................................................................................22

*Tyler v. Hillsdale Cnty Sheriff's Dep't*,
    775 F.3d 308 (6th Cir. 2014) (*Rehearing en Banc Granted,*
    *Opinion Vacated* (Apr. 21, 2015)) ..................................................27

*United States v. Decastro*,
    682 F.3d 160 (2d Cir. 2012) ................................................18, 21, 28

*United States v. Focia*,
    No. 2:15cr17-AKK, 2015 WL 3672161 (M.D. Ala. June 12, 2015) ................21

*United States v. Huitron-Guizar*,
    678 F.3d 1164 (10th Cir. 2012) ......................................................26

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ........................................................25, 27

*United States v. Skoien*,
    587 F.3d 803 (7th Cir. 2009) ..........................................................27

*United States v. Williams*,
    616 F.3d 685 (7th Cir. 2010) ..........................................................26

*Woollard v. Gallagher*,
    712 F.3d 865 (4th Cir. 2013) ..........................................................26

**Statutes**

27 C.F.R. § 478.99(a)................................................................2

18 U.S.C. § 922 (a)(3), (b)(3) .................................................2

Cal. Code Regs. tit. 11, § 4200 et seq. ................................16

Cal. Penal Code § 23635(a) ...................................................15

Cal. Penal Code §§ 26815(a), 27540(a)................................16

Cal. Penal Code §§ 26840, 27540, 31610-31835 ................15

Cal. Penal Code § 26845 .......................................................15

Cal. Penal Code §§ 26850-26859, 27540(e), 31615............15

Cal. Penal Code § 28180 .......................................................16

Cal. Penal Code § 28205 .......................................................15

Cal. Penal Code §§ 31900-32110 .........................................15

Fed. R. App. P. 29(c)(5)...........................................................1

Fed. R. App. P. 32(a)(5)........................................................32

Fed. R. App. P. 32(a)(6)........................................................32

Fed. R. App. P. 32(a)(7)(B)(iii) ............................................32

**Other Authorities**

*A Review of the Bureau of Alcohol, Tobacco, Firearms and Explosives*
   *and a Proposal to Merge It with the Federal Bureau of*
   *Investigation* 9 (Spring 2015), *available at*:
   https://cdn.americanprogress.org/wp-
   content/uploads/2015/05/ATF-report-webfinal.pdf ............9

Daniel Webster et. al., *Effects of State-Level Firearm Seller*
   *Accountability Polices on Firearm Trafficking*, 86 J. of Urban
   Health 525, 525, 527-530 (May 2009). ................................8

James V. Grimaldi & Sari Horwitz, *Industry Pressure Hides Gun Traces, Protects Dealers from Public Scrutiny*, Washington Post, Oct. 24, 2010, *available at*: http://www.washingtonpost.com/wp-dyn/content/article/2010/10/23/AR2010102302996.html?sid=ST2010102304311 ..............................................................................6, 9

Law Center to Prevent Gun Violence, *Annual Gun Law State Scorecard 2014* (2014), *available at* http://gunlawscorecard.org/ ......................4

Law Center to Prevent Gun Violence, *Dealer Regulations in California* (Jan. 12, 2015), *available at*: http://smartgunlaws.org/dealer-regulations-in-california ...................................13

Law Center to Prevent Gun Violence, *Dealer Regulations in Nevada* (Jan. 1, 2012), *available at*: http://smartgunlaws.org/dealer-regulations-in-nevada..........................................................................13

Law Center to Prevent Gun Violence, *Dealer Regulations Policy Summary* (Sept. 13, 2013), *available at* http://smartgunlaws.org/dealer-regulations-policy-summary ..............................9

Law Center to Prevent Gun Violence, *Texas State Law Summary* (July 9, 2015), *available at* http://smartgunlaws.org/texas-state-law-summary..............................................................................................16

Philip J. Cook & Kristin A. Goss, *The Gun Debate: What Everyone Needs to Know* 13 (2014)...................................................................18

Press Release, Office of Senator Kristen Gillibrand, Senators Gillibrand, Kirk Introduce First Bipartisan Gun Safety Bill Of New Congress (Jan. 30, 2013), *available at* http://www.gillibrand.senate.gov/newsroom/press/release/senators-gillibrand-kirk-introduce-first-bipartisan-gun-safety-bill-of-new-congress...........................................................................................5

*Trace the Guns, The Link Between Gun Laws and Interstate Trafficking* 4 (Sept. 2010), *available at* http://www.tracetheguns.org/report.pdf......................................................*passim*

U.S. Dep't of Justice, Office of Inspector General Evaluation and
Inspections Division, Inspection of Firearms Dealers by the Bureau
of Alcohol, Tobacco, Firearms and Explosives i (July 2004),
*available at*
http://www.justice.gov/oig/reports/ATF/e0405/final.pdf....................................6

U.S. Dep't of Justice, Office of the Inspector General Evaluation and
Inspections Division, Review of ATF's Federal Firearms Licensee
Inspection Program 1 (Apr. 2013), *available at*
http://www.justice.gov/oig/reports/2013/e1305.pdf.....................................9, 10

U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco and Firearms,
Following the Gun: Enforcing Federal Laws Against Firearms
Traffickers x (June 2000), *available at*
https://www.atf.gov/file/11876/download...........................................................6

*Amicus curiae* the Law Center to Prevent Gun Violence ("the Law Center")

is a non-profit, national law center dedicated to reducing gun violence and the

devastating impact it has on communities. The Law Center focuses on providing

comprehensive legal expertise to promote smart gun laws. These efforts include

tracking all Second Amendment litigation nationwide and providing support to

jurisdictions facing legal challenges. As an *amicus*, the Law Center has provided

informed analysis in a variety of firearm-related cases, including *District of

Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561

U.S. 742 (2010).

The Law Center also tracks and analyzes all firearms legislation at the state

and federal levels, and is intimately familiar with studies and statistics regarding

crime gun trafficking patterns[2] and efforts to address this significant, ongoing

problem. As a result of its expertise, the Law Center has a particular interest in the

present case, which implicates the complex relationship between federal and state

gun laws. An understanding of how this interplay relates to efforts to reduce

illegal gun sales and trafficking is critical to the proper resolution of this case, and

---

[1] Amicus curiae make the following disclosure pursuant to Fed. R. App. P. 29(c)(5): no party's counsel authored this brief in whole or in part. No party, party's counsel, nor any other person contributed any money to fund the preparation or submission of this brief, other than amicus curiae. All parties have consented to the filing of this brief.

[2] "Trafficking" refers to the diversion of guns from lawful commerce into the illegal market.

the Law Center seeks to aid the Court by providing its informed perspective on these issues.

## INTRODUCTION

The district court committed several critical errors in finding that the challenged laws unconstitutionally burden Second Amendment rights. The opinion's flaws are encapsulated by the district court's misguided and misleading characterization of the federal laws at issue as the "interstate handgun transfer ban." The challenged laws do no such thing. Responsible, law-abiding individuals seeking to purchase a handgun from an out-of-state federal firearms licensee ("FFL") may absolutely do so. The challenged laws, first enacted in 1968, merely require that the transaction be completed through an FFL that operates in the purchaser's state of residence. *See* 18 U.S.C. § 922 (a)(3), (b)(3); 27 C.F.R. § 478.99(a).[3] Contrary to the district court's characterization, these laws impose no "ban" on the purchase and use of firearms for self-defense.

Throughout its analysis, the district court made conclusions based on an incomplete understanding of present-day interstate gun trafficking patterns and the vital role played by the in-state FFL requirement in supporting states that have chosen to address illegal handgun sales and related trafficking. Moreover, the court utterly ignored reality in assuming that out-of-state dealers would have the

---

[3] This brief refers to the challenged laws collectively as the "in-state FFL requirement."

ability to research, understand, and accurately apply the various handgun sale

requirements of every other state.  This brief addresses these issues first, as they

provide useful context for understanding the case as a whole.  However, no less

important are the critical legal errors made by the court in its Second Amendment

analysis.

Armed with an incomplete understanding of the function and purpose of the

challenged laws, the district court erroneously concluded that they burden conduct

protected by the Second Amendment.  This represented a dramatic expansion of

the Second Amendment right far beyond the holding in *Heller*.  Similarly, the

district court's improper selection and application of strict scrutiny demonstrated a

misunderstanding of the in-state FFL requirement and its substantial relationship to

the important government interest of reducing handgun-related crime and violence.

If allowed to stand, the district court's opinion would severely undermine

state efforts to reduce illegal handgun sales and trafficking, while drastically —

and improperly — expanding the Second Amendment right recognized in *Heller*.

**ARGUMENT**

## I.   THE DISTRICT COURT'S ANALYSIS FAILED TO CONSIDER CRITICAL DATA SUPPORTING THE IN-STATE FFL REQUIREMENT.

The district court failed to properly consider evidence that crime guns flow

from states with weak gun laws to states with stronger laws.  Against a backdrop of

weak state and federal firearm regulations, several states have enacted their own laws to reduce illegal handgun sales and trafficking. Striking down the in-state FFL requirement would undermine these efforts by allowing criminals and traffickers to more easily cross states lines in order to purchase handguns in states with minimal restrictions.[4]

Moreover, given the huge variety of conditions and requirements imposed by the different states with respect to handgun sales, the district court clearly erred in relying on the overly simplified fiction that FFLs could research, understand, and implement the laws of every other state.

### A.     The In-State FFL Requirement Is Important in the Face of Ongoing Interstate Crime Gun Trafficking.

The district court failed to recognize that the "serious problem of individuals going across state lines to obtain firearms," which the Government cited as a justification for the challenged laws,[5] is an ongoing problem. Rather, the court downplayed the Appellants' concerns, stating that "it appears Defendants rely on statistics from the 1968 Senate Report to support the continued need for an in-state FFL." *Mance v. Holder*, --- F. Supp. 3d ----, 2015 WL 567302, at *11 (N.D. Tex.

---

[4] Last year, no less than 27 states received an "F" grade from the Law Center based on weak firearm regulations. *See* Law Center to Prevent Gun Violence ("LCPGV"), *Annual Gun Law State Scorecard 2014* (2014), *available at* http://gunlawscorecard.org/.

[5] Br. for Def. in Supp. of Mot. for Summ. J. at 3, *Mance*, 2015 WL 567302, at *9 (quoting S.Rep. No. 89-1866, at 19 (1966)).

Feb. 11, 2015).  According to the court, the federal laws currently in place — such as a background check requirement for individuals who buy guns from FFLs — are enough to address the current problem of interstate trafficking.  *Id.*  However, a full understanding of the present situation establishes that now, as much as in 1968, the in-state FFL requirement is a necessary tool for stemming the flow of interstate crime guns.

To fully appreciate this, it is necessary to examine the existing federal system for addressing gun trafficking.  First, there is no clear and effective federal statute that criminalizes gun trafficking.[6]  The few federal laws that do address trafficking, such as the prohibition on straw purchases[7] and regulations relating to FFL oversight, are undermined by a lack of enforcement.  Laws regulating FFLs are important in this context because FFLs are a major source of trafficked firearms.  A 2000 ATF report found that FFLs "were associated with the largest number of diverted firearms — over 40,000 guns, nearly *half* of the total number

---

[6] Senators Gillibrand and Kirk introduced a bill in 2013 to make gun trafficking a federal offense, noting that "[t]he absence of any federal law defining gun trafficking in this country is shocking." *See* Press Release, Office of Senator Kristen Gillibrand, Senators Gillibrand, Kirk Introduce First Bipartisan Gun Safety Bill Of New Congress (Jan. 30, 2013), *available at* http://www.gillibrand.senate.gov/newsroom/press/release/senators-gillibrand-kirk-introduce-first-bipartisan-gun-safety-bill-of-new-congress.

[7] A straw purchase occurs when a firearm is purchased by one person on behalf of another who is prohibited from possessing firearms.

of trafficked firearms documented" during the two-year study period.[8]  The report

concluded that "FFLs' access to large numbers of firearms makes them a particular

threat to public safety when they fail to comply with the law."[9]

Complicating matters, the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF"), the agency tasked with enforcement of these generally weak

laws, is significantly limited in its ability to investigate and prosecute trafficking

activity.  A 2004 report by the Office of the Inspector General ("OIG") concluded

that ATF's program for inspecting FFLs was "not fully effective for ensuring that

FFLs comply with federal firearms laws because inspections are infrequent and of

inconsistent quality, and follow-up inspections and adverse actions have been

sporadic."[10]  A Washington Post investigation in 2010 confirmed that ATF's

efforts have been hindered by a lack of sufficient funding, as well as limitations on

the use of crime gun trace data.[11]

---

[8] U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco and Firearms, Following the Gun: Enforcing Federal Laws Against Firearms Traffickers x (June 2000), *available at* https://www.atf.gov/file/11876/download (emphasis added).

[9] *Id.*

[10] U.S. Dep't of Justice, Office of Inspector General Evaluation and Inspections Division, Inspection of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives i (July 2004), *available at* http://www.justice.gov/oig/reports/ATF/e0405/final.pdf.

[11] James V. Grimaldi & Sari Horwitz, *Industry Pressure Hides Gun Traces, Protects Dealers from Public Scrutiny*, Washington Post, Oct. 24, 2010, *available at*: http://www.washingtonpost.com/wp-dyn/content/article/2010/10/23/AR2010102302996.html?sid=ST2010102304311.

Although several states have attempted to fill this void by enacting laws to regulate gun dealers and otherwise combat trafficking, the large majority of states have done little or nothing. The consequence of this patchwork system is that crime guns flow readily from states with weaker gun laws to states with stronger laws. A 2010 report by Mayors Against Illegal Guns ("MAIG")[12] used ATF crime gun trace data to study the connection between state gun laws and interstate trafficking and found that, in 2009, more than 43,000 traced crime guns had been purchased in one state and recovered in another—almost a third of the guns traced that year.[13] In addition, the report found that "[t]here is a strong association between a state's gun laws and that state's propensity to export crime guns," with just ten states supplying "nearly half" of the "guns that crossed state lines before being recovered in crimes."[14]

States with stronger gun laws are particularly vulnerable to interstate trafficking. In 2009, for example, more than half of the crime guns recovered and traced in Illinois, and *more than 98%* of those recovered in the District of Columbia, were originally sold in another state.[15] This data, combined with the

---

[12] Now Everytown for Gun Safety.

[13] MAIG, *Trace the Guns, The Link Between Gun Laws and Interstate Trafficking* 4 (Sept. 2010), *available at* http://www.tracetheguns.org/report.pdf ("Trace the Guns").

[14] *Id.* at 2-3.

[15] *Id.* at 7.

fact that FFLs are a major source of trafficked firearms, refutes the district court's conclusion that "Defendants [have not] shown a continued problem with policing out-of-state FFLs." *Mance*, 2015 WL 567302, at *14.

**B. Eliminating the In-State FFL Requirement Would Significantly Undermine State Efforts to Combat Illegal Gun Sales and Trafficking.**

The district court failed to appreciate that striking down the in-state FFL requirement would make it easier for criminals and traffickers to avoid compliance with state gun laws designed to address illegal sales and trafficking. An analysis of existing state regulations rebuts the court's contention that the Government did not "provide relevant evidence that the ban is necessary to continue serving the goal of complying with state law." *Id.* at *11.

1. Laws allowing or requiring state officials to inspect FFLs

Twenty-three states and the District of Columbia have enacted laws that allow or require state officials to inspect gun dealers.[16] State inspections provide an opportunity to detect potentially illegal activity.[17] This activity can include a dealer's failure to match sales records with current inventory or failure to comply

---

[16] Trace the Guns, *supra* note 13, at 26.

[17] *See* Daniel Webster et. al., *Effects of State-Level Firearm Seller Accountability Polices on Firearm Trafficking*, 86 J. of Urban Health 525, 525, 527-530 (May 2009).

with state licensing requirements[18] or other conditions imposed by state law, such as security measures to reduce theft and employee background checks.[19]

These state measures are particularly important in light of current weaknesses in federal law. For example, despite the huge number of active FFLs — more than 123,000 in 2013[20] — the number of ATF agents employed to regulate dealers has actually decreased in recent years.[21] Between this and other resource limitations, ATF is able to inspect each dealer, on average, only once every decade.[22] This reality underscores the importance of state inspection laws as a critical means of supplementing federal law. As of 2010, states with dealer inspection laws exported crime guns at a rate 50% lower than states without such laws.[23] However, these laws are easily circumvented if a criminal or trafficker

---

[18] Fifteen states and the District of Columbia require dealers to obtain a state-issued license. *See* LCPGV, *Dealer Regulations Policy Summary* (Sept. 13, 2013), *available at* http://smartgunlaws.org/dealer-regulations-policy-summary.

[19] *Id.* (Nine states require dealers to utilize security measures to reduce theft And five states require dealer employee background checks.)

[20] U.S. Dep't of Justice, Office of the Inspector General Evaluation and Inspections Division, Review of ATF's Federal Firearms Licensee Inspection Program 1 (Apr. 2013), *available at* http://www.justice.gov/oig/reports/2013/e1305.pdf. ("Review of FFL Inspection Program")

[21] *See* Center for American Progress, *A Review of the Bureau of Alcohol, Tobacco, Firearms and Explosives and a Proposal to Merge It with the Federal Bureau of Investigation* 9 (Spring 2015), *available at*: https://cdn.americanprogress.org/wp-content/uploads/2015/05/ATF-report-webfinal.pdf.

[22] *See* Grimaldi & Horwitz, *supra* note 11.

[23] Trace the Guns, *supra* note 13, at 27.

may simply go to one of the 27 other states — including Texas — that does not allow for FFL inspections.

For states that have made the effort to monitor dealers more closely, the in-state FFL requirement serves as a mechanism to help ensure that handgun purchases are handled by regulated and accountable in-state dealers. Eliminating the requirement would make it easier for criminals and traffickers to forum shop for a dealer in a state with loose regulations. This is not a hypothetical concern — almost 40 percent of FFLs inspected by ATF in 2011 were found not to be in compliance with federal laws.[24] This fact, together with current trafficking patterns, suggests that dealers in states with weak or nonexistent inspection laws are less likely to comply with the law.

2.    Laws allowing for state-level prosecution of gun trafficking activities

The importance of the in-state FFL requirement is also clear in the context of state laws that allow for the local prosecution of conduct related to illegal gun sales and trafficking, such as straw purchasing and falsifying purchaser information. According to the 2010 MAIG study of illegal trafficking patterns, states that have enacted such laws export crime guns at a much lower rate than states that have not. The nine states and the District of Columbia that authorize the prosecution of straw

---

[24] *See* Review of FFL Inspection Program, *supra* note 20 at 1.

purchasers, for example, have a crime gun export rate that is 64 percent lower than the 41 states — including Texas — that do not.[25]  Similarly, states that do not allow for the prosecution of falsifying purchaser information —including Texas — have a crime gun export rate that is 83 percent higher than the states that do.[26]

Striking down the in-state FFL requirement would make it easier for criminals and traffickers to avoid prosecution in states that have passed these laws. Such states have limited jurisdiction to enforce these laws with respect to purchases that occur entirely out-of-state, particularly when the conduct in question is legal in the other state.  Allowing out-of-state purchases undercuts the ability of law enforcement in states with strong laws to monitor transactions and pursue enforcement actions against criminals and traffickers.  Without the in-state FFL requirement, it would be easier for such individuals to avoid detection by simply traveling to nearby states without such laws.

California, for example, allows for the prosecution of  straw purchasing and falsifying purchaser information, whereas neighboring Nevada and Arizona do not. It is no surprise, therefore, that these states are the top suppliers of out-of-state crime guns recovered in California.[27]  Eliminating the in-state FFL requirement

---

[25] *See* Trace the Guns, *supra* note 13, at 11.

[26] *Id*. at 11.

[27] MAIG, Trace the Guns Interactive Map (2010),  *available at* http://www.traceguns.org/#/states/CA/imports.

will make this problem worse, since the requirement provides the only legal mechanism for ensuring that a handgun transaction entered into by a California resident will be completed in California, where local law enforcement can better monitor the transaction. Striking down the in-state FFL requirement would create additional opportunities for criminals and gun traffickers to avoid detection and prosecution by state officials.

## C. The Inconsistency of Gun Laws in Different States Further Highlights the Importance of the In-State FFL Requirement.

The value of the in-state FFL requirement comes into even sharper focus when comparing states based on a broad spectrum of policies. The 2010 MAIG report identifies ten policies that certain states have enacted to combat illegal firearm sales and trafficking.[28] Several states have all, or almost all, of these laws, but are located in close proximity to states that have none.

For example, California has one of the lowest crime gun export rates in the country, and yet shares a border with Nevada, which has one of the highest.[29] Without the in-state FFL requirement, a California resident who wishes to traffic

---

[28] These include laws relating to: (1) straw purchasing of firearms; (2) falsifying purchaser information; (3) failing to conduct dealer background checks; (4) background checks for all handgun sales at gun shows; (5) purchase permits for all handgun sales; (6) the discretion of local law enforcement to approve or deny concealed carry permits; (7) gun possession by violent misdemeanants; (8) the reporting lost or stolen guns to law enforcement; (9) local control of firearm regulations; and (10) state inspection of gun dealers. Trace the Guns, *supra* note 13, at 10.

[29] Trace the Guns, *supra* note 12, at 28.

guns could simply drive across the border to Nevada in order to find a loosely regulated environment in which to purchase firearms. A transaction occurring in Nevada would not have been processed by a California FFL, who is subject to a number of regulations specifically designed to reduce illegal gun sales and trafficking that are not imposed in Nevada.[30] The benefits of these regulations are lost with respect to purchases completed entirely out-of-state.

While one state cannot control what another state does with respect to illegal sales and trafficking, the in-state FFL requirement provides a legal mechanism for ensuring that a state's residents will not be able to easily bypass its laws by simply heading to a different jurisdiction to purchase a handgun. Although this already happens with unacceptable frequency, gutting the in-state FFL requirement would only make the current situation worse. Moreover, there is good reason to think that out-of-state FFLs, even those with the best of intentions, will not be in a position to properly understand and enforce the relevant gun laws of every other state.

---

[30] *Compare* LCPGV, *Dealer Regulations in California* (Jan. 12, 2015), *available at*: http://smartgunlaws.org/dealer-regulations-in-california (describing extensive licensing requirements) *with* LCPGV, *Dealer Regulations in Nevada* (Jan. 1, 2012), *available at*: http://smartgunlaws.org/dealer-regulations-in-nevada ("Nevada does not license firearms dealers").

**D.    The District Court Erred in Assuming that Out-Of-State FFLs Have the Capacity to Research and Accurately Apply Unfamiliar Gun Laws from Every Other State.**

The district court also erred in its assumption that even well-intentioned out-of-state dealers will have the capacity to research and accurately apply other states' gun laws.  The court stated that "nothing prevents an out-of-state FFL from Reno, Nevada, from conducting … research to ensure that a handgun transaction with a Sacramento resident, some 100 miles away, comports with federal, Nevada, California, and Sacramento restrictions." *Mance*, 2015 WL 567301, at *11 n.12. While it is theoretically possible that an FFL could research and apply the laws of another state, there are a number of reasons why it makes much more sense to require that each handgun purchase be completed by an FFL who operates in the state where the purchaser resides, is familiar with the particularized requirements of that state, and is subject to state-level enforcement if those requirements are not followed.

First, for states that regulate firearms in a comprehensive manner, it is simply unrealistic to assume that an out-of-state FFL will have the resources or the time necessary to ensure that the sale is in compliance with the law of the state where the purchaser resides.  For a purchaser from a state like California, for example, an out-of-state FFL would need to take the following actions, among others, to comply with California law:

1. Obtain, fill out, and submit the Dealer Record of Sale ("DROS") form to the California Department of Justice ("DOJ") and transmit the $19 DROS fee;[31]

2. Obtain and retain a copy of the purchaser's valid proof of residency, which includes "a utility bill from within the last three months, a residential lease, a property deed, or military permanent duty station orders indicating assignment within this state."[32]

3. Submit the purchaser's information to California DOJ to complete a background check;[33]

4. Confirm the existence and validity of the purchaser's California-issued Firearm Safety Certificate;[34]

5. Administer a "safe handling demonstration" of the handgun pursuant to the requirements of California law;[35]

6. Determine if the handgun is listed on the approved list of handguns under the California Unsafe Handgun Act;[36]

7. Ensure that a California-approved "firearm safety device" is included with the sale of the handgun;[37]

---

[31] Cal. Penal Code § 28205.

[32] Cal. Penal Code § 26845.

[33] Cal. Penal Code § 28205.

[34] Cal. Penal Code §§ 26840, 27540, 31610-31835.

[35] Cal. Penal Code §§ 26850-26859, 27540(e), 31615.

[36] Cal. Penal Code §§ 31900-32110.

[37] Cal. Penal Code § 23635(a).

8. Honor the California 10-day waiting period before transferring the handgun to the purchaser;[38]

It simply is not reasonable to expect that an FFL in Texas, for example, who has never before processed a firearm sale under California law, and who resides in a state that annually receives an "F" grade from the Law Center based on the weakness of its gun laws and lack of FFL oversight, will be able to ensure compliance with the comprehensive requirements of California law.[39] Given weak federal oversight, and the fact that dealers are less accountable to law enforcement officials operating in another state, the incentives of compliance for out-of-state dealers are low. Without the in-state FFL requirement, dealers with a direct conflict of interest become the final arbiter of a handgun sale's legality.

Second, even if dealers are willing to comply with the law, they may not have the means to properly process a sale. To sell a handgun to a California resident, for example, a dealer generally needs certain equipment and software that is used to submit information about the purchaser to California law enforcement.[40] This potential complexity is why many retail gun dealers tout themselves as

---

[38] Cal. Penal Code §§ 26815(a), 27540(a).

[39] *See* LCPGV, *Texas State Law Summary* (July 9, 2015), *available at* http://smartgunlaws.org/texas-state-law-summary.

[40] Cal. Penal Code § 28180; Cal. Code Regs. tit. 11, § 4200 et seq.

experts in the processes applicable in their state.[41]  They offer to assist gun buyers

in navigating what may be, at least for those unfamiliar with the law, a complicated

process.  While most gun dealers are able to fully understand and comply with the

law of their home state, it is unreasonable to think that they could be prepared to do

so for 49 other states and the District of Columbia (whose comprehensive gun laws

are much more akin to those of California).

The in-state FFL requirement helps ensure that a dealer who is intimately

familiar with and directly subject to a state's laws is involved in the purchase and

has final responsibility for determining its legality.  The district court's opinion

rested on the overly-simplified fiction that dealers would be willing and able to

research and accurately comply with what is likely to be a wholly unfamiliar, and

potentially complex, body of law from another state.

The district court therefore erred when it concluded that the evidence cited

by the Government did "not speak to the need for, and the reasonableness of,

requiring the participation of an additional in-state FFL in all transactions

involving out-of-state handguns."  *Mance*, 2015 WL 567301, at *9.  A system that

allows for handgun purchases to be completed entirely out-of-state undermines the

---

[41] *See, e.g.*, *The Grant Boys, Requirements for Purchasing a Firearm in the State of California* (Sept. 25, 2012), at http://www.grantboys.com/requirements-for-purchasing-a-firearm-in-the-state-of-california/ (describing the procedure in California); Merrimack Firearms, *How to Purchase Firearms in NH* (2011-2015), *at* http://www.nhgunshop.com/buying-guns-new-hampshire.htm (describing the process in New Hampshire).

efforts of certain states to reduce trafficking and diminishes dealer incentive to comply with the law. *See United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) ("the evident purpose of [§ 922(a)(3)] is to stop circumvention of state laws regulating gun possession; it does so by requiring state residents to comply with conditions of sale and similar requirements in their home state.").

For all of these reasons, the in-state FFL requirement serves an important interest that is not otherwise served by a scheme that allows out-of-state purchases. Striking down the in-state FFL requirement would only further weaken federal controls on gun trafficking and undermine those states that have attempted to address the problems of illegal sales and trafficking with their own legislation. The result would be an increase in the illegal sale and trafficking of handguns, the firearm responsible for the majority of gun-related crime and murder in this country.[42]

## II.   THE CHALLENGED LAWS DO NOT FALL WITHIN THE SCOPE OF THE SECOND AMENDMENT.

The district court also erred in its threshold legal finding — that the challenged laws fall within the scope of the Second Amendment.  Under the two-part inquiry generally used to analyze Second Amendment claims, the first step is "to determine whether the challenged law impinges upon a right protected by the

---

[42] *See* Philip J. Cook & Kristin A. Goss, *The Gun Debate: What Everyone Needs to Know* 13 (2014).

Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives ("NRA v. ATF")*, 700 F.3d 185, 194 (5th Cir. 2012). If the challenged law "burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster." *Id*. at 195.

Here, the district court erred because the challenged laws: (1) do not regulate conduct falling within the scope of the Second Amendment; and (2) are presumptively valid measures that also harmonize with the history of arms regulation in this country.

## A.    The Challenged Laws Do Not Burden Second Amendment Rights.

Contrary to the district court's opinion, the in-state FFL requirement does not burden the Appellees' Second Amendment rights. In *Heller*, the Supreme Court held that the Second Amendment protects the right of responsible, law-abiding citizens to possess a handgun in the home for self-defense. *Heller*, 554 U.S. at 635. However, the "right secured by the Second Amendment is not unlimited." *Id.* at 626. To that end, the Second Amendment does not protect "a right to keep and carry *any* weapon whatsoever in *any* manner whatsoever and for whatever purpose." *Id.* (emphasis added).

This Court has characterized the limiting language from *Heller* as a "critical passage." *NRA v. ATF*, 700 F.3d at 193. The lower court correctly recognized that the Second Amendment confers a right that "is not unlimited," but then departed from this commonly recognized limitation when it concluded that the challenged laws burden conduct protected by the Second Amendment. *Mance*, 2015 WL 567302, at *6.

Nothing about the challenged laws prevents responsible, law-abiding individuals from possessing a handgun for the purposes of self-defense. Nor do the challenged laws prevent such individuals from purchasing a handgun from *any* FFL in *any* state. The laws affect only the ability of an individual to take possession of a handgun purchased from an out-of-state dealer without the involvement of an in-state dealer — a right not protected by the Second Amendment. Consequently, the Appellees' ability to defend themselves with a firearm is in no way burdened by the challenged laws.

At its core, the Appellees' complaint is that the Hansons would have to wait a short amount of time and pay a modest transaction fee before they could take possession of a handgun they purchased from a Texas FFL, 1,500 miles from their home. If the Hansons find this to be inconvenient, however, they remain completely free to purchase the handguns they desire in their home jurisdiction. They may also complete the purchase from Texas, so long as Mr. Mance ships the

handguns to a D.C. FFL for retrieval by the Appellees.  With a variety of fast and efficient shipping services at Mr. Mance's disposal, it is entirely possible that the handguns desired by the Hansons could be waiting for them in D.C. before the Hansons even boarded their plane to return home.  This minor inconvenience, which results from the Hanson's voluntary decision to purchase a handgun far from home, does not amount to an identifiable burden on their Second Amendment rights.

An Alabama district court has already examined and rejected the lower court's holding on this issue.  *United States v. Focia*, No. 2:15cr17-AKK, 2015 WL 3672161, at *4 n.2 (M.D. Ala. June 12, 2015). There, the court found that "[t]he requirement that a non-FFL seller go through appropriate channels to sell or convey a firearm to a person residing in another state, or that the purchaser or recipient likewise go through appropriate channels, or simply purchase his or her firearm from a licensed retailer in their home state, does not substantially burden the core right of the individual to possess a firearm for self-defense in one's home." *Id.*; *see Decastro,* 682 F.3d at 168 (noting that § 922(a)(3) "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything.").

The "right of self-defense" that is "central to the Second Amendment right," *Heller*, 554 U.S. at 628, does not create a right for an individual to immediately

possess a newly purchased gun in a jurisdiction outside his or her place of residence without the involvement of an in-state FFL.  Such conduct falls outside the scope of the Second Amendment and there is no evidence that the challenged laws have affected the Appellees' ability to obtain or use a handgun for self-defense.

### B.    The Challenged Laws are Presumptively Valid and Harmonize with the History of Arms Regulation in this Country.

That the challenged laws impose "conditions and qualifications on the commercial sale of arms" is enough to establish their presumptive validity.  *See Heller*, 554 U.S. at 626-27 ("nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms."); *Bauer v. Harris*, --- F. Supp. 3d ---, 2015 WL 881515, at *6 (E.D. Cal. Mar. 2, 2015) (fee imposed on all gun sales "is a condition on the sale of firearms" and, "therefore, a presumptively lawful regulatory measure" that "is constitutional because it falls outside the historical scope of the Second Amendment."); *Peña v. Lindley*, No. 2:09–CV–01185–KJM–CKD, 2015 WL 854684, at *11, 13 (E.D. Cal. Feb. 27, 2015) (California's Unsafe Handgun Act "imposes conditions and qualifications on the commercial sale of arms," and, as such, "is one of the

presumptively lawful regulatory measures" that "falls outside the historical scope of the Second Amendment.").[43]

In addition, the challenged laws are part of a lineage of statutes regulating the purchase or possession of firearms based on state residency that trace their origins back to at least the early 1900s. *See* Brief for Appellants at 17-22. As this Court has stated, "[a] regulation that is 'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right." *NRA v. ATF*, 700 F.3d at 196 (quoting *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1253 (D.C. Cir. 2011)).

Multiple courts, including this Court, have held that "a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *NRA v. ATF*, 700 F.3d at 196; *Heller II*, 670 F.3d at 1253 (finding handgun registration requirement that dated back to the early 20th century to be "longstanding"); *Drake v. Filko*, 724 F.3d 426, 434 n.11 (3d Cir. 2013) (noting that the current versions of the laws prohibiting possession of firearms by felons and the mentally ill are "of mid-20th century vintage"), *cert. denied*, 134 S. Ct. 2134 (2014). Thus, the district court erred in finding that the challenged laws "do not date back quite far enough to be considered longstanding." *Mance*, 2015 WL

---

[43] The challenged laws impose exactly the "conditions and qualifications on the commercial sale of arms" that *Heller* identified as "presumptively lawful." *See* Brief for Appellants at 17-22.

567302, at *7. As part of a heritage of residency-based firearm restrictions, the challenged laws are longstanding measures that harmonize "with the history and tradition of arms regulation in this country." *NRA v. ATF*, 700 F.3d at 196 (holding that such a measure "would not threaten the core of the Second Amendment guarantee.").

In fact, just last month, in *Dearth v. Lynch*, a judge from the D.C. Circuit noted the "long history of regulating the acquisition and use of firearms by *non-residents* of a given State" and identified twelve states and the District of Columbia that imposed various restrictions on the acquisition, use, or possession of firearms by non-residents since at least the early 1900s. --- F.3d ----, 2015 WL 3851905, at *9 (D.C. Cir. June 23, 2015) (Henderson, K., dissenting).[44] The history of these laws support the view that "the 'core' Second Amendment protection announced in *Heller* does not include the right of a non-resident citizen to possess a firearm without regard to his residence." *Id.*

In light of this, the district court erred in dismissing the government's arguments that the challenged laws at issue here are presumptively lawful and longstanding regulations that fall outside the scope of the Second Amendment.

---

[44] The majority opinion did not disagree on this point; it remanded the case for further factual development, while the dissent determined that there were enough facts to decide the case and provided an opinion on the merits. *Dearth*, 2015 WL 3851905.

**III.  EVEN IF THE CHALLENGED LAWS IMPLICATE THE SECOND AMENDMENT, THEY REMAIN CONSTITUTIONAL.**

The fact that the laws at issue here fall outside the scope of the Second Amendment should end this Court's inquiry.  *See, e.g.*, *NRA v. ATF*, 700 F.3d at 194; *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).  But, even if this Court were to radically expand the holding of *Heller* and conclude that the challenged laws implicate the Second Amendment, those laws still would be constitutional under the appropriate level of review.

**A.  If Heightened Scrutiny is Necessary in Evaluating This Challenge, Strict Scrutiny is Not Appropriate.**

The second step of the two-step inquiry is "to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny."  *NRA v. ATF*, 700 F.3d at 194.  The appropriate level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right."  *Id.* at 195 (citation and quotation marks omitted).  If heightened scrutiny is necessary here, strict scrutiny is not appropriate because the challenged laws do not burden the Second Amendment and the Government has a profound interest in protecting citizens from gun violence.

The application of strict scrutiny is generally not appropriate in the evaluation of firearm regulations.  Protecting public safety is the bedrock function

of government, and guns have a "unique potential to facilitate death and destruction and thereby to destabilize ordered liberty." *McDonald*, 561 U.S. 742, 891 (2010) (Stevens, J., dissenting). Accordingly, state and local governments have a fundamental interest in safeguarding the public and law enforcement personnel from gun violence. *See Kelley v. Johnson*, 425 U.S. 238, 247 (1976). Following the Supreme Court's lead in *McDonald* and *Kelley*, the Tenth Circuit recently held that intermediate scrutiny "makes sense in the Second Amendment context" in part because "[t]he right to carry weapons in public for self-defense poses inherent risks to others." *Bonidy v. U. S. Postal Serv.*, --- F.3d ----, 2015 WL 3916547, at *4 (10th Cir. June 26, 2015).

Notably, nearly all courts that have chosen a level of scrutiny for evaluating Second Amendment claims have rejected the use of strict scrutiny. *See, e.g.*, *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012); *Heller II*, 670 F.3d at 1256 ; *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 964-65 (9th Cir. 2014), *cert. denied*, --- S. Ct. --- (June 8, 2015); *United States v. Williams*, 616 F.3d 685, 691-93 (7th Cir. 2010); *Marzzarella*, 614 F.3d at 96-97; *cf. Tyler v. Hillsdale Cnty*

*Sheriff's Dep't*, 775 F.3d 308, 328-29 (6th Cir. 2014) (*Rehearing en Banc Granted, Opinion Vacated* (Apr. 21, 2015)).[45]

Furthermore, as "numerous other courts and legal scholars have pointed out, a strict scrutiny standard of review" does "not square with the [*Heller*] majority's references to 'presumptively lawful regulatory measures.'" *Heller v. District of Columbia* ("*Heller III*"), 698 F. Supp. 2d 179, 187 (D.D.C. 2010) (citing *United States v. Skoien*, 587 F.3d 803, 811 (7th Cir. 2009) (noting that the court did "not see how the listed laws could be 'presumptively' constitutional if they were subject to strict scrutiny")); *Marzzarella*, 595 F. Supp. 2d at 604 (observing that "the Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review"), *aff'd*, 614 F.3d 85 (3d Cir. 2010).

Here, the challenged laws do not restrict or prohibit the use of any particular type of handgun in self-defense. Responsible, law-abiding citizens are free to purchase and defend themselves with a vast array of firearms. Accordingly, because these laws — at most — only minimally burden the Second Amendment right, application of strict scrutiny is unwarranted. *See, e.g.*, *Decastro*, 682 F.3d at

---

[45] The Sixth Circuit recently became the only federal appellate court to depart from this consensus. However, in applying strict scrutiny, the *Tyler* court noted that no other court had "reviewed a firearm restriction as severe as this one—one that forever deprives a law-abiding, non-violent, non-felon of his Second Amendment rights." *Tyler*, 775 F.3d at 335.

168 (in light of "the ample alternative means of acquiring firearms for self-defense purposes, § 922(a)(3) does not impose a substantial burden on the exercise of Decastro's Second Amendment rights.").

**B.     Intermediate Scrutiny Was the Appropriate Level of Review and is Generally Applicable in the Second Amendment Context.**

Because the challenged laws only minimally burden Second Amendment rights, intermediate scrutiny is the appropriate level of review, assuming that any heightened scrutiny is required at all.  This Court has reached the same conclusion in analogous cases involving arguably more stringent laws.

The district court noted that this Court applied intermediate scrutiny in *NRA v. ATF,* where age-restrictions on the purchase of handguns were at issue, because "(1) an age qualification on commercial firearm sales was significantly different from a total prohibition on handgun possession; (2) the age restriction did not strike at the core of the Second Amendment by preventing 18-to-20-year-olds from possessing and using handguns for home defense because it was not a historical outlier; and (3) the restriction only had temporary effect because the targeted group would eventually age out of the restriction's reach."  *Mance*, 2015 WL 567302, at *8 (citing *NRA v. ATF*, 700 F.3d at 205-07).  The same analysis applies to this case.

First, the in-state FFL requirement is "significantly different" from a total prohibition on handgun possession.[46]  Indeed, Appellees are still free to purchase and possess handguns.  Second, the in-state FFL requirement does not strike at the core of the Second Amendment by preventing anyone from possessing or using handguns for self-defense, and is related to laws that have been around in some form for over 100 years.  Third, the in-state FFL requirement only has a temporary effect of stalling possession.  The Hansons may retrieve the handguns they want from their home-jurisdiction FFL as soon as they are shipped there.  Under the analysis employed by this Court in *NRA v. ATF*, the challenged laws warrant review under intermediate scrutiny, assuming the Court finds they implicate the Second Amendment at all.

## C.   The Challenged Laws Satisfy Intermediate Scrutiny.

Intermediate scrutiny requires a showing that the laws are "reasonably adapted to achieve an important government interest."  *NRA v. McCraw*, 719 F.3d 338, 348 (5th Cir. 2013).  There must be a fit between the challenged regulation and the stated objective that is reasonable, not perfect, and the regulation need not be the least restrictive means of serving the interest.  *See, e.g.*, *Lorillard Tobacco*

---

[46] The district court claimed strict scrutiny was necessary in part because the challenged laws allegedly "[r]estricted the distribution channels of legal goods protected by the Constitution to a small fraction of the total number of possible retail outlets."  *Mance*, 2015 WL 567302, at *8.  This statement grossly exaggerates the effects of the law.  Appellees may purchase firearms from thousands of FFLs.

*Co. v. Reilly*, 533 U.S. 525, 556 (2001).  The challenged laws easily satisfy this standard.  *See* Brief for Appellant at 28-37.

As explained in detail above, the in-state FFL requirement is closely related to the important government interest of reducing handgun crime.  Eliminating the requirement would make it easier for criminals and gun traffickers to cross state lines in order to obtain handguns from states with lax laws.  Requiring handgun sales to be completed by a dealer in the purchaser's state of residency, who is both familiar with and accountable to the regulations of that state, is a policy closely related to the important interest of reducing illegal sales and trafficking.  Accordingly, a substantial relationship exists between the challenged laws and the government's important interest in protecting public safety.

## CONCLUSION

For all of the reasons set forth above, this Court should reverse the district court's decision.

Dated:      July 20, 2015

Respectfully submitted,

COVINGTON & BURLING LLP

By: s/ *John W. Sorrenti*
JOHN W. SORRENTI
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel:    (202) 662-5033
jsorrenti@cov.com

*Counsel for Amicus Curiae Law Center to Prevent Gun Violence*

*Of Counsel*

COVINGTON & BURLING LLP
SIMON J. FRANKEL
One Front Street
San Francisco, California
94111-5356
Tel:    (415) 591-7052
sfrankel@cov.com

## CERTIFICATION OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitation of 5th Cir. R. 29.3 and 32 because the brief contains 6997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:      July 20, 2015

COVINGTON & BURLING LLP

By: _s/ John W. Sorrenti_
      John W. Sorrenti

Attorney for *Amicus Curiae Law Center to Prevent Gun Violence*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on July 20, 2015.

I certify that for participants in the case who are registered CM/ECF users service will be accomplished by the appellate CM/ECF system.

I certify that a true and correct copy of the foregoing Brief of *Amicus Curiae* also was served via Federal Express on the following:

> Daniel M. Riess
> Trial Attorney
> U.S. Department of Justice
> Civil Division, Rm. 7220
> 20 Massachusetts Avenue NW
> Washington, DC 20530
> Telephone: (202) 514-3481

Dated:      July 20, 2015

COVINGTON & BURLING LLP

By: *s/ John W. Sorrenti*
      John W. Sorrenti

Attorney for *Amicus Curiae Law Center to Prevent Gun Violence*