No. 15-10311

# In the United States Court of Appeals for the Fifth Circuit

---

FREDRIC RUSSELL MANCE, JR., TRACEY AMBEAU HANSON,
ANDREW HANSON, AND CITIZENS COMMITTEE FOR THE RIGHT TO
KEEP AND BEAR ARMS,

Plaintiffs-Appellees,

v.

LORETTA LYNCH, ATTORNEY GENERAL OF THE UNITED STATES;
AND THOMAS E. BRANDON, ACTING DIRECTOR, BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND EXPLOSIVES,

Defendants-Appellants.

---

Appeal from a Judgment of the United States District Court
for the Northern District of Texas
The Hon. Reed O'Connor, District Judge
(Dist. Ct. No. 4:14-CV-539-O)

---

## BRIEF FOR THE APPELLEES

---

William B. Mateja
Michael D. Nammar
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
214.747.5070/Fax 214.747.2091

Alan Gura
   Counsel of Record
GURA & POSSESSKY, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314
703.835.9085/703.997.7665

August 17, 2015

Counsel for Appellees

CERTIFICATE OF INTERESTED PERSONS

*Mance, et al.* v. *Lynch, et al.*, No. 15-10311

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

<u>Plaintiffs</u>:
Fredric Russell Mance, Jr., Tracey Ambeau Hanson, Andrew Hanson, Citizens Committee For The Right To Keep And Bear Arms

<u>Defendants</u>:
Loretta Lynch, Thomas E. Brandon

<u>Plaintiffs' Counsel</u>:
Alan Gura, Gura & Possessky, PLLC; William B. Mateja, Michael D. Nammar, Fish & Richardson P.C.

<u>Defendants' Counsel</u>:
Benjamin C. Mizer, Beth S. Brinkmann, John R. Parker, Mark B. Stern, Michael S. Raab, Tara S. Morrissey, Lesley R. Farby, Daniel M. Riess – U.S. Department of Justice

<u>Amici Curiae</u>:
The Brady Center to Prevent Gun Violence
The Law Center to Prevent Gun Violence

Counsel for Amicus Curiae Brady Center:
Sean A. Lev
Matthew A. Seligman
Eduardo F. Bruera
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.

Counsel for Amicus Curiae Law Center:
John W. Sorrenti
Simon J. Frankel, Of Counsel
Covington & Burling LLP

/s/ Alan Gura
Alan Gura
Counsel for Appellees

## STATEMENT REGARDING ORAL ARGUMENT

Appellees would welcome the opportunity to participate in oral argument should the Court find oral argument helpful to its resolution of the case. Owing to the importance of the constitutional issues at stake, oral argument is advisable.

TABLE OF CONTENTS

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . .  iii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.     The Legal Framework for Interstate Handgun
            Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

         1.    Federal Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

         2.    Texas Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

         3.    District of Columbia Law. . . . . . . . . . . . . . . . . . . . 5

    B.     The Plaintiffs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.     Plaintiffs' Experience Under the Federal
            Interstate Handgun Transfer Ban. . . . . . . . . . . . . . . . . . . 10

    D.     Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.    The Government Bears the Burden of Proving that Laws Burdening Second Amendment Rights Pass Heightened Scrutiny Review. . . . . . . . . . . . . . . . . . . . . . . . 18

II.    The Second Amendment Guarantees a Fundamental Right to Acquire Handguns. . . . . . . . . . . . . . . . . . . . . . . . 23

III.    The Interstate Handgun Transfer Ban Is Not A "Longstanding, Presumptively Lawful Regulatory Measure". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    A.    "Longstanding" Laws Need Not Have Direct Framing Era Analogs, But They Must Be Harmonized with Framing Era Tradition and Practice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    B.    The Government Failed To Produce Any Evidence of Analogous, Traditional Regulations. . . . 33

IV.    The Interstate Handgun Transfer Ban Fails Any Level of Means-Ends Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . 34

    A.    The Interstate Handgun Transfer Ban "Burdens" and "Regulates" Second Amendment Conduct, Thereby "Impinging" Upon the Right to Keep and Bear Arms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    B.    The Interstate Handgun Transfer Ban Is Subject to Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    C.    Blanket Prohibition of Interstate Handgun Transfers Does Not Properly Fit Any Governmental Interest. . . . . . . . . . . . . . . . . . . . . . . . 50

V.    The Interstate Handgun Transfer Ban Violates Plaintiffs' Right to Equal Protection. . . . . . . . . . . . . . . . . . 59

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Addendum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 1

# TABLE OF AUTHORITIES

Cases

*Adamson* v. *California*,
332 U.S. 46 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Andrews* v. *State*,
50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Annex Books, Inc.* v. *City of Indianapolis*,
581 F.3d 460 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Ashcroft* v. *ACLU*,
542 U.S. 656 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Bolling* v. *Sharpe*,
347 U.S. 497 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Buckley* v. *Valeo*,
424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Carey* v. *Pop. Servs. Int'l*,
431 U.S. 678 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 29, 43, 47, 48

*Citizens United* v. *FEC*,
558 U.S. 310 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . 18-20, 22, 23, 25, 26, 30, 32, 41

*Doe* v. *Bolton*,
410 U.S. 179 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . 21, 45, 46

*Gonzales* v. *Carhart,*
    550 U.S. 124 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Griswold* v. *Connecticut,*
    381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Harrott* v. *County of Kings,*
    25 Cal.4th 1138, 25 P.3d 649 (2001) . . . . . . . . . . . . . . . . . . . . . . 56

*Heller* v. *District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ill. Ass'n of Firearms Retailers* v. *City of Chicago,*
    961 F. Supp. 2d 928 (N.D. Ill. 2014).. . . . . . . . . . . . . . . 24, 26, 32, 39

*Jackson* v. *City & Cnty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Karcher* v. *Daggett,*
    462 U.S. 725 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Kirkpatrick* v. *Preisler,*
    394 U.S. 526 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Kwong* v. *Bloomberg,*
    723 F.3d 160 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lane* v. *Holder,*
    703 F.3d 668 (4th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Malloy* v. *Hogan,*
    378 U.S. 1 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*McCutcheon* v. *FCC,*
    134 S. Ct. 1434 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*McDonald* v. *City of Chicago,*
   561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 35

*Milnot Co.* v. *Richardson,*
   350 F. Supp. 221 (S.D. Ill. 1972). . . . . . . . . . . . . . . . . . . . . . . . . 51

*Moore* v. *Madigan,*
   702 F.3d 933 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco,*
   *Firearms & Explosives,* 700 F.3d 185 (5th Cir. 2012) .. 15, 19, 20, 26,
                                              27, 30-34, 41, 46-50

*O'Reilly* v. *Bd. of Appeals,*
   942 F.2d 281 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Peoples Rights Org.* v. *City of Columbus,*
   152 F.3d 522 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Reliable Consultants, Inc.* v. *Earle,*
   517 F.3d 738 (5th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . 24, 29

*Richmond Newspapers* v. *Virginia,*
   448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Romer* v. *Evans,*
   517 U.S. 620 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Schad* v. *Mt. Ephraim,*
   452 U.S. 61 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Schneider* v. *State,*
   308 U.S. 147 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Shelby County* v. *Holder,*
   133 S. Ct. 2612 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Springfield Armory* v. *City of Columbus*,
    29 F.3d 250 (6th Cir. 1994).................................. 56

*Strickland* v. *State*,
    137 Ga. 1, 72 S.E. 260 (Ga. 1911). ........................ 36

*Supreme Court of New Hampshire* v. *Piper*,
    470 U.S. 274 (1985). ...................................... 56

*United States* v. *Barton*,
    633 F.3d 168 (3d Cir. 2011). ........................... 19, 28

*United States* v. *Carolene Products Co.*,
    304 U.S. 144 (1938). ................................... 20, 51

*United States* v. *Chester*,
    628 F.3d 673 (4th Cir. 2010)............................... 21

*United States* v. *Chovan*,
    735 F.3d 1127 (9th Cir. 2013)............................. 21

*United States* v. *Cruikshank*,
    92 U.S. 542 (1876) ....................................... 35

*United States* v. *Decastro*,
    682 F.3d 160 (2d Cir. 2012). ............................. 22

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010). ...................... 26, 27, 50

*United States* v. *Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) ............................. 47

*United States* v. *Moore*,
    666 F.3d 313 (4th Cir. 2012)............................. 28

*United States* v. *Torres-Rosario,*
    658 F.3d 110 (1st Cir. 2011)................................... 28

*United States* v. *Williams,*
    616 F.3d 685 (7th Cir. 2010)................................. 28

*Virginia* v. *Am. Booksellers Ass'n,*
    484 U.S. 383 (1988). ...................................... 29

Statutes and Rules

18 U.S.C. § 921(a)(2)........................................ 4

18 U.S.C. § 922(a)(3) .................................... 3, 15

18 U.S.C. § 922(a)(5) ...................................... 3

18 U.S.C. § 922(b)(3)............................... 4, 10, 11, 14

18 U.S.C. § 922(g)(1) ...................................... 28

27 C.F.R. § 478.96(c)(1)................................... 4, 5

27 C.F.R. § 478.96(c)(2)...................................... 5

27 C.F.R. § 478.99 ....................................... 4, 14

D.C. Code § 22-4505(a)(6).................................... 7

D.C. Code § 7-2502.01(a)..................................... 5

D.C. Code § 7-2502.06(a).................................. 6, 57

D.C. Code § 7-2505.01....................................... 6

D.C.M.R. § 24-2320.3 ....................................... 8

D.C.M.R. § 24-2320.3(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

D.C.M.R. § 24-2320.3(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

D.C.M.R. § 24-2320.3(f) (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Haw. Rev. Stat. § 134-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Mich. Comp. Laws § 28.422(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

N.C. Gen. Stat. § 14-402(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

N.J. Stat. Ann. § 2C:58-3(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

S.B. 213, "An Act to Require that Weapons Permits
     be Obtained from the County of Residence of
     the Purchaser," N.C. Laws 1979, c. 895 . . . . . . . . . . . . . . . . . . . . . 37


Other Authorities

58 D.C. Register No. 38, at 008240-008241 (September 23, 2011),
     available at http://www.dcregs.dc.gov/Gateway/
     NoticeHome.aspx?noticeid=1742040
     (last visited October 10, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

58 D.C. Register, No. 33, at 007572-007573 (August 19, 2011),
     available at http://www.dcregs.dc. gov/Gateway/
     NoticeHome.aspx?noticeid=1544548
     (last visited October 10, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

L.A. Powe, Jr., *Guns, Words, and Constitutional
     Interpretation*, 38 Wm. & Mary L. Rev. 1311 (1997). . . . . . . . . . . . 19

Some Considerations on the Game Laws (1796). . . . . . . . . . . . . . . . . . 25

St. George Tucker, Blackstone's Commentaries (1803). . . . . . . . . . . . 31

The Writings of Thomas Jefferson
(T.J. Randolph, ed., 1830)...................................... 25

## INTRODUCTION

This Court would not hesitate to strike down laws barring, without more, the interstate transfer of books, religious articles, contraceptives, or any other thing imbued with constitutional protection.

Handguns should be no different. The Government's prohibition of a national handgun market has outlived its rationale, and it cannot survive the Supreme Court's holding that Americans have a fundamental individual right to keep and bear handguns. Responsible, law-abiding Americans do not become less so merely by shopping across state lines—especially not when doing so under a license granted by their local police department.

Plaintiffs-Appellees ("Plaintiffs") Fredric Mance, Tracey and Andrew Hanson, and the other members of the Citizens Committee for the Right to Keep and Bear Arms, are fully qualified to buy and sell handguns under federal law. They have the blessing of their local authorities in seeking to buy and sell handguns from each other. The only impediment to their doing so is the Government's prohibition of handgun transactions that cross state lines, no matter the

circumstances, even as the Government would not interfere with Plaintiffs' lawful interstate rifle and shotgun transactions.

No reason, much less a constitutionally-adequate reason, exists to limit lawful handgun acquisition to one's state of residence. Provided they comply with all federal, state, and local laws, individuals are free to take possession of rifles and shotguns from federally-licensed firearms dealers anywhere in the United States. If licensed firearms dealers in Texas can be trusted to demand, and honor, Washington, D.C.'s rifle transfer authorizations, there is no reason to bar them from processing identical certificates issued for the transfer of handguns.

The Government nonetheless insists that it must ban interstate handgun sales to prevent individuals from circumventing local handgun laws. But many states allow for such transactions, and structure their laws in ways that cannot be circumvented merely by crossing state lines. Indeed, the Hansons reside in a "state" that demands police pre-approval for the acquisition of firearms from any source—and expressly welcomes interstate handgun sales.

The Government's one-size-fits-all prohibition commits the very sin that it purports to remedy, overriding the considered judgment of states

and localities as to how handgun sales are regulated. In so doing, it violates the fundamental rights to keep arms and to equal protection.

## STATEMENT OF ISSUES

1. Whether the Second Amendment secures a right to acquire arms.

2. Whether the Government violates the Second Amendment rights of law-abiding, responsible American citizens when it bars them from purchasing handguns, in full compliance with all relevant state and local laws, outside their state of residence.

3. Whether the Government violates the Fifth Amendment right of equal protection when it bars similarly-situated American citizens from purchasing handguns in otherwise legal transactions, based solely on their state of residence.

## STATEMENT OF THE CASE

A.     The Legal Framework for Interstate Handgun Transactions.

1.     *Federal Law*

Title 18 U.S.C. §§ 922(a)(3) and (5) forbid individuals from transporting into or receiving in their state of residence any firearm acquired outside that state since December 16, 1968, except for firearms acquired by bequest or intestate succession, or pursuant to a

transfer from a federally-licensed dealer that complies with 18 U.S.C. § 922(b)(3). For purposes of these provisions, the District of Columbia is a "state." 18 U.S.C. § 921(a)(2).

Title 18 U.S.C. § 922(b)(3) and 27 C.F.R. § 478.99 bar licensed federal firearms dealers from transferring firearms to individuals who do not reside within the state in which the dealers' place of business is located. A significant exception to this prohibition allows a dealer to transfer rifles and shotguns to individuals residing out-of-state:

> if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States) . . .

18 U.S.C. § 922(b)(3). Title 27 C.F.R. § 478.96(c)(1) reiterates that interstate rifle or shotgun transactions are lawful provided:

(i) The purchaser meets with the licensee in person at the licensee's premises to accomplish the transfer, sale, and delivery of the rifle or shotgun;

(ii) The licensed importer, licensed manufacturer, or licensed dealer complies with the provisions of § 478.102; [requiring a background check]

(iii)     The purchaser furnishes to the licensed importer, licensed manufacturer, or licensed dealer the firearms transaction record, Form 4473, required by § 478.124; and

(iv)     The sale, delivery, and receipt of the rifle or shotgun fully comply with the legal conditions of sale in both such States.

Pursuant to 27 C.F.R. § 478.96(c)(2),

[A]ny licensed manufacturer, licensed importer, or licensed dealer is presumed, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both such States.

By operation of these provisions, individuals who want to acquire handguns at retail, or from individuals in other states, may only take delivery of such handguns from a federal firearms licensee in the state wherein they reside. But individuals may purchase rifles and shotguns freely across state lines provided they do so in person, comply with local laws, fill out standard federal forms, and undergo a background check.

2.     *Texas Law*

Texas law does not forbid the sale of handguns to people residing outside of Texas.

3.     *District of Columbia Law*

The District of Columbia requires that all firearms be registered, D.C. Code § 7-2502.01(a), but does not prohibit the importation of

firearms. It requires only that "[a]n application for a registration certificate shall be filed (and a registration certificate issued) prior to taking possession of a firearm from a licensed dealer or [other registrant],"[1] and "[i]n all other cases, an application for registration shall be filed immediately after a firearm is brought into the District" within 48 hours of providing notice to the police department. D.C. Code § 7-2502.06(a).

Accordingly, firearms dealers outside the District of Columbia may (and do) transfer rifles and shotguns to District residents upon presentation of approved registration certificates.[2] The District of Columbia utilizes a single form, PD-219, that serves as the application to register any type of firearm, without distinction between handguns and long guns, and which serves as the registration certificate when stamped "APPROVED" and labeled with a registration number.[3]

---

[1]District law forbids individual-to-individual firearms transfers. D.C. Code § 7-2505.01.

[2]Individuals relocating to the District may import firearms they acquired as residents of other states. D.C. Code § 7-2502.06(a).

[3]*See* Metropolitan Police Dept. (Washington, D.C.), Application for Firearms Registration Certificate, PD-219, available at http://mpdc.dc. gov/sites/default/files/dc/sites/mpdc/service_content/attachments/PD-21 9%20Firearms%20Registration%20Application(Rev0613)_fillable.pdf

As for handgun purchases, District of Columbia law specifically allows a handgun buyer to transport handguns "from the place of purchase to his or her home." D.C. Code § 22-4505(a)(6). A handgun buyer must "[o]btain assistance necessary to complete the [registration] application by presenting the firearm registration application to a firearms dealer licensed under federal law . . . (2) [l]ocated outside the District if the firearm is purchased outside the District." D.C.M.R. § 24-2320.3(b)(2). Following approval, the handgun purchaser must:

> Present the approved firearm registration application to the dealer licensed under federal law or, if federal law such as 18 U.S.C. § 922 prohibits the dealer from delivering the pistol to the applicant because the dealer is not within the District of Columbia, have that firearms dealer transport the pistol to a dealer located within the District, where the applicant will take delivery of the pistol.

D.C.M.R. § 24-2320.3(f).

Accordingly, but for the federal interstate handgun transfer ban, Washington, D.C. residents are legally authorized to take delivery of handguns they purchase across state lines.

This was not always the case. Until 2011, District law required that all handgun sales be processed through a D.C.-based licensed dealer.

_____

(last visited August 10, 2015).

*See* D.C.M.R. § 24-2320.3(f) (2010). But on August 19, 2011, the District of Columbia's Police Commissioner published a notice of Emergency and Proposed Rulemaking, amending D.C.M.R. § 24-2320.3 into its present form to "clarify" that District residents are forbidden from acquiring handguns outside the District, and must ship any handguns purchased outside the District to an in-District dealer for final transfer, *only* if federal law so provides. "Should the federal law change, then that requirement will no longer be applicable to any District firearms registration applicant."[4]

> Emergency rulemaking is necessitated by an immediate need to preserve and promote the public welfare by having the amendment immediately effective so as to assist District residents in the exercise of their constitutional right to possess a handgun for self defense within their home.

*Id.* This amendment was made permanent on September 23, 2011.[5]

---

[4]*See* 58 D.C. Register, No. 33, at 007572-007573 (August 19, 2011), available at http://www.dcregs.dc.gov/Gateway/NoticeHome. aspx?noticeid=1544548 (last visited August 10, 2015).

[5]*See* 58 D.C. Register No. 38, at 008240-008241 (September 23, 2011), available at http://www.dcregs.dc.gov/Gateway/NoticeHome. aspx?noticeid=1742040 (last visited August 10, 2015).

B. The Plaintiffs.

Plaintiff Fredric Mance holds a Federal Firearms License ("FFL"), pursuant to which he retails handguns in Arlington, Texas. ROA.280. Plaintiffs Tracey and Andrew Hanson, a married couple, reside in Washington, D.C. ROA.283, ROA.284, ROA.286, ROA.287. All three are members of Plaintiff Citizens Committee for the Right to Keep and Bear Arms, a non-profit membership association dedicated to promoting the benefits of the right to bear arms, whose members buy and sell handguns throughout the United States. ROA.289.

Tracey and Andrew Hanson are responsible, law-abiding American citizens. They are each over the age of 21, are not under indictment, have never been convicted of a felony or misdemeanor crime of domestic violence, are not fugitives from justice, are not unlawful users of or addicted to any controlled substance, have not been adjudicated mental defectives or committed to a mental institution, have not been discharged from the Armed Forces under dishonorable conditions, have never renounced their citizenship, and have never been the subject of a restraining order relating to a child or an intimate partner. ROA.283, ROA.286.

Apart from the individual Plaintiffs, the Committee's members include law-abiding, responsible Americans throughout the United States who desire to, and do, purchase handguns for traditional lawful purposes, including self-defense. Some of the Committee's members reside in states that, like the District of Columbia, do not prohibit purchasing handguns out of state. Some of the Committee's members also reside in states that, like the District of Columbia, require a license or pre-registration to purchase handguns. The Committee's members also include law-abiding, responsible Americans throughout the United States who desire to, and do, sell handguns for traditional lawful purposes, including self-defense. Some of these Committee members sell handguns in states that do not forbid the sale of handguns to non-residents. ROA.289-90.

C.     Plaintiffs' Experience Under the Federal
        Interstate Handgun Transfer Ban.

Mance would sell handguns directly to consumers residing in other states, and in the District of Columbia, to the extent lawful under state and District law, but refrains from doing so because that conduct is prohibited by the federal interstate handgun transfer ban, 18 U.S.C. § 922(b)(3). ROA.280. Mance reasonably fears arrest, prosecution,

incarceration, and fine were he to violate the law. Accordingly, when handgun consumers residing outside Texas approach Mance about purchasing handguns, he declines to engage in those sales, and instead, offers only to ship the consumers' desired handguns to dealers in their states or the District of Columbia for transfer there. Compliance with the federal interstate handgun transfer ban thus makes Mance's handguns more expensive for these out-of-state consumers, to say nothing of the delay inherent in completing such transactions. The ban has and continues to cost Mance sales. *Id.*

The Hansons would shop for and buy handguns directly from federally-licensed dealers outside of Washington, D.C., to the extent lawful under state and District law, but refrain from doing so because that conduct is prohibited by the federal interstate handgun transfer ban, 18 U.S.C. § 922(b)(3). ROA.283, ROA.286. The Hansons fear arrest, prosecution, incarceration, and fine were they to violate the law. Because they cannot directly access the national handgun market, the Hansons face higher costs in purchasing handguns. Any handgun that they would purchase outside of Washington, D.C. would have to be shipped, at their expense, to an "in state" federal licensee, assuming

the seller is even willing to effect such shipments. The receiving federal licensee would then charge them a fee to complete the transfer. This insulates any firearms retailer from competition and severely limits the Hansons' choice as consumers. Indeed, there are no federally-licensed firearms retailers in Washington, D.C., and the only licensee willing to effect a transfer charges $125. ROA.283, ROA.284, ROA.286, ROA.287.

Because District of Columbia law allows the Hansons to purchase handguns directly out-of-state, and various states do not prohibit the Hansons, as D.C. residents, from acquiring handguns, it is only the federal interstate handgun transfer ban that causes them to sustain shipping and transfer fees when buying handguns. ROA.284, ROA.287.

On June 21, 2014, the Hansons visited Mance at his place of business in Arlington, Texas, as they were each in the market for the purchase of handguns for self-defense. The Hansons each identified a handgun in Mance's inventory that is legal for them to possess in Washington, D.C., and which they would have purchased from Mance directly, and which he would have sold them directly, if only it were legal to do so. ROA.281, ROA.284, ROA.287.

Because the Hansons do not reside in Texas, and do not wish to violate federal law, they would not take delivery of a handgun from Mance, nor would they bring a handgun purchased directly outside of Washington, D.C. to their home. Nor would the Hansons make any false statement on a Form 4473. Mance would not transfer any handgun to the Hansons, because doing so would violate the federal interstate handgun transfer ban. *Id.*

Rather than violate the law, or have the handguns shipped at the Hansons' expense for transfer through a Washington, D.C.-based FFL, Plaintiffs agreed to refrain from completing any handgun transfers unless it became legal for the Hansons to take handgun delivery from Mance. The three memorialized that intent by completing, in each other's presence as required by District of Columbia law, the District of Columbia's PD-219 form. Mance verified that the Hansons' credit card would be valid to complete the purchase, but no money, or firearms, changed hands. ROA.281, ROA.284, ROA.285, ROA.287, ROA.288.

But for the federal interstate handgun transfer ban, the Hansons would directly purchase the handgun from Mance. The Hansons would also shop for, and purchase, handguns from other dealers outside of

Washington, D.C., ROA.285, ROA.288, and Mance would sell handguns to other consumers throughout the country, ROA.281. Other Committee members would likewise buy and sell handguns across state lines, but for the interstate handgun transfer ban. ROA.289, ROA.290.

D.        Procedural History.

On July 14, 2014, Plaintiffs brought this action seeking declaratory and injunctive relief from the federal interstate handgun transfer ban. ROA.1, ROA.3. Specifically, Plaintiffs challenged the Government's enforcement of:

> 18 U.S.C. § 922(b)(3), 27 C.F.R. § 478.99, and any derivative provision, in such manner as to (a) forbid the sale of handguns to otherwise qualified individuals on account of their state of residence; or in the alternative, (b) from enforcing these provisions in such manner as to forbid the sale of handguns to otherwise qualified individuals where the sale would not violate any state or local law; or in the alternative, (c) from enforcing these provisions in such manner as to forbid the sale of handguns to otherwise qualified individuals who have complied with all state or local laws requiring licensing, pre-registration, or other form of pre-approval for the sale

ROA.18.

The Government moved to dismiss the complaint or, in the alternative, for summary judgment, and Plaintiffs cross-moved for summary judgment. The Government claimed, inter alia, that Plaintiffs could not obtain complete relief without also challenging 18

U.S.C. § 922(a)(3)'s prohibition on the importation of handguns into one's state of residence. To definitively resolve this dispute, Plaintiffs amended their complaint to add a challenge to this provision. ROA.456.

The Government also argued at great length that Plaintiffs lacked standing per *Lane* v. *Holder*, 703 F.3d 668 (4th Cir. 2012). *Lane* held, inter alia, that the Government's enforcement of the Gun Control Act does not injure consumers for Article III purposes, as the Act regulates only dealers; that any consumer injury is caused by the intervening, voluntary acts of third party dealers who choose to obey the law; and that because consumers can obtain firearms by complying with the law, they are not truly injured.

Two days after the Fourth Circuit heard *Lane*, this Court decided *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012) ("*NRA*"), which is plainly incompatible with these theories. Counsel immediately notified the Fourth Circuit of this Court's decision, ROA.291-92. But two months later, when it decided *Lane*, the Fourth Circuit opted not to address this Court's decision in *NRA*. The District Court below followed *this* Court's standing precedent, and otherwise distinguished *Lane* as this case

involves a dealer-plaintiff. ROA.468-71. "The government does not press the standing argument on appeal." Appellants' Br. 5 n.10.

The District Court heard argument on the parties' cross-dispositive motions on January 20, 2015. ROA.6. On February 11, 2015, the District Court denied the Government's motion, granted Plaintiffs' motion, and entered judgment for Plaintiffs. ROA.6, ROA.463-91. On February 26, 2015, the District Court denied the Government's motion to stay the judgment. ROA.517.

## SUMMARY OF ARGUMENT

The interstate handgun transfer ban easily fails this Court's two-step analytical approach to Second Amendment cases.

First, the act of purchasing handguns is obviously within the scope of the Second Amendment's protection. As there is a right to keep and carry handguns, there is, plainly, the right to sell and acquire them. The Government's contrary arguments simply defy credulity, as does the Government's argument that longstanding tradition accepts the prohibition of gun sales to residents of other states. It does not.

Because barring non-state residents from trading in handguns is unknown to the Second Amendment's tradition, this Court must apply

heightened scrutiny to the interstate handgun transfer ban. The Government below argued for rational basis review, even if the Second Amendment applies, based on the Second Circuit's "substantial burden" test. It is unclear whether the Government maintains this position on appeal, but the District Court correctly followed this Court's precedent holding that heightened scrutiny is required.

Of the two heightened scrutiny standards, strict or intermediate scrutiny, the proper standard of review would be strict scrutiny. But in the end, the precise standard of review is unimportant. Even under intermediate scrutiny, the Government cannot show that this law is properly tailored to advancing any important regulatory interests.

Accepting fully that the Government has an anti-circumvention interest in ensuring that people comply with their local jurisdiction's firearm laws, federal law already demonstrates the proper way to advance that interest: require FFLs to follow the law, as is already the case when Americans go shopping for rifles and shotguns outside their home states. The Government makes much of late-1960s Congressional findings, but is largely silent on more recent amendments to the federal Gun Control Act, and the modern developments that these reflect.

Whatever justification might have once existed for prohibiting a national market for handguns, this prohibition is an unconstitutional relic in search of a rationale. In no way can anti-circumvention theories justify banning interstate handgun sales to individuals whose states welcome the practice. Indeed, the interstate handgun transfer ban works to defeat the interests of those states and localities, such as Texas and Washington, D.C., whose laws allow and even encourage the interstate handgun trade.

ARGUMENT

I. THE GOVERNMENT BEARS THE BURDEN OF PROVING THAT LAWS BURDENING SECOND AMENDMENT RIGHTS PASS HEIGHTENED SCRUTINY REVIEW.

As the Supreme Court demonstrated, laws can be struck down for conflicting with the Second Amendment's core guarantee without engaging in any means-ends scrutiny. *District of Columbia* v. *Heller*, 554 U.S. 570 (2008). In *Heller*, once it was determined that the Second Amendment secures a right to have handguns for self-defense, city ordinances banning handguns and the keeping of functional firearms simply could not survive. "The Court invalidated the laws because they violated the central right that the Second Amendment was intended to

protect . . . ." *NRA*, 700 F.3d at 193. Other cases lend themselves to different constitutional tests, *e.g.*, gun licensing laws affording unbridled discretion could be viewed as prior restraints, *cf.* L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*, 38 Wm. & Mary L. Rev. 1311, 1384 (1997), while disarmed individuals may raise as-applied challenges based on their personal circumstances, *United States* v. *Barton*, 633 F.3d 168, 174 (3d Cir. 2011).

But in large part, when Second Amendment claims arise,

> [a] two-step inquiry has emerged as the prevailing approach: the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.

*NRA*, 700 F.3d at 194 (citations omitted). This case appears well-suited to this approach.

"To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citations omitted).

If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster. If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny.

*Id.* at 195 (citations omitted).

"[T]he appropriate level of scrutiny depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* (citations omitted). But at least in this circuit, means-ends scrutiny in Second Amendment cases must always be heightened scrutiny—strict or intermediate. *Id.* Even the

"intermediate" scrutiny test must be more rigorous than rational basis review, which *Heller* held "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right" such as "the right to keep and bear arms."

*Id.* (quoting *Heller*, 554 U.S. at 628 n.27).[6]

Other circuits are in accord. As the Seventh Circuit put it, "we know that *Heller*'s reference to 'any standard of scrutiny' means any

---

[6]While heightened scrutiny may not apply where a regulation is "not designed to strike at the right itself" and has only an "incidental effect" on a right, *Gonzales* v. *Carhart*, 550 U.S. 124, 157-58 (2007), heightened review must apply when "legislation appears on its face to be within a specific prohibition of the Constitution, as those of the first ten amendments . . . ." *Heller*, 554 U.S. at 628 n.27 (quoting *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938)).

*heightened* standard of scrutiny; the Court specifically excluded rational-basis review." *Ezell* v. *City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011) (citation omitted). "[W]e reject rational basis review and conclude that some sort of heightened scrutiny must apply." *United States* v. *Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013). "*Heller* clearly does reject any kind of 'rational basis' or reasonableness test," *Heller* v. *District of Columbia*, 670 F.3d 1244, 1256 (D.C. Cir. 2011), and thus, the choice is "between strict and intermediate scrutiny," *id.* at 1257. "[T]he [Supreme] Court would apply some form of heightened constitutional scrutiny if a historical evaluation did not end the matter." *United States* v. *Chester*, 628 F.3d 673, 680 (4th Cir. 2010).

It is unclear whether the Government still argues, as it did below, that rational basis review should govern this case in the event that the Second Amendment applies at all (it does, *see infra*). Notwithstanding its argument heading entitled, "Intermediate Scrutiny Is The Proper Standard Of Review," Appellants' Br. 22, the Government claims that the interstate handgun transfer ban is "subject *at most* to intermediate scrutiny," *id.* at 15 (citation omitted) (emphasis added), and repeatedly

argues under the Second Circuit's "substantial burden" test for applying rational basis review in Second Amendment cases. *See*, *e.g.*, Appellants' Br. 26 ("This is not the sort of 'substantial burden' that warrants strict scrutiny") (citing *Kwong* v. *Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013)).

To be sure, the Second Circuit applies a uniquely parsimonious approach to Second Amendment rights, offering that "heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) *operate as a substantial burden* on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." *Kwong*, 723 F.3d at 167 (quoting *United States* v. *Decastro*, 682 F.3d 160, 166 (2d Cir. 2012)).[7] But a *Heller*-level prohibition is not required to trigger heightened scrutiny—*Heller*'s laws directly contradicted the

---

[7]Accordingly, even New York City's $340 three-year license fee for home handgun possession (on top of the initial $94.25 fingerprinting and background check fee, *Kwong*, 723 F.3d at 162 n.5) is not "anything more than a 'marginal, incremental or even appreciable restraint' on one's Second Amendment rights" because it only makes handgun possession more expensive. *Id.* at 167. Moreover, the Second Circuit's version of "heightened" scrutiny for Second Amendment cases requires only recitation of the Government's purpose. *Id.* at 168-69.

constitutional guarantee. And courts lack "the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634; *cf. McDonald* v. *City of Chicago*, 561 U.S. 742, 790-91 (2010) (Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise").

In any event, this Court's precedent is clear enough: heightened scrutiny, be it strict or intermediate, applies to laws implicating Second Amendment rights.

## II. THE SECOND AMENDMENT GUARANTEES A FUNDAMENTAL RIGHT TO ACQUIRE HANDGUNS.

"[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). The Second Amendment secures the right to possess handguns. Because there is a right to possess handguns, there is, necessarily, a right to acquire them.

After all, "restricting the ability to purchase an item is tantamount to restricting that item's use." *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (footnote omitted); *accord Carey* v. *Pop. Servs. Int'l*, 431 U.S. 678, 687-88 (1977) ("A total prohibition against the sale of contraceptives . . . would intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use."). Surely, if there exists a substantive due process right to acquire sex toys, *Reliable Consultants*, and contraceptives, *Carey*, there is a Second Amendment right to acquire handguns.

Indeed, courts have long accepted this rudimentary aspect of the right to arms. "The right to keep and bear arms, necessarily involves the right to purchase them . . . ." *Andrews* v. *State*, 50 Tenn. 165, 178 (1871). "[A]lthough that acquisition right is far from absolute," the Second Amendment "right must also include the right to *acquire* a firearm . . . ." *Ill. Ass'n of Firearms Retailers* v. *City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014); *see also Jackson* v. *City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them") (citing *Ezell*, 651 F.3d at 704).

As the Supreme Court acknowledged in surveying the right's history, "What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece . . .?" *Heller*, 554 U.S. at 583 n.7 (quoting SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796)). "Our citizens have always been free to make, vend and export arms. It is the constant occupation and livelihood of some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J. Randolph, ed., 1830).

The Government nonetheless reasons that there is no right to acquire arms, because *Heller* offered that "longstanding prohibitions on the possession of firearms by felons and the mentally ill, [] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26; *see* Appellants' Br. 19.

But as the Third Circuit explained in rejecting the Government's argument,

Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment . . . In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and

extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*.

*United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010); *cf. Ill. Retailers*, 968 F.3d at 937.

This Court stands in accord. In *NRA*, this Court considered the constitutionality of federal laws banning FFL handgun sales to adults ages 18-20—plainly, in *Heller*'s phrasing, "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. Referencing *Heller*'s class of "presumptively lawful" laws, this Court expressed confusion as to whether the Supreme Court meant that such laws are presumptively lawful because they fall outside the Second Amendment's scope, or presumptively lawful because they satisfy means-ends scrutiny. *NRA*, 700 F.3d at 196. This Court settled on the former explanation, but with two significant qualifications. "For now, we state that a *longstanding*, presumptively lawful regulatory measure . . . would *likely* fall outside the ambit of the Second Amendment." *Id.* (emphasis added).

The first qualification is the word "longstanding." Not *all* commercial restrictions are presumptively lawful, just those possessing a meaningful historical pedigree. In reading "longstanding" as an element of a presumptively lawful regulation, this Court held, in the Third Circuit's words, that it "necessarily must examine the nature and extent of the imposed condition." *Marzzarella*, 614 F.3d at 92 n.8. Accordingly, *NRA* did not uphold the challenged law merely because it regulates gun sales. Rather, this Court "summarized considerable evidence that burdening the conduct at issue—the ability of 18-to-20-year-olds to purchase handguns from FFLs—is consistent with a longstanding, historical tradition . . . ." *NRA*, 700 F.3d at 203.

Having analyzed the regulation's historical pedigree, this Court then engaged the second qualification of its approach to commercial restrictions under *Heller*'s dicta: presumptively lawful regulations are only "likely" to pass step-one review. *Id.* at 196. Thus, even though this Court suspected that the particular regulation at issue passed step one, it nonetheless proceeded to step two, and upheld the regulation after proceeding with an intermediate scrutiny level analysis. *Id.* at 204.

This Court's reticence to write conduct out of the Second Amendment is widely shared. For example, courts typically do not read "presumptively lawful" laws barring felons from accessing guns as inflexible absolutes. "By describing the felon disarmament ban as 'presumptively' lawful, the Supreme Court implied that the presumption may be rebutted." *Barton*, 633 F.3d at 173 (quotation omitted); *United States* v. *Moore*, 666 F.3d 313, 319 (4th Cir. 2012); *United States* v. *Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011); *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir. 2010). If a "presumptively lawful" felon disarmament law such as 18 U.S.C. § 922(g)(1) can be overcome on particularized facts, it simply cannot be that the entire category of commercial restrictions are off-limits to Second Amendment scrutiny at step one.

The District of Columbia would not have prevailed in *Heller* had it banned only the importation and acquisition of handguns, rather than their possession. Nor can the Government prevail here by arguing that abolishing all interstate handgun transfers somehow does not implicate the people's right to keep and bear arms. The Government can no more ban the sale of protected guns than it can ban the sale of protected

books, *Virginia* v. *Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988);

contraceptives, *Carey*, *supra*, 431 U.S. 678; *Griswold* v. *Connecticut*,

381 U.S. 479 (1965), or (in this circuit) sex toys, *Reliable Consultants*,

*supra*, 517 F.3d 738. The Government's denial of the right to acquire

handguns lacks merit.

III. THE INTERSTATE HANDGUN TRANSFER BAN IS NOT A
     "LONGSTANDING, PRESUMPTIVELY LAWFUL REGULATORY MEASURE."

The Government's claim that the interstate handgun transfer ban is

a "presumptively lawful regulatory measure" lacks any evidentiary

support. It is not enough that the Framers enacted *some* regulations—

the question is whether they enacted regulations that in any way

resembled the regulation here at issue: a residence-based prohibition

on acquiring arms. Nor would it suffice had analogous regulations *ever*

existed. To support the "longstanding, presumptively lawful" claim,

laws must have some connection to the Framers' view of the Second

Amendment. Modern regulatory judgments, made under legal regimes

thought immune to the Second Amendment, cannot count.

The Government's "longstanding" argument fails by all measures.

The interstate handgun transfer ban cannot be harmonized to

historical tradition as this Court requires. Indeed, the Government's

assertions regarding historical practice do not hold up when examined.

A.     "Longstanding" Laws Need Not Have Direct Framing
       Era Analogs, But They Must Be Harmonized with
       Framing Era Tradition and Practice.

The Government errs egregiously when claiming that "the Supreme

Court and this Court have made clear that 'evidence of founding-era

thinking' is not required." Appellants' Br. 21. *Heller* and *NRA* both

make explicitly clear that "founding-era thinking" is precisely what is

at stake when considering the Second Amendment's scope.

*Heller* instructed that the Second Amendment must be understood

according to its original public meaning. "In interpreting this text, we

are guided by the principle that '[t]he Constitution was written to be

understood by the voters; its words and phrases were used in their

normal and ordinary as distinguished from technical meaning.'" *Heller*,

554 U.S. at 576 (quotation omitted). "Constitutional rights are

enshrined with the scope they were understood to have when the

people adopted them, whether or not future legislatures or (yes) even

future judges think that scope too broad." *Id.* at 634-35.

Whatever its language might signify to modern eyes, "an amendment to the Constitution should be read in a 'sense most obvious to the common understanding at the time of its adoption, . . . For it was for public adoption that it was proposed.'" *Adamson* v. *California*, 332 U.S. 46, 63 (1947) (Frankfurter, J., concurring) (citation omitted), *overruled on other grounds by Malloy* v. *Hogan*, 378 U.S. 1 (1964). The rule is especially salient when interpreting the Bill of Rights. "A bill of rights may be considered, not only as intended to give law, and assign limits to government . . . , but as giving information to the people [so that] every man of the meanest capacity and understanding may learn his own rights, and know when they are violated. . . ." 1 St. George Tucker, Blackstone's Commentaries, app. 308 (1803).

"Longstanding" laws can inform the "scope" of the right that the Framers ratified, because the fact that the right's ratification did not disturb certain practices may be evidence that the Framers or those who followed soon after did not view such practices as inconsistent with the right. And "*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *NRA*, 700 F.3d at 196.

But *Heller* was careful to confirm that "future legislatures" could not override "the scope [rights] were understood to have when the people adopted them," *Heller*, 554 U.S. at 634. Thus, "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning." *Moore* v. *Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (citation omitted). "[T]he relevant time period for the first-step historical analysis is 1791." *Firearms Retailers*, 961 F. Supp.2d at 935.

As this Court put it, "we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *NRA*, 700 F.3d at 194. "[A] longstanding measure that harmonizes with the history and tradition of arms regulation in this country would not threaten the core of the Second Amendment guarantee." *Id.* at 196. To carve the interstate acquisition of handguns out from the Second Amendment right to acquire handguns, the Government must show, if not an on-point 1791 enactment, at least some evidence that the Framers would have accepted such a restriction, because the restriction is consistent with "founding-era thinking."

This, the Government cannot do.

B.    The Government Failed To Produce Any Evidence of
      Analogous, Traditional Regulations.

The interstate handgun transfer prohibition is not "longstanding." It

dates only to 1968—far from the Founding Era and the post-ratification

period. And contrary to the Government's arguments, it does not

"harmonize with the history and tradition of arms regulation in this

country" in a manner that might inform the scope of Second

Amendment rights. *Id.*

The Government suggests that so long as *some* regulations existed in

the Framing Era, all modern regulations are therefore constitutional.

But it simply does not matter that "gun safety regulation was

commonplace in the colonies," or that "[a]round the time of the

founding, there were a variety of gun safety regulations in effect,

including 'laws keeping track of who in the community had guns' and

'laws disarming certain groups and restricting sales to certain groups.'"

Appellants' Br. 21-22 (quoting *NRA*, 700 F.3d at 200). Even if this case

concerned a "gun safety regulation" or "laws disarming certain groups"

—and it does not—the Supreme Court was unimpressed by the District

of Columbia's characterization of its functional firearm ban as a "gun

safety regulation." The history of Jim Crow disarmament would not constitutionalize such actions today.

Moreover, even were the Government correct in asserting that "[b]etween 1909 and 1939, at least 16 States enacted laws restricting the acquisition, possession, or carrying of one or more types of firearms to state residents," Appellants' Br. 20 (footnote omitted), only the laws pertaining to non-resident acquisition might arguably be relevant to a discussion about the longstanding nature of an interstate handgun transfer ban. Yet on examination, none of the Government's cited provisions measure up.

First, the District Court was undoubtedly correct in finding a lack of linkage between 1909, the earliest allegedly-relevant regulation, and the Framing Era. No legislator alive in 1909 had any memory of the Framing Era. "The historical traditions associated with the Second Amendment guarantee," *NRA*, 700 F.3d at 194, had long been established by the twentieth century. The Government offered zero evidence of any pre-twentieth century thinking regarding residence-based restrictions on the acquisition of firearms.

More to the point, the Court will note that all of the Government's cited provisions are state enactments. It cannot be said that state legislatures acting from 1909 through 1939 reflected compliance with the Second Amendment's requirements, because those legislatures were on notice that they were not bound to respect Second Amendment rights at all. *See United States* v. *Cruikshank*, 92 U.S. 542 (1876) (holding the Fourteenth Amendment does not apply the Second Amendment as against the States), *overruled*, *McDonald* v. *City of Chicago*, *supra*, 561 U.S. 742.

Turning to the actual substance of the allegedly similar laws, eleven of the Government's seventeen[8] twentieth-century state laws—of Rhode Island, Indiana, Alabama, West Virginia, Georgia, Montana, New York, Illinois, Massachusetts, New Jersey, and Maine— do not relate to the sale or purchase of handguns, but only to the carrying of handguns, an issue raising very different regulatory concerns. Indeed, Georgia's Supreme Court found that the state's carry license law, advanced here

---

[8]The Government cited the laws of sixteen states, but offered different Montana laws first in moving for summary judgment, and later on reply. Each is addressed here.

by the Government to justify a sales prohibition, had no application to commerce:

> It is lawful to sell pistols. But a . . . construction [of the carry restriction] might make it impossible for the carrier to deliver them to the dealer, or the dealer to deliver them to the customer. We will not anticipate that any such construction will be given, but one which will carry out the legislative purpose.

*Strickland* v. *State*, 137 Ga. 1, 12, 72 S.E. 260, 265 (Ga. 1911).

Moreover, to the extent these states required a license to carry a handgun, four of them—Illinois, New Jersey, Rhode Island and Maine—required a license only to carry a handgun in a concealed manner. Non-resident handgun carriers openly carrying handguns were left undisturbed. The Government's reliance upon New Jersey law is particularly inapt, because that state has long required a permit to purchase handguns that is made available to non-residents. *See* N.J. Stat. Ann. § 2C:58-3(d).

Two of the Government's cited carry restrictions expressly authorized the licensing of non-residents maintaining business in the state. Apart from the carry license available to residents, New York allowed handguns to be possessed by householders, storekeepers, merchants, and messengers. ROA.213. Massachusetts offered concealed

carry licenses to "any person residing *or having a place of business within the jurisdiction of the person issuing the license*." ROA.215 (emphasis added).

The 1919 North Carolina law cited by the Government, requiring a permit to purchase a handgun, required only that a permit be issued by "the clerk of the Superior Court of the county in which such purchase, sale or transfer is intended to be made." ROA.214. Permits were available to "any person . . . in any such county," and were not expressly limited to state residents. *Id.* The Government infers a residence requirement from the permit form, in which the applicant's residence address might be presupposed to be within the state, but the alternative options for describing the address leave even this much unclear. ROA.214-15. It appears that North Carolina's residence requirement dates only to 1979, with the adoption of S.B. 213, "An Act to Require that Weapons Permits be Obtained from the County of Residence of the Purchaser," N.C. Laws 1979, c. 895. Oregon required gun buyers to obtain permission from their local officials, but the cited law did not preclude out-of-state permits. The cited Arkansas provision appears to be a gun registration scheme for residents.

One law the Government cited actually contradicts its position. In 1918, Montana made it "unlawful for any person to purchase, borrow, or otherwise acquire possession of any firearm . . . from any person, firm or corporation outside of the State of Montana, without first obtaining a permit from the sheriff of the County in which such person lives." ROA.395. In other words, Montana expressly allowed its residents to acquire firearms out-of-state, and chose to subject that activity to a permit. Notably, Montana's law mirrors that of the District of Columbia today, which encourages out-of-state handgun purchases.

That leaves the Government with only Missouri and Michigan's laws, from 1921 and 1927, respectively, as limiting handgun purchases to residents who have obtained permission from their local sheriff or other police official in those states. In Missouri, the Sheriff was to "be satisfied that the person applying for the same is of good moral character and of lawful age and that the granting of the same will not endanger to public safety." ROA.215. Michigan presupposed that the police would ensure that the purchaser had not "been convicted of a felony or adjudged insane in this state or elsewhere." ROA.216.

Before the Internet age, legislatures might have viewed transients as being less susceptible to effective background checks than established residents (or, as in the case of New York and Massachusetts, non-residents who maintained a business presence in those states). If the Sheriff's personal familiarity with an individual might be disqualifying, it might have been deemed impossible to review the background of a traveling stranger. But no state generally disarmed visitors, and it cannot be said that non-residents were deemed dangerous in the sense as were minors, lunatics, and felons.

In sum, the Government is left with only two state laws far removed from the Framing Era, enacted by legislatures operating under the Supreme Court's license to ignore the Second Amendment. This cannot establish a "longstanding" exemption from the normal understanding that there must be a fundamental right to acquire arms. "[C]itation to a few isolated statutes—even to those from the appropriate time period—fall[] far short of establishing that gun sales and transfers were historically unprotected by the Second Amendment." *Illinois Retailers*, 961 F. Supp. 2d at 937 (citation omitted). The Government has shown much less here.

The Bill of Rights would quickly disappear if sparse citation to an anomalous state law here or there could undermine the considered understanding of so basic a constitutional right as the right to acquire arms, especially if those state laws haled from an era preceding the Fourteenth Amendment's incorporation of rights as against the states. Early Ohio laws punished "any person" fourteen or older who "shall profanely curse or damn, or profanely swear by the name of God, Jesus Christ or the Holy Ghost;" Addendum 2, and anyone who "shall exhibit any puppet show, wire dancing or tumbling, jugling [sic] or slight of hand, and shall ask or receive any money or other property for exhibiting the same . . . ." *Id*. at 3. Manchester, New Hampshire commanded that "[n]o person shall sing or repeat, or cause to be sung or repeated, any lewd, obscene, or profane songs, or shall repeat any lewd, obscene, or profane word, or write or mark in any manner" such word "or obscene or lascivious figure or representation, on any . . . thing whatever." *Id*. at 5. But these laws prove only that some legislators do not share constitutional values, not that today, there is no First Amendment right to "profanely" invoke God, exhibit puppet shows, sing crude songs or render lascivious figures.

IV.  THE INTERSTATE HANDGUN TRANSFER BAN FAILS ANY LEVEL OF MEANS-ENDS SCRUTINY.

  A.  The Interstate Handgun Transfer Ban "Burdens" and "Regulates" Second Amendment Conduct, Thereby "Impinging" Upon the Right to Keep and Bear Arms.

The Government and its amici repeatedly deny that Plaintiffs' case passes step one of the two step process, on grounds that the interstate handgun transfer ban does not act as a complete ban on the acquisition of handguns. The challenged "requirements do not prohibit anyone from possessing, carrying, or using firearms for self-defense anywhere, whether inside or outside the home," but "merely regulate the manner in which individuals purchase firearms." Appellants' Br. 19.

That is not the Court's inquiry at step one. Putting aside the fact that some people are priced out of the handgun market owing to the increased costs and burdens associated with the ban, the first step does not ask whether the challenged provision completely destroys the right. As *Heller* demonstrated, such laws do not trigger means-ends scrutiny at all. Rather, the first step inquiry asks whether the challenged law "regulates conduct that falls within the scope of the Second Amendment's guarantee," *NRA*, 700 F.3d at 194, "burdens conduct that

falls within the Second Amendment's scope," *id.* at195, or "impinges on the Second Amendment right," *id.* at 194.

Laws imposing a thousand dollar tax on handguns, or limiting handgun sales to the 3:00 a.m. hour, would also "not prohibit" the possession of handguns, and "merely regulate" the purchase of guns, but no court would find that such laws do not implicate the Second Amendment. Even if the Second Amendment did not inherently secure the acquisition of handguns, it is specious to claim that abolishing the national market for handguns does not in any way impinge on the People's ability to keep and bear arms.

Another version of this argument holds that Plaintiffs' rights are not violated because they have "ample alternative means of acquiring firearms for self-defense." Appellants' Br. 26 (quotation omitted). Under this construction, no burden on a constitutional right is ever unlawful. If, at the end of the day, the citizen can access the right, she should just quit complaining, obey, and bear the law's burdens. That is not the law.

Plaintiffs are also constrained to point out that the Government and its amici do not accurately describe the scope of the violation. Plaintiffs do not "merely complain that the laws result in a transaction fee of

$125 plus shipping costs," Appellants' Br. 26, which would be bad enough. Plaintiffs also complain about reduced competition and choice, higher prices, lost sales, and other incidents of abolishing the national market for a consumer product. *See, e.g.* ROA.405, ROA.411; *see also Carey*, 431 U.S. at 689.

The Government's claim that "[t]he circumstances here bear no resemblance to those in *Carey*," Appellants' Br. 27, is puzzling. *Carey* involved a challenge to New York's law restricting contraceptive sales to licensed pharmacists, brought by an out-of-state firm wishing to sell contraceptives to state residents by mail. *Carey*, 431 U.S. at 682. The circumstances are directly on-point. In any event, the Government's argument is circular. *Carey* and *Doe* v. *Bolton*, 410 U.S. 179 (1973), which the Government also mentions,[9] are allegedly different because the laws in those cases were unrelated to the states' health-protection interest, while the challenged laws here allegedly serve the interest of public safety. Appellants' Br. 27-28. In other words, because the Government should win, the constitutional right is not implicated.

---

[9]*Doe* similarly involved a challenge to a state residency requirement for obtaining an abortion. 410 U.S. at 200.

Amicus Law Center in particular employs derisive language to minimize this very substantial burden, claiming that the Hansons need only "wait a short amount of time and pay a modest transaction fee." LCPGV Br. 20. It even labels the convoluted multi-dealer process a "minor inconvenience." *Id.* at 21. But these are merely value judgments offered by people who are basically opposed to civilian ownership of firearms. They might feel differently about paying a $125 tax to vote, being forbidden from accessing abortion services across state lines, or waiting a short amount of time to buy birth control.

Perhaps to some, these, too, would be "minor inconveniences," arguably going to the question of fit—but not to the question of whether constitutional rights are implicated. Indeed, amicus Law Center is simply wrong in claiming that the Hansons "remain completely free to purchase the handguns they desire in their home jurisdiction." LCPGV Br. 20. There are no handgun retailers in Washington, D.C. ROA.284, ROA.287.

And even if there were handgun retailers in Washington, D.C., the Hansons would enjoy as much a right in purchasing handguns across the District line from competing retailers—an act specifically

authorized by the District police—as they do in purchasing anything else. After all, Americans are ordinarily entitled to exercise their constitutional rights throughout the territory of the United States. For example, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schad* v. *Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) (quoting *Schneider* v. *State*, 308 U.S. 147, 163 (1939)).

In *Ezell*, the district court denied a motion to preliminarily enjoin Chicago's gun range ban, theorizing that plaintiffs who sought to use gun ranges were only harmed by the added expense of traveling outside the city to do so. The Seventh Circuit reversed. "This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly mistaken assumption." *Ezell*, 651 F.3d at 697.

Invoking the rule of *Schad* and *Schneider*, the Seventh Circuit explained:

> The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

*Id.* Instead, the city was required to justify its restriction under "a more rigorous showing" than intermediate, "if not quite 'strict scrutiny,'" *id.* at 708, something it could not do.

The interstate handgun transfer ban impinges upon the Second Amendment. The Court must proceed to the step two inquiry.

B.     The Interstate Handgun Transfer Ban Is Subject to Strict Scrutiny.

The interstate handgun transfer ban is very much "a salient outlier in the historical landscape of gun control." *NRA*, 700 F.3d at 205. Laws of this nature were virtually unknown prior to its late twentieth-century enactment. And banning handgun sales to all law-abiding, responsible adults, outside their home state, plainly threatens the Second Amendment right at its core. The law is not "analogous to longstanding, presumptively lawful bans on possession by felons and the mentally ill," *id.* at 206, nor does it target "a discrete category" of adults, *id.* at 205; it targets everyone. *All* handgun consumers are severely impacted by being denied a national market for handguns. Our national union presupposes something of a free trade zone among its core benefits. A law confining to the borders of one's state all trade

in an article to which the people have an enumerated, fundamental right cannot be the subject of reduced scrutiny.

It bears repeating: "A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny." *NRA*, 700 F.3d at 195; *see also United States* v. *Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny"). The interstate handgun transfer ban squarely fits this description.

Likewise on-point is the Supreme Court's decision in *Carey*, *supra*, 431 U.S. 678, striking down a New York law barring all but licensed pharmacists from selling contraceptives under strict scrutiny. The Court began by noting that "[t]he burden is, of course, not as great as that under a total ban on distribution." *Id*. at 689.

> Nevertheless, the restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition.

*Id.*; *cf. Annex Books, Inc.* v. *City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2010) ("laws requiring the closure of bookstores at night and on Sunday are likely to curtail sales, the public benefits of the restrictions must be established by evidence, and not just asserted").

Admittedly, this Court applied only intermediate scrutiny to test the prohibition on FFL sales to 18-20 year olds, "to the extent that these laws resemble presumptively lawful regulatory measures . . ." *NRA*, 700 F.3d at 206. But this Court also explained that its "two-step" methodology for resolving Second Amendment cases draws heavily upon First Amendment doctrine, and that First Amendment law further guides the selection of a standard of review at the second step. *Id.* at 197-98.

The First Amendment analogy is instructive. Had the Government banned the interstate sale of books, on the theory that local bookstores were better able to police community standards for obscenity, the Government could be expected to make the same arguments seen here: consumers remain free to purchase any book so long as their local store would stock it, and booksellers may sell any book that is legal to possess in their jurisdiction, so long as the purchaser was a local

resident less likely to smuggle the books across state lines into more restrictive jurisdictions. The reader could pay to ship an out-of-state book to a local book-licensee who, for a fee as high as $125, might complete the transfer. But it would be very difficult to imagine this Court applying only "intermediate" scrutiny to such a law, even if though it would be content-neutral (applying to all books), on the notion that it imposes only slight burdens the First Amendment's periphery.

Indeed, the other two factors leading to intermediate scrutiny in *NRA* are not presented here. The 18-20 year olds ban was "sufficiently bounded" in large part because handguns were still available on the unregulated private market, or through family transfers. *Id.* at 207. The restriction here is more pervasive, applying to *all* handguns, however acquired, if they are acquired beyond the borders of one's state. And unlike the age qualification, the interstate handgun transfer ban does not have a "temporary effect." *Id.* Wherever one lives, one is denied the right to directly acquire handguns in the rest of the country.

But in the final analysis, the exact level of scrutiny is unimportant. The interstate handgun transfer ban fails all the same.

C.      Blanket Prohibition of Interstate Handgun Transfers
        Does Not Properly Fit Any Governmental Interest.

The Government cannot meet its burden, under strict or

intermediate scrutiny, of justifying a stifling residential restriction of

Second Amendment rights. Under strict scrutiny, the Government

carries the burden of proving the law "furthers a compelling interest

and is narrowly tailored to achieve that interest," *Citizens United* v.

*FEC*, 558 U.S. 310, 340 (2010) (quotation omitted), a burden that

cannot be met where less restrictive alternatives are available. *Ashcroft*

v. *ACLU*, 542 U.S. 656, 666 (2004). Intermediate scrutiny "requires the

government to demonstrate a 'reasonable fit' between the challenged

regulation and an 'important' government objective." *NRA*, 700 F.3d at

195. "The regulation need not be the least restrictive means of serving

the interest, but may not burden more [conduct] than is reasonably

necessary." *Marzzarella*, 614 F.3d at 98.

Plaintiffs do not dispute that the Government has a legitimate, even

compelling interest in regulating handgun sales in the interest of public

safety. Nor does it matter in the end whether the Government has an

interest in curtailing interstate handgun trafficking that violates state

laws, because the Government has so many options to better tailor its regulations. But the District Court was correctly skeptical as to whether Congressional findings from the mid-1960s are obsolete.

"[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." *Carolene Products*, 304 U.S. at 153;[10] *see McCutcheon* v. *FCC*, 134 S. Ct. 1434, 1456 (2014) ("absence of [harmful] prospect today" to uphold campaign contribution limits); *Shelby County* v. *Holder*, 133 S. Ct. 2612, 2617 (2013) (invalidating measures predicated on "decades old data and eradicated practices"); *Kirkpatrick* v. *Preisler*, 394 U.S. 526, 535-36 (1968) (rejecting old voting district map because changes in transportation and communications had rendered it obsolete in terms of promoting equal representation); *Karcher* v. *Daggett*, 462 U.S. 725, 733 (1983) (modern technology changes redistricting rationale).

The Government relied upon the finding that, in the 1960s, Washington, D.C.'s gun laws were being circumvented "because many

---

[10]The statute at issue in *Carolene Products* was eventually invalidated on changed circumstances grounds. *Milnot Co.* v. *Richardson*, 350 F. Supp. 221, 225 (S.D. Ill. 1972).

individuals with criminal records in the District of Columbia purchased handguns in a nearby Maryland county with 'minimal' sales regulations." Appellants' Br. 3 (quotation omitted). Today, however, Washington, D.C. *wants* people who would purchase guns to purchase them in Maryland and other states—it amended its laws specifically for that purpose. And any Maryland gun dealer knows not to transfer a firearm to a District of Columbia resident who lacks a registration certificate for that firearm, obtained after that dealer assisted in its application.

Moreover, the undeniable fact is that modern communications and computerized databases wholly enable national access to federal or state background check databases, as the case may be. Federal law has featured national access to the NICS database for some time. Of course, this case does not challenge the refusal of any state to provide national access to its background check system, but it does involve a "state" that positively invites out-of-state reliance on its handgun licensing scheme.

The Government's argument that "if the district court's decision were upheld, there would be no federal requirement that handgun

sales comply with the laws of the purchaser's state of residence,"
Appellants' Br. 36, is specious. By this logic, no law could ever be struck
down for failing strict or intermediate scrutiny, so long as some
properly proscribed activity falls within its overreach. Courts cannot re-
write laws, but they can instruct Congress as to how to fix a
constitutional defect. *See, e.g.* ROA.484 ("The current law relating to
rifles and shotguns provides an example of a narrowly tailored law").
Congress could easily extend its treatment of interstate AK-47 sales to
interstate handgun sales—by requiring compliance with local laws, and
authorizing the prosecution of those who circumvent those local laws.

Moreover, even were the interstate handgun transfer ban
constitutional on its face, Plaintiffs asserted, and the District Court
approved of, an as-applied challenge for the facts of this case. How can
the Hansons circumvent Washington, D.C.'s law by complying with it,
including the provision regarding interstate sales? Limiting the
interstate handgun transfer ban to situations that would actually
circumvent state laws would be a significant improvement.

Under any form of heightened scrutiny, it is not enough that the
challenged provisions might advance the Government's interest.

Banning all gun sales would also address the circumvention of state gun laws. Nor would the fact that handguns are misused in crime provide any more justification for the unconstitutional law here than it did in *Heller*. Assessing the validity of a handgun ban, the Supreme Court declined to give weight to handguns' criminal application because handguns are also preferred by law-abiding, responsible citizens. Amicus Brady's allegations concerning trafficking are likewise misplaced. Neither the challenged laws, nor this case, address the circumstance of an individual lawfully buying guns in one state and then unlawfully transporting those guns for illegal sale elsewhere.

The argument that interstate sales should not be allowed, because states do not adequately update the federal background check database, is unavailing. By that logic, states could prohibit all gun sales by simply refusing to operate or assist in the operation of any background check system. In any event, nothing prevents a state that chooses to become a point of contact state from allowing out-of-state dealers to access its background check system. And again, the extremity of prohibiting all out-of-state sales on an anti-circumvention rationale is even more apparent where states actually license the

purchase of handguns. The District of Columbia's government is not especially enamored of the Second Amendment, but it realized that it had no legitimate interest in where its residents obtain handguns so long as those handguns are pre-registered.

As the District Court found, the Government's "statistics . . . do not speak to the need for, and the reasonableness of, requiring the participation of an additional in-state FFL in *all* transactions involving out-of-state handguns." ROA.480 (emphasis added). Neither do the new statistics offered by amicus Brady on appeal answer the question. It remains unclear what is so compelling, or important, about ensuring that handgun transfers go through a local middleman who does absolutely nothing that the initial federal firearms licensee cannot do as well. The out-of-state dealer, and the local middleman, hold the same federal license, with identical responsibilities.

Federal law already charges FFLs selling rifles and shotguns with adherence to the laws of other jurisdictions when selling firearms to out-of-state residents. If Mance can follow an out-of-state rifle law, he can follow an out-of-state handgun law. Courts are rightfully skeptical of state residency restrictions based on the concept that the people of

one state cannot gain sufficient knowledge of laws or conditions in another state. *Cf. O'Reilly* v. *Bd. of Appeals*, 942 F.2d 281 (4th Cir. 1991) (non-resident taxi driver can prove familiarity with out-of-state geography). Attorneys, for example, are required to know and uphold the laws of the various jurisdictions in which they are barred, yet that does not allow states to restrict bar membership to in-state residents. *Supreme Court of New Hampshire* v. *Piper*, 470 U.S. 274, 285 (1985).

The notion that local handgun laws are necessarily more complicated, to the point of being unknowable by out-of-state firearms dealers, is specious. Few laws have vexed courts as much as regulations seeking to ban particular rifles as "assault weapons." *See, e.g.*, *Peoples Rights Org.* v. *City of Columbus*, 152 F.3d 522 (6th Cir. 1998) (striking down five definitions of "assault weapon" as unconstitutionally vague); *Springfield Armory* v. *City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994) (rifle "ordinance is fundamentally irrational and impossible to apply consistently by the buying public, the sportsman, the law enforcement officer, the prosecutor or the judge"); *Harrott* v. *County of Kings*, 25 Cal.4th 1138, 1153, 25 P.3d 649, 659 (2001) (adopting saving construction of California Assault Weapons Control Act provisions

raising "serious and doubtful constitutional questions as applied to ordinary citizens"). And yet as a matter of federal law, licensed firearms dealers are entrusted to sell long arms in compliance with all state and local laws throughout the United States, to the residents of any American city.

In any event, many jurisdictions—including the one in which the Hansons reside—remove all hypothetical guesswork from handgun transactions by requiring police pre-approval of any handgun transfer. D.C. Code § 7-2502.06(a); *see also, e.g.,* Haw. Rev. Stat. § 134-2; Mich. Comp. Laws § 28.422(1); N.C. Gen. Stat. § 14-402(a). If the District has satisfied itself that an individual may acquire and bring home a handgun, following its famously rigorous handgun registration procedures, it should not matter—and to the District government, it no longer matters—whether a dealer delivers the handgun inside or outside the District. As the Government can accept Mance honoring an approved rifle registration certificate from the District of Columbia's Metropolitan Police Department, it is illogical for it to resist allowing him to honor identical District Police certificates issued for handguns.

However compelling might be the Government's interests in assuring that handgun consumers comply with their local firearms laws, that interest is adequately satisfied in the same manner that the Government satisfies its interest in promoting compliance with local long gun laws: by mandating that licensed firearms dealers follow local laws. And the Government has no valid independent regulatory interest, compelling or otherwise, in assuring compliance with local firearms laws where the consumers' local authorities pre-approve handgun transactions.

Given licensed dealers' ability to follow the law, the feasability of adequate background check systems, and the existence of local pre-transfer approval procedures which the Government already accepts with respect to other firearms, prohibiting all interstate handgun transfers is obviously not a narrowly-tailored solution to any problem. To the extent the evasion of local handgun laws may be a problem, far less restrictive yet no less effective alternatives are already in place. Even if there is something about local handgun laws that make them inscrutable to out-of-state FFLs, in a manner different than long gun laws, the Government could at a minimum authorize interstate

transfers to residents of localities, such as Washington, D.C., whose strict pre-transfer licensing requirements make circumvention impossible.

V.    THE INTERSTATE HANDGUN TRANSFER BAN VIOLATES PLAINTIFFS' RIGHT TO EQUAL PROTECTION.

The Fifth Amendment's Due Process Clause has long been understood to bind the federal government to standards of equal protection. *Bolling* v. *Sharpe*, 347 U.S. 497, 499 (1954). "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley* v. *Valeo*, 424 U.S. 1, 93 (1976) (citations omitted). Equal protection analysis demands that heightened scrutiny be applied in cases which burden fundamental rights or target suspect classes. *Romer* v. *Evans*, 517 U.S. 620, 621 (1996).

Plaintiffs do not contend that non-state residents constitute a suspect class for purposes of equal protection analysis. However, it is plainly clear that the interstate handgun transfer ban burdens the Second Amendment right to keep and bear arms. Responsible, law abiding Americans who are otherwise identically situated are classified differently in their exercise of the right to acquire a handgun only on

account of their residence. And licensed gun dealers are unable to sell handguns to some customers solely on account of their location outside the putative customers' home state.

Plaintiffs acknowledge that equal protection analysis may not be reached where specific, substantive rights analysis is available. However, the Government takes the position that no substantive rights are implicated, which would leave equal protection principles in play. Even in the absence of a fundamental right or suspect class, the interstate handgun transfer ban fails rational basis review. It is not rational to prohibit a handgun transaction, on a non-circumvention rationale, when there are no local laws to circumvent because the transaction is fully legal in both the buyer and seller's home jurisdiction. It is also not rational to prohibit a handgun transaction, on a non-circumvention rationale, where the same FFL and the same consumer are allowed to engage in long gun transactions—both as a general matter, because there is no distinction between one's ability to understand and follow handgun, as opposed to long gun, law; and especially, where local laws treat handgun and long gun transactions identically.

The District Court's judgment should be affirmed.

Dated:  August 17, 2015                    Respectfully submitted,

                                      /s/ Alan Gura

William B. Mateja                          Alan Gura
Michael D. Nammar                             Counsel of Record
FISH & RICHARDSON P.C.                      GURA & POSSESSKY, PLLC
1717 Main Street, Suite 5000               105 Oronoco Street, Suite 305
Dallas, TX 75201                           Alexandria, VA 22314
214.747.5070/Fax 214.747.2091              703.835.9085/703.997.7665

*Counsel for Appellees*

CERTIFICATE OF SERVICE

On this, the 17th day of August, 2015, I electronically filed the

attached Brief with the Clerk of the Court for the United States

Court of Appeals for the Fifth Circuit by using the CM/ECF system.

Participants in this appeal are registered CM/ECF users who will be

served by the CM/ECF system on August 17, 2015.

I declare under penalty of perjury that the foregoing is true and

correct.

Executed this the 17th day of August, 2015.

/s/ Alan Gura
Alan Gura

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 11,671 words, excluding  the parts of the brief  exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.


/s/ Alan Gura
Alan Gura
Attorney for Plaintiffs-Appellees
Dated: August 17, 2015

# Addendum

# ACTS

OF

*A GENERAL NATURE,*

Enacted, revised and ordered to be re-printed,

AT THE FIRST SESSION

OF THE

Twenty-Second General Assembly

OF THE

# STATE OF OHIO,

BEGUN AND HELD IN THE TOWN OF COLUMBUS,

## DECEMBER 1, 1823,

AND IN THE TWENTY-SECOND YEAR OF SAID STATE.

VOL. XXII.

PUBLISHED BY AUTHORITY.

## COLUMBUS:

PRINTED BY P. H. OLMSTED.

1824.

STANFORD LIBRARY

Addendum 1

Digitized by Google

rant legally issued or by the order of some civil officer within the county on view or hearing; and shall be fined in a sum not exceeding twenty dollars; and any judge of the court of common pleas or justice of the peace within the proper county, be, and they are hereby empowered, authorized and required to proceed against and punish every person offending against the provisions of this act; and upon view, or hearing, may, or on information given on oath or affirmation, shall, if need be, issue his warrant to bring the body of the accused before him, and shall, in a summary way, inquire into the truth of the accusation; and if guilty, shall enforce the penalty of this act annexed to the offence: and said offender (if the said judge or justice should think necessary,) may be detained in custody and committed until sentence be performed: *Proviso*, That this section shall not be so construed as to deprive any religious society of the right of laying hands upon the person or persons who may be disturbing the congregation, and turning him or them out of their church or place of worship. *Proviso.*

Sec. 4. That if any person of the age of fourteen years or upwards, shall profanely curse or damn, or profanely swear by the name of God, Jesus Christ or the Holy Ghost, each and every person so offending, shall be fined in a sum not exceeding one dollar, nor less than twenty-five cents for every such offence. *Profane swearing.*

Sec. 5. That if any person or persons shall be found making or exciting any contention or disturbance at any tavern, court, election or other meeting of the citizens for the purpose of transacting or doing any business appertaining to or enjoined on them, the person or persons so offending, shall be fined in a sum not exceeding five dollars, nor less than fifty cents each, and if necessary, imprisoned until such meeting shall be ready to disperse: *Proviso*, The time for which such person or persons may be confined, shall not exceed six hours. *Exciting disturbance at court, &c.* *Proviso.*

Sec. 6. That if any person or persons shall play bullets along or across any street in any town or village within this state, or if any person or persons shall run any horse or horses within the limits of any such town or village, every person or persons so offending, shall be fined in a sum not exceeding five dollars nor less than fifty cents. *Bullets and horse racing in streets.*

Sec. 7. That if any keeper of a public house or retailer of spiritous liquors in this state, shall establish, keep, or permit to be kept upon his or their lots or premises, any nine pin alley, or shall in whole or in part be interested in any nine pin alley, upon the lot or premises of another, he or they shall, upon conviction thereof forfeit and pay to, and for the use of the proper township, not less than twenty-five, nor more than one hundred dollars: And this section *Nine pin alley*

Digitized by Google

shall be construed to extend to any alley denominated a nine pin alley whether such alley is used for playing therein, a greater or less number than nine pins.

*Puppet shows and wire dancing for money.* Sec. 8. That if any person or persons shall exhibit any puppet show, wire dancing or tumbling, jugling or slight of hand within this state, and shall ask or receive any money or other property for exhibiting the same, every such person so offending, shall forfeit and pay for every such offence the sum of ten dollars.

*Destroying advertisements set up, &c.* Sec. 9. That if any person shall intentionally deface, obliterate, tear down or destroy in whole or in part any copy or transcript of or extract from any law or act of the United States or of this state, or any proclamation, publication, advertisement of notification, whatsoever, set up in any public place within this state, for the public information of any citizen, by the authority of any law or act of this state, such person shall, on conviction thereof, before any court having jurisdiction of the same, be fined in any sum not exceeding ten dollars, and may be committed to jail for a time not exceeding twenty four hours, at the discretion of the court.

*Selling spirits, &c. at or near religious assemblies.* Sec. 10. That if any person shall expose or offer for sale at any place where any religious society of people are collecting or collected together, for the purpose of religious worship, or within one mile thereof any spirituous liquor, cider or beer, such person may be arrested and detained in custody not exceeding six hours at any one time and shall be fined in a sum not exceeding twenty dollars: *Provided,*

*Proviso.* That nothing in this act shall affect merchants, licensed tavern keepers, innkeepers, distillers or manufacturers of cider or beer, selling ardent spirits, cider or beer at their usual place of vending the same or at their residence.

*Fines how collected and paid.* Sec. 11. That all fines accruing under the provisions of this act shall be collected in the name of the state of Ohio, as in other cases of a breach of the peace, and be paid into the township treasury for the use of the townships in which the offence shall have been committed within twenty days after collected; and if any officer fail to pay over such fine by him collected agreeably to the provisions of this act,

*Penalty for neglect.* such officer shall for any such neglect forfeit and pay into the township treasury double the amount of any fine or fines by him collected, to be recovered in a summary way before any justice of the peace having cognizance of the same at the suit of the township treasurer: *Provided,* That all

*Proviso.* prosecutions under the provisions of this act shall be commenced within ten days after the offence shall have been committed, except prosecutions against justices for not paying over any fine or fines as aforesaid.

Sec. 12. That the act entitled "an act for the prevention of certain immoral practices," passed the third day of January, one thousand eight hundred and sixteen; and the act a-

Digitized by Google

Addendum 3

# THE

# CHARTER

WITH ITS

## AMENDMENTS

AND THE

# REVISED ORDINANCES,

OF THE

## CITY OF MANCHESTER, *N.H.*

PUBLISHED UNDER THE AUTHORITY OF THE CITY COUNCIL.



MANCHESTER, N. H.,
HENRY A. GAGE & Co., PRINTERS.
1859.

Digitized by Google

Addendum 4

and to prosecute any person offending against any of its provisions.

Sec. 17. No person shall make any brawls or tumults, or, in any street, lane or alley, or public place, be guilty of any rude, indecent or disorderly conduct, or shall insult or wantonly impede any person passing thereon, or shall throw any stones, bricks, snowballs, or dirt, or play at ball or at any game at which ball is used.

Sec. 18. No person shall sing or repeat, or cause to be sung or repeated any lewd, obscene, or profane songs, or shall repeat any lewd, obscene, or profane words, or write or mark in any manner any obscene or profane word, or obscene or lascivious figure or representation, on any building, fence, wall, post or other thing whatever.

Sec. 19. No person shall wantonly injure or deface any building, fence, wall, post, sign-board, or sign, or any lamp-post, or lamp or lantern thereon, or shall wantonly cut or injure any tree standing in any street, highway or public place, or shall rob any garden or field of fruit or vegetables, or shall wantonly injure any trees, shrubs, or bushes growing in any street, common or square, garden, field, or yard, or shall, without lawful permission, climb on or over any fence of any garden or yard.

Sec. 20. No person shall, within the compact part of the city, fire or discharge any cannon, gun, pistol, or other fire-arms, or fire or discharge any rockets, squibs, crackers, or any preparation of gun-powder, (except by permission of the Mayor and Aldermen in writing,) or shall make any bonfire, or improperly use or expose any friction matches, or knowingly raise or repeat any false cry of fire.

Sec. 21. No person shall, within the view of any dwelling house, or of any public road or street, in the day time, bathe or swim without necessity, or expose his person indecently in dressing or undressing for the purpose of swimming or bathing or otherwise, without necessity.