No. 15-10311

## In The
## United States Court of Appeals
## For the Fifth Circuit

FREDRIC RUSSELL MANCE, JR.; TRACEY AMBEAU HANSON; ANDREW HANSON; CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS,

Plaintiffs-Appellees,

v.

LORETTA LYNCH, U.S. ATTORNEY GENERAL; THOMAS E. BRANDON, ACTING DIRECTOR, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

**BRIEF OF AMICUS CURIAE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. IN SUPPORT OF PLAINTIFFS-APPELLEES**

Charles J. Cooper
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600

*Counsel for Amicus Curiae
National Rifle Association of
America, Inc.*

# CERTIFICATE OF INTERESTED PERSONS

15-10311, *Fredric Mance, Jr., et al. v. Loretta Lynch, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees:**
Fredric Russell Mance, Jr.
Tracey Ambeau Hanson
Andrew Hanson
Citizens Committee For The Right To Keep And Bear Arms

**Counsel for Plaintiffs-Appellees:**
Alan Gura
GURA & POSSESSKY

William B. Mateja
Michael D. Nammar
FISH & RICHARDSON P.C.

**Defendants:**
Loretta Lynch
Thomas E. Brandon

**Counsel for Defendants-Appellants:**
Benjamin C. Mizer
Beth S. Brinkmann
John R. Parker
Mark B. Stern
Michael S. Raab
Tara S. Morrissey
Lesley R. Farby
Daniel M. Riess
U.S. DEPARTMENT OF JUSTICE

***Amici Curiae*:**
The Brady Center to Prevent Gun Violence
The Law Center to Prevent Gun Violence
The National Rifle Association of America

**Counsel for *Amici Curiae*:**
(For *Amicus* The Brady Center to Prevent Gun Violence):
Sean A. Lev
Matthew A. Seligman
Eduardo F. Bruera
KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

(For *Amicus* The Law Center to Prevent Gun Violence):
John Sorrenti
COVINGTON & BURLING, L.L.P.

(For *Amicus* The National Rifle Association of America, Inc.):
Charles J. Cooper
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC

The National Rifle Association of America, Inc. does not have a parent

corporation, nor does any publicly held corporation own 10% or more of its stock.


Dated: August 24, 2015          <u>s/ Charles J. Cooper</u>
                                        Charles J. Cooper

                                        *Counsel for Amicus Curiae*
                                        *National Rifle Association of*
                                        *America, Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERSTED PERSONS ............................................................i

TABLE OF AUTHORITIES ...................................................................................iv

INTEREST OF AMICUS CURIAE .........................................................................1

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................3

I.     Congress's Ban on the Interstate Purchase and Sale of Handguns Infringes Conduct That Falls Within the Scope of the Second Amendment..................4

       a.     Founding-Era History Indicates that the Interstate Purchase and Sale of Firearms Is Protected by the Second Amendment....................4

       b.     There Is No Post-Ratification, Longstanding Tradition of Restricting Interstate Commerce in Firearms. ....................................10

II.    Congress's Ban on the Interstate Purchase and Sale of Handguns Is a Severe Infringement of Rights that Lie at the Core of the Second Amendment...................................................................................................14

       a.     A Restriction on Acquiring Firearms Is Tantamount to a Restriction on Possessing Them. ..........................................................................14

       b.     Congress's Ban Gives In-State Firearm Dealers a Veto over Interstate Competition and Thus Severely Infringes Core Second Amendment Conduct.........................................................................19

III.   Congress's Ban on the Interstate Purchase and Sale of Handguns Fails Any Measure of Heightened Constitutional Scrutiny. .................................22

CONCLUSION .....................................................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010)...............16, 17

*Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460 (7th Cir. 2009) ..............16

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986)............................................15, 16

*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935)........................................13, 14

*Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996).............................................16

*Brown v. Entertainment Merchs. Ass'n*, 131 S. Ct. 2729 (2011) ...........................25

*Buckley v. Valeo*, 424 U.S. 1 (1976).................................................................17, 25

*Carey v. Population Servs., Int'l*, 431 U.S. 678 (1977)...................................*passim*

*Citizens United v. FEC*, 558 U.S. 310 (2010)........................................................17

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ..........................................................25

*Comptroller of the Treasury of Md. v. Wynne*, 135 S. Ct. 1787 (2015) .................13

*Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299 (1851).................................13

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................*passim*

*Ex parte Jackson*, 96 U.S. 727 (1877) ...................................................................15

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
     546 U.S. 418 (2006)......................................................................................18

*Grosjean v. American Press Co.*, 297 U.S. 233 (1936).........................................15

*Hughes v. Oklahoma*, 441 U.S. 322 (1979) ............................................................9

*Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928
     (N.D. Ill. 2014)...............................................................................................15

*International Text-Book Co. v. Pigg*, 217 U.S. 91 (1910) .....................................13

*Mance v. Holder*, 74 F. Supp. 3d 795 (N.D. Tex. 2015) ...............................6, 20, 24

*McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465 (5th Cir. 2014) .....18, 19

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ......................................................26

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................19, 23

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
     460 U.S. 575 (1983).......................................................................................16

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................................6

iv

*NRA v. BATFE*, 700 F.3d 185 (5th Cir. 2012) ...................................................*passim*

*NRA v. BATFE*, 714 F.3d 334 (5th Cir. 2013) .........................................................7

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ...............................6

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008) .........................18

*Reno v. American Civil Liberties Union,* 521 U.S 844 (1997) .................................7

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)............................................6

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)................................14, 15

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ....................................7, 8, 22

*United States v. Virginia*, 518 U.S. 515 (1996) .....................................................26

*Welton v. Missouri*, 91 U.S. 275 (1875) ................................................................13

## Statutes

18 U.S.C.

§ 922 (a)(3) .....................................................................................2, 20

§ 922(b) .................................................................................................20

§ 922(b)(3) .............................................................................2, 24, 27

Act of Feb. 25, 1939, ch. 14, 1939 Me. Laws 53 ...................................................11

Act of Apr. 6, 1936, No. 82, 1936 Ala. Acts 51 .....................................................11

Act of Feb. 21, 1935, ch. 63, 1935 Ind. Acts 159....................................................11

Act of June 2, 1927, ch. 372, 1927 Mich. Pub. Acts 887 ........................................12

Act of March 11, 1924, ch. 137, 1924 N.J. Laws 305 .............................................11

Act of March 19, 1923, 1923 Ark. Acts 379 ...........................................................11

Act of May 29, 1922, ch. 485, 1922 Mass. Acts 560 ..............................................11

Act of April 7, 1921, 1921 Mo. Laws 692...............................................................12

Act of July 11, 1919, 1919 Ill. Laws 431 ................................................................11

Act of March 10, 1919, ch. 197, 1919 N.C. Sess. Laws 397....................................12

Act of March 3, 1919, ch. 74, 1919 Mont. Acts 147 ...............................................13

Act of Feb. 20, 1918, ch. 2, 1918 Mont. Laws 6 ...............................................12, 13

Act of May 21, 1913, ch. 608, 1913 N.Y. Laws 1627..............................................11

Act of Feb. 26, 1913, ch. 256, 1913 Or. Laws 497..................................................12

Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134 ...............................................11

Act of May 2, 1910, ch. 591, 1910 R.I. Acts & Resolves 156 ................................11

Act of Feb. 16, 1909, ch. 51, 1909 W. Va. Acts 394...............................................11

## <u>Other</u>

*The Address and Reasons of Dissent of the Pennsylvania Minority of the Convention of the State of Pennsylvania to their Constituents* (1787), *reprinted in* 3 H. STORING, THE COMPLETE ANTI-FEDERALIST (1981)................8

THE FEDERALIST NO. 7 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ......9, 10

THE FEDERALIST NO. 22 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ........10

THE FEDERALIST NO. 42 (James Madison) (Clinton Rossiter ed., 1961) ...............10

Journal of Convention: Wednesday, February 6, 1788, *reprinted in* DEBATES AND PROCEEDINGS IN THE CONVENTION OF THE COMMONWEALTH OF MASSACHUSETTS (1856) .......................................................................................8

Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703 (2012)...............................................23

## INTEREST OF AMICUS CURIAE

The National Rifle Association of America, Inc. ("NRA") is the oldest civil rights organization in America and the Nation's foremost defender of Second Amendment rights. Founded in 1871, the NRA has approximately five million members and is America's leading provider of firearms marksmanship and safety training for civilians. The NRA has a strong interest in this case because its outcome will affect the ability of the many NRA members who reside throughout the United States to exercise their fundamental right to keep and bear arms.

Pursuant to Federal Rule of Appellate Procedure 29, the NRA certifies that this brief was not written in whole or in part by counsel for any party, that no party or party's counsel made a monetary contribution to the preparation and submission of this brief, and that no person or entity other than the NRA, its members, and its counsel has made such a monetary contribution. All parties have consented to the filing of this brief.

## INTRODUCTION

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). The Second Amendment, *Heller* makes clear, does not allow the government to "ban the possession of handguns," *id.* at 629; it also surely does not allow it to accomplish the same end by preventing

law-abiding citizens from *purchasing* a handgun in the first place. As the Court has said in the context of other constitutional rights, "[l]imiting the *distribution*" of an item that law-abiding citizens have a constitutional right to possess "clearly imposes a significant burden on the right of the individuals to *use*" that item. *Carey v. Population Servs., Int'l*, 431 U.S. 678, 689 (1977) (emphases added) (holding that a statute banning the distribution of contraceptives by anyone other than a licensed pharmacist was unconstitutional).

The provisions of federal law challenged in this case burden the Second Amendment right to keep and bear arms in just this way. Section 922(a)(3) of the federal criminal code generally makes it unlawful for any person "to transport into or receive in the State where he resides . . . any firearm purchased . . . outside that State." 18 U.S.C. § 922(a)(3). Section 922(b)(3), in tandem, bars any federally-licensed firearm dealer from selling a handgun "to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located." These restrictions do not apply to long guns; only handguns, "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. And while the statute permits interstate transactions in which an out-of-state handgun is first transferred to an in-state dealer to close the sale, the only effect of that exception is to give a veto over

out-of-state handgun sales to in-state dealers—*precisely the individuals most motivated to prevent interstate competition*.

Taken together, the challenged provisions amount to a severe restriction on conduct that lies at the core of the Second Amendment: the rights of law-abiding, responsible citizens to acquire—and therefore *to possess*—handguns for the protection of hearth and home. The Second Amendment will not tolerate the severe burden imposed by the challenged provisions of Section 922, and the district court was right to strike them down.

## ARGUMENT

In assessing a law challenged on Second Amendment grounds, this Court undertakes a "two-step inquiry," asking first "whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee," and if so, "whether the law survives the proper level of scrutiny." *NRA v. BATFE*, 700 F.3d 185, 194 (5th Cir. 2012). The ban on interstate commerce in handguns challenged in this case imposes an onerous burden on conduct—the *very acquisition* of arms to be kept and borne—that lies not only within the confines of the Second Amendment but at its core. That ban thus must be subjected, at the very least, to the strictest of means-ends scrutiny. *See id.* at 195. And it cannot survive that or any other level of heightened scrutiny, for the ban is not narrowly tailored to achieve any interest the Government may possess.

## I. Congress's Ban on the Interstate Purchase and Sale of Handguns Infringes Conduct That Falls Within the Scope of the Second Amendment.

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008). Accordingly, the "historical analysis" that *Heller* instructs courts to use to discern "the full scope of the Second Amendment" must focus on *the time of ratification. Id.* at 626. Here, the United States has provided no founding-era support whatsoever for the notion that the interstate purchase and sale of firearms falls outside the Second Amendment's protections. And even if the historical lens is widened considerably to reach the assortment of state statutes unearthed by the Government that were enacted between 1909 and 1939—well-over a century after the Second Amendment was ratified, and in fact closer in time to *us* than the Founders—the United States still falls far short of showing that its ban is the type of "longstanding prohibition[ ]," that *Heller* blesses as "presumptively lawful." *Id.* at 626, 627 n.26.

### a. Founding-Era History Indicates that the Interstate Purchase and Sale of Firearms Is Protected by the Second Amendment.

1. The Supreme Court's watershed opinion in *Heller* is important not only for its outcome but for its methodology. "In interpreting [the Second Amendment's] text," the Court noted, "we are guided by the principle that '[t]he Constitution was written to be understood by the voters.' " *Id.* at 576 (quoting

*United States v. Sprague*, 282 U.S. 716, 731 (1931) (alteration in original)). That principle entails that interpretation of the Second Amendment's words must look to the "normal and ordinary . . . meaning" that would "have been known to ordinary citizens in the founding generation." *Id.* at 576–77. And because the founding-era meaning of the Second Amendment's text indicates that it "codified a *pre-existing* right," interpretation of that constitutional provision must also look to "the historical background of the Second Amendment." *Id.* at 592.

This privileging of founding-era understandings is evident not only in what the Court *said* in *Heller*, but also in what it *did*. The Court spent the first twenty-three pages of its analysis carefully parsing the original meaning of each phrase in the Second Amendment's text. It spent the next five sifting through its drafting history and founding-era state-constitutional analogues. Only then did it turn to an analysis of "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," an inquiry it undertook only to confirm that these later generations "interpreted the amendment as we do." *See id.* at 605.

Because of *Heller*'s unequivocal focus on the founding-era history and meaning of the Second Amendment, several circuit courts have concluded that any inquiry into the "scope" of the Second Amendment's protections must, in the same way, be rooted in *the founding generation*'s understanding of the contours of the

right they codified. *See Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012)

("1791" is "the critical year for determining the [Second Amendment's] meaning,

according to *McDonald v. City of Chicago*"); *United States v. Chester*, 628 F.3d

673, 680 (4th Cir. 2010) ("This historical inquiry seeks to determine whether the

conduct at issue was understood to be within the scope of the right at the time of

ratification."); *see also Peruta v. County of San Diego*, 742 F.3d 1144, 1150 (9th

Cir. 2014), *reh'g en banc granted*, 781 F.3d 1106 (9th Cir. 2015).

2.  This Court's earlier decision in *BATFE* does not stand in the way of this

sensible reading of *Heller*. In *BATFE*, this Court upheld several provisions of

federal law that make it illegal for 18-to-20 year olds to purchase handguns from

federally licensed firearm dealers. That restriction, the Court concluded, likely

"falls outside the Second Amendment's protection." *BATFE*, 700 F.3d at 203. But

in doing so, this Court deliberately and explicitly tied that conclusion to the

"evidence of founding-era thinking" that the district court properly demanded from

the Government in this case. *See Mance v. Holder*, 74 F. Supp. 3d 795, 805 (N.D.

Tex. 2015). After a thorough survey of the founding-era "historical record," this

Court concluded that "laws disarming certain groups" who were targeted "for

public safety reasons" were so "commonplace in the colonies, and around the time

of the founding" that those types of restrictions were "woven into the tapestry of

the [Second Amendment's] guarantee" from the beginning. *BATFE*, 700 F.3d at

200. While the NRA continues to disagree with this Court's conclusion that the historical record *supported* the law at issue in *BATFE*, *see NRA v. BATFE*, 714 F.3d 334, 340 (5th Cir. 2013) (Jones, J., dissenting from the denial of rehearing en banc), this Court did not (and could not) purport to *reject* the critical importance of founding-era understandings under *Heller*.

The United States quotes this Court's dicta that "a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue," *BATFE*, 700 F.3d at 196—language that the Government seizes upon as supporting its suggestion that "evidence of founding-era thinking is not required" when determining the Second Amendment's scope, Appellant's Br. at 21. But it is both true and uncontroversial that a modern restriction need not "boast a *precise* founding-era analogue," *BATFE*, 700 F.3d at 196 (emphasis added)—any more than the Internet must *precisely* mirror some late-eighteenth century medium of communication to enjoy protection by the First Amendment, *Reno v. American Civil Liberties Union,* 521 U.S 844, 849 (1997). Instead, a modern restriction must be analogous to some exception to the scope that that constitutional provision "[was] understood to have when the people adopted [it]," *Heller*, 554 U.S. at 634–35.

For example, regardless of the provenance of modern laws barring violent felons from possessing firearms, *see United States v. Skoien*, 614 F.3d 638, 640

(7th Cir. 2010) (en banc), the founding generation plainly understood that the right to bear arms did not extend to demonstrably dangerous individuals. *See, e.g.*, Journal of Convention: Wednesday, February 6, 1788, *reprinted in* DEBATES AND PROCEEDINGS IN THE CONVENTION OF THE COMMONWEALTH OF MASSACHUSETTS 86 (1856) (proposal by Samuel Adams that "the said Constitution be never construed to authorize Congress … to prevent the people of the United States, who are peaceable citizens, from keeping their own arms"); *The Address and Reasons of Dissent of the Pennsylvania Minority of the Convention of the State of Pennsylvania to their Constituents* (1787), *reprinted in* 3 H. STORING, THE COMPLETE ANTI-FEDERALIST 145, 151 (1981) ("no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals") (emphasis added). Thus, a valid regulation must be a modern species of a founding-era genus—a requirement that *BATFE* itself clearly recognized, since it conducted and explicitly relied upon a lengthy examination of "founding-era thinking." *BATFE*, 700 F.3d at 203.

    3.  Section 922's ban on interstate firearm transactions is wholly unrelated to a limitation on the scope of the Second Amendment that the founders would have recognized. The United States' only argument to the contrary is confined to a quotation of this Court's statements in *BATFE* that "gun safety regulation was commonplace" at the founding, including "laws disarming certain groups and

8

restricting sales to certain groups." Appellant's Br. at 21–22. But surely the fact that "gun safety regulation was commonplace" at the founding does not mean that *any conceivable gun safety regulation falls outside the Second Amendment's scope*. That would gut the Second Amendment in word as well as in deed, for *every* law burdening Second Amendment conduct that might be challenged in court could be characterized as a "gun safety regulation." Nor is it enough to point to founding-era laws "restricting sales to certain groups," *BATFE*, 700 F.3d at 200, since the restriction at issue here is nothing of the kind. It is a *blanket ban* on interstate purchase and sale of handguns that applies across the board, not to "particular groups [targeted] for public safety reasons." *Id.*

Moreover, any suggestion that Section 922's ban on interstate handgun commerce is "[i]n conformity with founding-era thinking," *id.* at 203, flies in the face of the very design and purpose of the Constitution. The provisions challenged here perversely give in-state firearm dealers the power, in effect, to squelch out any interstate competition. But a "central concern" of the Framers, and "an immediate reason for calling the Constitutional Convention," was "the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979). Indeed, the fear that without a firmer economic union "[e]ach State . . .

would pursue a system of commercial policy peculiar to itself," THE FEDERALIST NO. 7, at 62 (Alexander Hamilton) (Clinton Rossiter ed., 1961), is palpable throughout the pages of the Federalist Papers. "[N]o object," wrote Hamilton in Number 22, "more strongly demands a federal superintendence" than the "power to regulate commerce." THE FEDERALIST NO. 22, at 143–44 (Alexander Hamilton) (Clinton Rossiter ed., 1961) "Were [each State] at liberty to regulate the trade between State and State," Madison added in Number 42, "it must be foreseen that ways would be found out to load the articles of import and export . . . with duties which would fall on the makers of the latter and the consumers of the former." THE FEDERALIST NO. 42, at 267–68 (James Madison) (Clinton Rossiter ed., 1961).

The laws at issue in this case essentially give in-state firearm dealers a veto over interstate competition in handgun commerce. That is the *embodiment* of the economic balkanization that motivated the Framers to gather in Philadelphia in the summer of 1787. It blinks reality to suggest that there would have been any support by the founding generation for a restriction on the Second Amendment's reach of this type.

### b. There Is No Post-Ratification, Longstanding Tradition of Restricting Interstate Commerce in Firearms.

The United States' next argument is that, even if not within a *founding-era* exception to the Second Amendment's protection, its ban at least falls into an exception that is *longstanding*. "Between 1909 and 1939," it says, "at least 16

states enacted laws restricting the acquisition, possession, or carrying of one or more types of firearms to state residents." Appellant's Br. at 20. But not a single law in the eclectic assortment of regulations pointed to by the Government enacted a restriction anything like the ban on interstate handgun commerce that is at issue here.

Fully eleven of the sixteen laws trumpeted by the United States were in fact regulations of the *possession or public carrying* of firearms. *See* Act of Feb. 16, 1909, ch. 51, 1909 W. Va. Acts 394, 395–96; Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134; Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627, 1628–29; Act of July 11, 1919, § 4, 1919 Ill. Laws 431, 432; Act of May 29, 1922, ch. 485, § 9, 1922 Mass. Acts 560, 563; Act of March 19, 1923 §§ 1, 3, 1923 Ark. Acts 379, 379–80; Act of March 11, 1924, ch. 137, §§ 1–2, 1924 N.J. Laws 305, 305–06; Act of Feb. 25, 1939, ch. 14, 1939 Me. Laws 53; Act of May 2, 1910, ch. 591, § 1, 1910 R.I. Acts & Resolves 156, 156–57; Act of Feb. 21, 1935, ch. 63, §§ 1, 3, 5, 1935 Ind. Acts 159, 159–61; Act of Apr. 6, 1936, No. 82, §§ 1, 5, 7, 1936 Ala. Acts 51, 51–52.[1] All of them merely imposed licensing requirements, a limitation that remains uncontroversial under modern law. These laws thus did not even

---

[1] The text of each of these laws is available in the Government's Record Excerpts at GRE 52–62.

remotely involve the purchase and sale of firearms, and they provide no support for the entirely different restrictions challenged in this case.

The remaining five laws did at least regulate the purchase or sale of firearms; but not one of them enacted anything like a blanket ban on interstate firearm commerce. Four of them—North Carolina, Missouri, Michigan, and Oregon's—merely required the purchaser of a firearm to obtain a license from a local official before the purchase. While they generally restricted the availability of such licenses to residents of the State, and thus might have been construed as barring firearm sales by in-state dealers to out-of-state purchasers,[2] they in no way prevented in-state purchasers who had obtained the requisite license from shopping out of state. *See* Act of Feb. 26, 1913, ch. 256, § 1, 1913 Or. Laws 497; Act of March 10, 1919, ch. 197, §§ 1–2, 1919 N.C. Sess. Laws 397, 397–98; Act of April 7, 1921, § 2, 1921 Mo. Laws 692; Act of June 2, 1927, ch. 372, §§ 2, 6, 1927 Mich. Pub. Acts 887, 887–88, 889. Those laws might be read as restricting exports, but they did not restrict imports. Montana's law was the mirror opposite; it *only* required a license for purchases by state residents "from any person, firm or corporation outside the State of Montana." Act of Feb. 20, 1918, ch. 2, §§ 1–3, 8,

---

[2] That reading of these laws depends on the assumption that these four states would not have given reciprocity to out-of-staters who obtained licenses from *their own* local officials. The United States has presented no evidence that these States refused to give reciprocity to sister-state residents in this way.

1918 Mont. Laws 6, 6–9.[3] It thus restricted imports but not exports. These five state laws—the earliest of which was enacted in 1913, 122 years after the Second Amendment was adopted—thus did not come close to choking off the interstate handgun market in the way the ban in this case does.

What is more, to the extent those state laws *did* restrict interstate commerce in firearms, they were likely unconstitutional the moment they were enacted. The constitutional imperative of preventing balkanization of interstate trade was as important to early-twentieth-century jurists as it was to the founders—and indeed it remains an important part of our constitutional jurisprudence today under the "dormant Commerce Clause" rubric. *See Comptroller of the Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1794 (2015). By the early decades of the twentieth century it was already well-established that "a state may not, in any form or under any guise, directly burden the prosecution of interstate business." *International Text-Book Co. v. Pigg*, 217 U.S. 91, 112 (1910); *see also Welton v. Missouri*, 91 U.S. 275, 282 (1875); *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 318–19 (1851). "The Constitution," after all, "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run

---

[3] The United States cites Montana twice; the first citation is for a simple carry regulation. Act of March 3, 1919, ch. 74, § 5, 1919 Mont. Acts 147, 148; GRE 54.

prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935).

The Government's argument is thus reduced to the suggestion that five state licensing laws that restricted interstate commerce in firearms only in part, that were enacted during a period that is closer in time to today than the founding, and that were likely unconstitutional the moment they were enacted, are enough to establish that blanket restrictions on the interstate purchase and sale of firearms "harmonize[ ] with the historical traditions associated with the Second Amendment guarantee." *BATFE*, 700 F.3d at 194. That cannot be the law.

## II. Congress's Ban on the Interstate Purchase and Sale of Handguns Is a Severe Infringement of Rights that Lie at the Core of the Second Amendment.

### a. A Restriction on Acquiring Firearms Is Tantamount to a Restriction on Possessing Them.

Section 922's ban on interstate commerce in firearms not only falls within the scope of the Second Amendment's protections; it cuts to that provision's very core. The heartland of the Second Amendment, both this Court and the Supreme Court have held, is "the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family." *Id.* at 195; *see also Heller*, 554 U.S. at 625. But a law-abiding adult cannot *possess and use* a handgun in defense of home and family if he *cannot acquire* a handgun. As the Third Circuit has concluded, "prohibiting the commercial sale of firearms . . . would be untenable

under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010); *see also Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930–31 (N.D. Ill. 2014) (striking down municipal ban on firearm sales). And this logic is as familiar as it is self-evident, for across the spectrum of constitutional-rights jurisprudence, it is well-recognized that a restriction on purchasing some constitutionally-protected good or service is tantamount to—and must be subjected to the same level of scrutiny as—a restriction on possessing it.

This principle has long been established in the context of the First Amendment's free speech guarantee—an area of law that this Court and many others have looked to as an especially persuasive source of "guidance in interpreting the Second Amendment." *BATFE*, 700 F.3d at 197–98. As early as 1936, for example, the Supreme Court struck down a state law requiring newspapers to pay a 2% license tax, reasoning that such a tax's "effect is to curtail the amount of revenue realized from advertising; and . . . its direct tendency is to restrict circulation." *Grosjean v. American Press Co.*, 297 U.S. 233, 244–45 (1936); *see also Ex parte Jackson*, 96 U.S. 727, 733 (1877) ("Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value."). While later cases have glossed *Grosjean* as based in part on the fear that the state tax there "ha[d] the inevitable effect of *singling out* those engaged in expressive activity," *Arcara v.*

*Cloud Books, Inc.*, 478 U.S. 697, 707 (1986), that is no less true here. Section 922 *singles out* trade in handguns—the possession of which lies at the *core* of the Second Amendment—for specially unfavorable treatment. *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983) ("[D]ifferential treatment [of newspapers], unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional.").

In like form, the courts have struck down all manner of restrictions on the purchase and sale of goods necessary to make exercise of free speech rights meaningful. They have struck down local regulation of adult bookstores, "because books (even of the 'adult' variety) have a constitutional status different from granola and wine." *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2009). They have struck down restrictions on the sale of works of art, reasoning that "[t]he sale of protected materials is also protected," since "without . . . money, the plaintiffs would not have engaged in the protected expressive activity." *Bery v. City of New York*, 97 F.3d 689, 695, 696 (2d Cir. 1996). And they have struck down laws regulating the "business of tattooing" because "[t]he process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and

woodwinds." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010).

The area of First Amendment doctrine where this principle is perhaps most clearly and emphatically recognized, however, is campaign finance. In its seminal decision in *Buckley v. Valeo*, the Supreme Court recognized that:

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.

424 U.S. 1, 19 (1976). Accordingly, it has subjected restrictions on how much money may be spent to disseminate speech to the highest level of constitutional scrutiny. *See Citizens United v. FEC*, 558 U.S. 310, 339 (2010) ("[A] prohibition on corporate independent expenditures is thus a ban on speech . . . . Were the Court to uphold these restrictions, the Government could repress speech by silencing certain voices at any of the various points in the speech process.").

This same principle is also well-recognized in unenumerated rights doctrine. In *Carey v. Population Servs., Int'l*, 431 U.S. 678 (1977), for example, the Supreme Court struck down a state requirement that only licensed pharmacists could sell contraceptives, subjecting that law to the same level of scrutiny as it would a restriction on *possessing* them. "Restrictions on the distribution of contraceptives," the Court reasoned, "intrude upon individual decisions in matters

17

of procreation and contraception as harshly as a direct ban on their use. Indeed, in practice, a prohibition against all sales, since more easily and less offensively enforced, might have an even more devastating effect upon the freedom to choose contraception." *Id.* at 687–88. Accordingly, "the same test must be applied to state regulations that . . . substantially limit[ ] access to [contraceptives] as is applied to state statutes that prohibit [them] entirely"—not because "there is an independent fundamental 'right of access to contraceptives,' but because such access is essential to exercise of the constitutionally protected right . . . ." *Id.* at 688; *see also Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 744 (5th Cir. 2008) (striking down a ban on the sale of sexual devices because a restriction on the ability "to legally purchase [such] a device . . . heavily burdens [the] constitutional right" to "engage in private intimate conduct of his or her choosing").

Finally, this very same principle is uncontroversially applied in cases protecting the right to free exercise of religion under the Religious Freedom Restoration Act. In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, the Supreme Court analyzed the Controlled Substance Act's restriction of the *possession* of "hoasca," a hallucinogenic tea used ceremonially by a religious sect, and its restriction of the *distribution* of that substance in the same breath, striking both restrictions down. 546 U.S. 418, 425–27, 439 (2006). Similarly, this Court has concluded that the Eagle Protection Act's prohibition of the "possession, sale,

barter, purchase, transport, export, or import of bald eagles or golden eagles or any parts of bald eagles or golden eagles" substantially burdens the religious beliefs of "sincere adherent[s] to an American Indian religion" because it "limits [their] access . . . to possession of eagle feathers." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 469, 472 (5th Cir. 2014).

A simple and intuitive principle thus runs throughout the corpus of constitutional-rights jurisprudence: a limitation on acquiring some constitutionally-protected good or service is merely another way of limiting its possession, and it must be analyzed—and scrutinized—as such. Unless the right to keep and bear arms is to be "singled out for special—and specially unfavorable—treatment," *McDonald v. City of Chicago*, 561 U.S. 742, 745 (2010), that principle applies with equal force here. And that means that the restrictions at issue in this case—which target handguns, "the most popular weapon chosen by Americans for self-defense in the home," *Heller*, 554 U.S. 629—must be recognized as cutting to the heart of the Second Amendment.

**b.** **Congress's Ban Gives In-State Firearm Dealers a Veto over Interstate Competition and Thus Severely Infringes Core Second Amendment Conduct.**

The United States has characterized the provisions of federal law challenged in this case as "merely regulat[ing] the manner in which individuals purchase firearms." Appellant Br. at 19. Those provisions "allow buyers to purchase their

firearms of choice," the Government says, "even if those firearms are sold by an out-of-state dealer." *Id.* That dramatically understates the burden imposed by the Government's restrictions. The court below saw those restrictions for what they really are: a "federal interstate handgun transfer ban" that bars any citizen anywhere from "acquiring a handgun directly from a federal firearms licensee in another state." *Mance v. Holder*, 74 F. Supp. 3d 795, 799 & n.2 (N.D. Tex. 2015).

The United States makes much out of an exception to its ban that allows interstate transfers if the buyer "arrange[s] for the handgun to be delivered to an in-state firearms dealer, from whom the purchaser may retrieve the handgun directly." Appellant's Br. at 5; *see also* 18 U.S.C. § 922(a)(3), (b). But that exception cannot save the general ban, for its only real effect is to give in-state dealers an absolute veto on competition from out of state. The true function of Section 922's exception is thus to perversely hand control of interstate handgun commerce over to precisely the individuals and businesses with *the greatest* incentive to see any interstate competition buried.

It is clear from the record that in-state dealers are using that veto power to great effect. Uncontradicted record evidence shows that at least one dealer in the District of Columbia charges a $125 fee for the service of "facilitating" out-of-state handgun purchases. Declaration of Andrew Hanson ¶ 4, Appendix to Plaintiff's Motion for Summary Judgment App.4 (Oct. 17, 2014), Doc. 23. Throughout its

brief on appeal the Government belittles this $125 upcharge as a trivial amount, Appellant's Br. at 14, 19, 26, and so it might seem in the abstract. But considering that many commonly-owned handguns retail for between $400 and $500, this "incidental . . . $125 transfer fee," *id.* at 19, turns out to cost somewhere between a quarter to a third of the price of the firearm. In-state firearm dealers have thus been able to use the market power perversely granted them by Section 922 to impose a crippling 25 to 30% surcharge on their out-of-state competitors.

This is not the first time the government has defended a restriction on the purchase and sale of a constitutionally-protected good on the basis that *some* avenues of obtaining the good are left open. In *Carey*, New York argued that its ban on the distribution of contraceptives was not an unconstitutional burden on privacy rights because it "[did] not totally prohibit distribution of contraceptives," since adults could still obtain them from licensed pharmacists and minors under 16 could obtain them from physicians. 431 U.S. at 697. The Supreme Court rejected this "it-could-be-worse" reasoning. Though the burden of the restrictions was "not as great as that under a total ban on distribution," the "restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition." *Id.* at 689 (footnote omitted). That was enough to render New

York's law unconstitutional in *Carey*, and it is also enough here. Section 922 does of course leave law-abiding citizens with *some* opportunities to acquire handguns, but by restricting those opportunities "to a small fraction of the total number of possible retail outlets"—those in one state out of 50—it makes handguns "considerably less accessible." *Id.* The Second Amendment will not brook so severe a burden on the acquisition of "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629.

## III. Congress's Ban on the Interstate Purchase and Sale of Handguns Fails Any Measure of Heightened Constitutional Scrutiny.

1. Since it severely impairs the exercise of core Second Amendment rights in this way, the United States' ban on the interstate purchase and sale of handguns is, on any fair interpretation of *Heller*, *per se* unconstitutional. The Second Amendment, the Court noted in that case, was itself "the very *product* of an interest-balancing by the people," and that provision simply does not "leave[ ] to future evaluation" whether the core rights it protects are "*really worth* insisting upon." *Heller*, 554 U.S. at 634–35.

Accordingly, though much of the post-*Heller* case law has focused on what measure of scrutiny ought to apply in Second Amendment challenges, venturing into this " 'levels of scrutiny' quagmire," *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010), is in fact directly contrary to the Supreme Court's teaching. As even a former Brady Center attorney has recognized, a means-end scrutiny

methodology "effectively embrace[s] the sort of interest-balancing approach" that the Supreme Court "condemned" in *Heller*. Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 706–07 (2012). In that case, Justice Breyer wrote in favor of applying to the Second Amendment "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases." *Heller*, 554 U.S. at 689–90 (Breyer, J., dissenting). But the majority expressly *declined* Justice Breyer's invitation, holding instead that the freedom of law-abiding citizens to keep and bear arms for self-defense was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text. *Id.* at 635. And in *McDonald*, the Court reaffirmed that *Heller* had deliberately and "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

Despite the clarity and consistency of these decisions, this Court has applied a sliding-scale approach that selects "the appropriate level of scrutiny" based "on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *BATFE*, 700 F.3d at 195. Under that approach, "[a] regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun

to defend his or her home and family—triggers strict scrutiny." *Id.* (citation omitted). As demonstrated above, the ban on interstate handgun commerce challenged here amounts to just such a regulation; even under this Court's precedent, then, it is subject to no less than strict scrutiny. As the court below held, "[r]estricting the distribution channels of legal goods protected by the Constitution to a small fraction of the total number of possible retail outlets requires a compelling interest that is narrowly tailored." *Mance*, 74 F. Supp. 3d at 807.

Even if this Court concludes that only intermediate scrutiny applies, however, Section 922's ban still cannot stand, for it is not appropriately tailored. It is both bizarrely underinclusive, reaching handguns but not long guns, and dangerously overinclusive, selecting burdensome means of advancing public safety in the face of a readily-available alternative that could advance that goal just as effectively and at far less cost to the rights protected by the Second Amendment.

2. While Section 922 sweepingly prohibits the direct interstate purchase and sale of handguns, it contains a glaring exception for long guns of any kind. The federal ban on interstate transfers "shall not apply," Section 922(b)(3)(A) provides, "to the sale or delivery of any rifle or shotgun" so long as "the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States." This line drawn by Section 922 makes no sense.

To be sure, a "statute is not invalid" simply "because it might have gone farther than it did." *Buckley*, 424 U.S. at 105. But strangely-drawn underinclusiveness like this nonetheless serves to "diminish the credibility of the government's rationale for restricting [Second Amendment conduct] in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994). The United States' decision to stop pursuing its purported public-safety goal at the boundary between handguns and long guns is inexplicable, and it "raises serious doubts about whether the government is in fact pursuing the interest it invokes," *Brown v. Entertainment Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011), rather than targeting conduct protected by the Second Amendment out of simple hostility to that right.

The United States attempts to show that the line between handguns and long guns is in fact justifiable because "the handgun . . . is the most formidable and most frequently used tool of the criminal." Appellant's Br. at 32 (internal quotation marks omitted). But in *Heller* the Supreme Court rejected *precisely this reason* for singling out handguns for special disfavor. In dissent in that case, Justice Breyer urged that handguns in particular "are involved in a majority of firearm deaths and injuries in the United States" and "appear to be a very popular weapon among criminals." *Heller*, 554 U.S. at 697–98 (Breyer, J., dissenting). But the majority in *Heller* replied that despite "the problem of handgun violence in this country," the Second Amendment had simply taken "off the table" any restriction that prevents

law-abiding citizens from using that "quintessential self-defense weapon." *Id.* at 629, 636 (majority opinion). The United States cannot now turn to this distinction between handguns and other firearms—explicitly rejected by *Heller*—and retool it as a justification for Section 922's unconstitutional underinclusiveness.

3. Finally, Section 922 is also fatally *over*inclusive, infringing far more constitutionally-protected conduct than needed. The Government of course does possess an important interest in promoting public safety. But in order to meet even intermediate scrutiny, it must prove that there is at least "a reasonable fit between the law" and that interest. *BATFE*, 700 F.3d at 205. Though intermediate scrutiny, unlike strict scrutiny, does not impose a "least restrictive means" requirement, the government still must show, as the Supreme Court recently clarified, that its restrictions are "narrowly tailored," possessing a "close fit between ends and means." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534–35 (2014). "The burden of justification is demanding and *it rests entirely on the [government]*." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (emphasis added). Here, the ready availability of far less restrictive means demonstrates that the fit is anything but close.

An effective—and far less restrictive—means of preventing the illegal interstate sale of firearms is *already part of the current system*. As seen above, the sale of rifles and shotguns across state lines is freely allowed by Section 922, so

long as "the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States." 18 U.S.C. § 922(b)(3). There is no suggestion that this rule has not worked for long guns, and the Government could easily extend it to handguns.

## CONCLUSION

For the reasons given above, Amicus Curiae NRA respectfully submits that the district court's judgment should be affirmed.

Dated: August 24, 2015        Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Amicus Curiae National
Rifle Association of America, Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of FED. R. APP. P. 29(d) because this brief contains 6,652 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and 5TH CIR. R. 32.2.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: August 24, 2015                 s/ Charles J. Cooper
                                         Charles J. Cooper

                                         *Counsel for Amicus Curiae*
                                         *National Rifle Association of*
                                         *America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on August 24, 2015. I certify that service will be accomplished by the appellate CM/ECF system on all parties or their counsel, except for the following who will be served by First Class USPS Mail:

> Daniel M. Riess
> U.S. Department of Justice
> Civil Division Federal Programs Branch
> 20 Massachusetts Avenue, N.W.
> Washington, DC 20530

Dated: August 24, 2015

s/ Charles J. Cooper
Charles J. Cooper

*Counsel for Amicus Curiae*
*National Rifle Association of*
*America, Inc.*