# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

FREDRIC RUSSELL MANCE, JR; TRACEY AMBEAU HANSON; ANDREW HANSON; CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS,

*Plaintiffs-Appellees,*

v.

LORETTA LYNCH, U.S. ATTORNEY GENERAL; THOMAS E. BRANDON, Acting Director, Bureau of Alcohol, Tobacco, Firearms & Explosives,

*Defendants-Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS Civil Action No. 4:14-cv-539**

**BRIEF OF THE NATIONAL SHOOTING SPORTS FOUNDATION, INC., AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

LAWRENCE G. KEANE
KRISTIN W. ROSCOE
  *Of Counsel*
THE NATIONAL SHOOTING SPORTS
  FOUNDATION, INC.
Flintlock Ridge Office Center
11 Mile Hill Road
Newtown, Connecticut 06470
(203) 426-1320

MICHAEL L. RICE
  *Counsel of Record*
SIMON, RAY & WINIKKA LLP
500 N. Akard, Suite 2860
Dallas, Texas 75201
(214) 871-2292

*Attorneys for Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

FREDRIC RUSSELL MANCE, JR; TRACEY AMBEAU HANSON; ANDREW HANSON; CITIZENS COMMITTEE FOR THE RIGHT
TO KEEP AND BEAR ARMS,

*Plaintiffs-Appellees,*

v.

LORETTA LYNCH, U.S. ATTORNEY GENERAL; THOMAS E. BRANDON,
Acting Director, Bureau of Alcohol, Tobacco, Firearms & Explosives,

*Defendants-Appellants.*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Pursuant to Rule 29.2, this certificate supplements the Certificates of Interested Persons filed by Appellants and Appellees. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.  National Shooting Sports Foundation, Inc. ("NSSF"), *Amicus Curiae*. NSSF is a non-stock, non-profit corporation. Accordingly, it has no parent corporations and no publicly-held company owns 10% or more of its stock.

2. Simon, Ray & Winikka LLP, Counsel for *Amicus Curiae* (Michael L. Rice).

3. Lawrence G. Keane, Kristin W. Roscoe, National Shooting Sports Foundation, Inc., Of Counsel for *Amicus Curiae*.

4. Plaintiffs Fredric Russell Mance, Jr.; Tracey Ambeau Hanson; Andrew Hanson and Citizens Committee for the Right to Keep and Bear Arms.

5. Counsel for Plaintiffs: Alan Gura, Gura & Possessky, PLLC; William B. Mateja, Michael D. Nammar, Fish & Richardson P.C.

6. Defendants Loretta Lynch, U.S. Attorney General; and Thomas E. Brandon, Acting Director, Bureau of Alcohol, Tobacco, Firearms & Explosives.

7. Counsel for Defendants: Benjamin C. Mizer, Beth S. Brinkmann, John R. Parker, Mark B. Stern, Michael S. Raab, Tara S. Morrissey, Lesley R. Farby, Daniel M. Riess, U.S. Department of Justice.

8. *Amicus Curiae* The Brady Center to Prevent Gun Violence.

9. Counsel for the Brady Center: Sean A. Lev, Matthew A. Seligman, Eduardo F. Bruera, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.

10. *Amicus Curiae* The Law Center to Prevent Gun Violence.

11. Counsel for the Law Center: John W. Sorrenti, Covington & Burling LLP.

Dated: August 24, 2015

/s/ *Michael L. Rice*
Michael L. Rice
Attorney of Record for *Amicus Curiae*

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS...................... i

TABLE OF AUTHORITIES................................................................ iv

CONSENT OF PARTIES ................................................................... 1

INTEREST OF THE *AMICUS CURIAE* ............................................. 2

ARGUMENT ................................................................................... 4

**I.** THE SECOND AMENDMENT GUARANTEES THE RIGHT OF
LAW-ABIDING CITIZENS TO KEEP AND BEAR HANDGUNS FOR
SELF-DEFENSE............................................................................ 4

    **A.** The Second Amendment Right to Keep and Bear Arms Necessarily
Includes the Right to Acquire those Arms..................................... 5

    **B.** The Interstate Handgun Sales Ban Impinges on the Second
Amendment Right to Acquire Handguns. ..................................... 8

**II.** THE INTERSTATE HANDGUN SALES BAN IS AN
UNCONSTITUTIONAL INTERFERENCE WITH THE RIGHTS
GUARANTEED BY THE SECOND AMENDMENT. ................................. 10

    **A.** Speculation That Interstate Handgun Sales Undermine Enforcement
of State Firearms Laws Does Not Justify the Ban. .................................. 13

        1. Criminals and Juveniles Crossing State Lines. ................................. 13

        2. Licensed Retailers' Assumed Inability to Comply
with Other States' Law........................................................ 19

    **B.** Law Abiding Citizens of One State Cannot be Barred from
Exercising their Constitutional Rights in Forty-Nine Other States. ......... 21

    **C.** Speculation About the Effect of the Interstate Handgun Sales Ban on
Firearm Trafficking Cannot Justify Interference with the Exercise of
an Individual's Second Amendment Rights. ........................................... 24

    CONCLUSION .................................................................. 30

# TABLE OF AUTHORITIES

## CASES

*Andrews v. State*, 50 Tenn. 165 (1871)......................................................................... 7

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977)................................. 6, 7, 17

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... *passim*

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...................................................................... 18

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..................... 5, 9, 10, 11, 22

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ......................................................... 7

*Ill. Ass'n of Firearms Retailers v. City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ........................................... 6, 10, 23, 26, 29

*Jackson v. City & County of San Francisco*, 746 F.3d 953
    (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2799 (2015) .......................................... 5

*Lewis v. United States*, 445 U.S. 55 (1980)............................................................... 12

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ......................................... 5, 16

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .......................................... 23, 29

*Nat'l Rifle Ass'n of Am., Inc. v. McGraw*,
    719 F.3d 338 (5th Cir. 2013).............................................................................. 18

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,
    Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012) ................................. 8, 10

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008).......................... 7

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) ................................................. 18

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ...................... 10, 17

*Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981) ......................................... 23

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ............................................ 18

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ...................................... 6

*United States v. Virginia*, 518 U.S. 515 (1996)........................................................ 18

*Washington v. Glucksberg*, 521 U.S. 702 (1997) .................................................... 16

# TABLE OF AUTHORITIES
(continued)

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. II. ........................................................................... 4

## STATUTES AND REGULATIONS

18 U.S.C. § 922(a)(3) ............................................................................. 3

18 U.S.C. § 922(b)(3) ......................................................................... 3, 20

18 U.S.C. § 922(d) ............................................................................... 14

18 U.S.C. § 922(g) ............................................................................... 14

18 U.S.C. § 922(s) ............................................................................... 15

18 U.S.C. § 922(t) ............................................................................... 15

18 U.S.C. § 923(g)(1) ........................................................................... 16

18 U.S.C. § 923(g)(3) ........................................................................... 16

Brady Handgun Violence Prevention Act,
   Pub. L. No. 103-159, 107 Stat. 1536 (1993) ..................................... 13

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ............... 12

Militia Act of 1792, Ch. XXVIII, art. I (May 8, 1792) .......................... 7

Omnibus Crime Control and Safe Streets Act of 1968,
   Pub. L. No. 90-351, 82 Stat. 197 ....................................................... 12

27 C.F.R. § 478.22 ............................................................................... 16

27 C.F.R. § 478.25a ............................................................................. 16

27 C.F.R. § 478.99(a) ............................................................................ 3

27 C.F.R. § 478.121 ............................................................................. 16

27 C.F.R. § 478.124 ............................................................................. 15

27 C.F.R. § 478.125 ............................................................................. 16

27 C.F.R. § 478.127 ............................................................................. 16

28 C.F.R. §§ 25.1-25.11 ......................................................................... 15


**OTHER AUTHORITIES**

Bureau of Alcohol, Tobacco & Firearms,
*Crime Gun Trace Reports (1999)* (Nov. 2000).................................... 28

Bureau of Alcohol, Tobacco, Firearms & Explosives,
*Firearms Trace Data – 2013* ................................................. 25, 27, 28

Bureau of Alcohol, Tobacco, Firearms & Explosives, *State Laws
and Published Ordinances – Firearms* (31st ed. 2010-2011)............................. 20

Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895) ........................ 8

Katherine A. Vittes, Jon S. Vernick, Daniel W. Webster,
*Legal Status and Source of Offenders' Firearms in States
with the Least Stringent Criteria for Gun Ownership*,
19 Injury Prevention 26 (2013) .......................................................... 26

## CONSENT OF PARTIES

Pursuant to Fed. R. App. P. 29(a), counsel for the National Shooting Sports Foundation, Inc. hereby certifies that he has obtained consent from all parties to the filing of the instant *amicus curiae* brief.

# INTEREST OF THE *AMICUS CURIAE*[1]

*Amicus curiae*, the National Shooting Sports Foundation, Inc. ("NSSF"), is the trade association for the firearms, ammunition, hunting, and shooting sports industry. Formed in 1961, NSSF is a Connecticut non-profit tax-exempt corporation with a membership of more than 12,000 firearms manufacturers, distributors, and retailers; sportsmen's organizations; shooting ranges; gun clubs; publishers, and individuals. NSSF's mission is to promote, protect and preserve hunting and the shooting sports. NSSF provides trusted leadership in addressing industry challenges; advances participation in and understanding of hunting and the shooting sports; reaffirms and strengthens its members' commitment to the safe and responsible use of their products; and promotes a political environment that is supportive of America's traditional hunting heritage and firearms freedoms. As the guardian of the industry that supports our nation's rich hunting and shooting traditions, NSSF believes that lawful commerce in firearms and firearms-related products must be protected – and that, in particular, no law or regulation should unreasonably limit the lawful transfer of firearms to law-abiding adults who have a

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae*, or its counsel, made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

constitutional right guaranteed by the Second Amendment to the United States Constitution to purchase, own, possess and use such firearms.

NSSF's interest in this action derives principally from the fact that its firearms manufacturer, distributor, and retailer members provide for the lawful commerce in firearms that makes the exercise of Second Amendment rights possible,[2] and include the Federal Firearms Licensees ("FFLs" or "licensed retailers") who are currently prohibited by the challenged statutes and regulations, 18 U.S.C. §§ 922(a)(3) and (b)(3); and 27 C.F.R. § 478.99(a) (together, the "interstate handgun sales ban"), from selling handguns directly to qualified citizens who reside outside the States where the licensed retailers are located. Plaintiffs have ably demonstrated in the Brief for the Appellees that the District Court's analysis of the constitutionality of these provisions was well-reasoned and supported by the record before the court.

NSSF submits this brief to emphasize the important shift to today's understanding of the protections guaranteed by the Second Amendment and how those guarantees must extend to the lawful sale of protected firearms. NSSF also seeks to expand upon the discussion of today's FFL system and instant background

---

[2] Members of the firearms industry supply the United States' armed forces and federal, state, and local law enforcement with the firearms they use to protect America's national security and keep our communities safe, and also supply hunters, sportsmen, and gun owners with the firearms they use for lawful purposes.

check, which address the concerns raised in 1968 about interstate handgun sales much more directly without stepping on the constitutional rights of law-abiding, qualified handgun buyers and the licensed retailers who seek to sell handguns to them.  Because the interstate handgun sales ban impinges on a fundamental constitutional right, NSSF submits this brief in support of Plaintiffs and urges the Court to affirm the decision below.

## ARGUMENT

The instant action challenges the interstate handgun sales ban, which prohibits a licensed retailer from selling and transferring handguns to legally qualified buyers simply because those buyers do not reside in the same state as where the FFL does business.  The interstate handgun sales ban unreasonably infringes upon the Second Amendment rights of individuals who are otherwise qualified to purchase handguns and the rights of licensed retailers who wish to sell handguns to them.

**I.  THE SECOND AMENDMENT GUARANTEES THE RIGHT OF LAW-ABIDING CITIZENS TO KEEP AND BEAR HANDGUNS FOR SELF-DEFENSE.**

The Second Amendment to the United States Constitution preserves "the right of the people to keep and bear Arms" and declares that this right "shall not be infringed."  U.S. CONST. amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court made abundantly clear that a ban on the possession

of handguns – an "entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense – runs afoul of this constitutional provision.  554 U.S. at 628.  And in extending the Second Amendment's guarantees to the States under the Fourteenth Amendment, the Supreme Court found it "clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."  *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010).

### A. The Second Amendment Right to Keep and Bear Arms Necessarily Includes the Right to Acquire those Arms.

Of particular importance to NSSF's constituents – in particular the licensed retailers across the country whose business is the lawful commerce in firearms and ammunition – is the basic principle that the constitutionally protected right to possess and use a handgun is meaningless absent the right to purchase or otherwise acquire a handgun, and the corresponding right to sell such a handgun to a qualified buyer.  "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *see also Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (finding right to possess firearms for protection includes right "to obtain the bullets necessary to

use them"), *cert. denied*, 135 S. Ct. 2799 (2015); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (recognizing that a law "prohibiting the commercial sale of firearms" is "a result [that] would be untenable under *Heller*").

Consistent with this inherent link between the right to keep and bear arms and the right to acquire or sell those arms, a district court recently struck down the City of Chicago's municipal ordinance, adopted following the Supreme Court's decision in *McDonald*, banning the sale of firearms within the city. *See Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 946-47 (N.D. Ill. 2014) ("*ILAFR*"). In so ruling, the court found that the ban interfered with what the court characterized as "the *most fundamental* prerequisite of legal gun ownership—that of simple acquisition." *Id.* at 938 (emphasis in original).

There can be no serious argument that banning the purchase of items whose possession and use is constitutionally protected interferes with the exercise of the constitutional right. For example, the Supreme Court has recognized that "[r]estrictions on the distribution of contraceptives clearly burden the freedom to make [constitutionally protected decisions in matters of childbearing]." *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687 (1977). Thus, "[l]imiting the distribution of nonprescription contraceptives to licensed pharmacists clearly imposes a significant burden on the right of the individuals to use contraceptives if they choose to do so." *Id.* at 689.

This Court has likewise recognized that restrictions on commercial transactions necessary for the exercise of constitutionally protected rights are burdens on the exercise of those rights:

> [W]e hold that the Texas law burdens this constitutional right [to engage in private intimate conduct of his or her choosing]. An individual who wants to legally use a safe sexual device during private intimate moments alone or with another is unable to legally purchase a device in Texas, which heavily burdens a constitutional right.

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 744 (5th Cir. 2008). Relying on the Supreme Court's decisions in *Carey* and *Griswold v. Connecticut*, 381 U.S. 479 (1965), this Court recognized that "restricting commercial transactions" can – and in that case did – impose unconstitutional burdens on the exercise of fundamental constitutional rights. 517 F.3d at 744. Respect for the individual rights guaranteed by the Second Amendment demands that the same approach apply here, and that the commercial transactions in which NSSF's members engage are entitled to protection.[3]

---

[3] Recognition that the "right to keep arms, necessarily involves the right to purchase them," *Andrews v. State*, 50 Tenn. 165, 178 (1871) (construing State constitutional provision deemed to be the equivalent of the Second Amendment), is fully consistent with this nation's firearms history. Indeed, the Supreme Court in *Heller* acknowledged the existence of "militia laws of the founding period that required militia members to 'keep' arms," 554 U.S. at 582, which at the time generally meant that able-bodied men arm themselves, and that necessarily required that they be able to acquire arms. *See, e.g.*, Militia Act of 1792, Ch. XXVIII, art. I (May 8, 1792) ("every citizen, so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock"). In the

**B.    The Interstate Handgun Sales Ban Impinges on the Second Amendment Right to Acquire Handguns.**

In analyzing Second Amendment challenges to legislative actions, a two-step approach has developed and was employed by this Court in *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185 (5th Cir. 2012) ("*NRA*").  The "first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee…." *NRA*, 700 F.3d at 194.  "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634-35.  Determining whether a law impinges on the rights guaranteed by the Second Amendment, "we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *NRA*, 700 F.3d at 194.

The District Court concluded (ROA.474-76) that, with respect to the interstate handgun sales ban, no comparable interstate limitation on the right to

_____

*(continued…)*

words of Thomas Jefferson:  "Our citizens have always been free to make, vend, and export arms; it is the constant occupation and livelihood of some of them." Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895); *see also Heller*, 554 U.S. at 583 n.7 ("'What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece …?'") (quoting Some Considerations on the Game Laws 54 (1796)).

keep and bear arms—including the right to buy and sell arms—was known to the Framers or in general application at the time the Second Amendment was adopted (or at any time before the twentieth century). This is undoubtedly correct, even if this Court looks at the few early twentieth century State statutes cited by the government. *See Ezell*, 651 F.3d at 706 (finding that even a few State statutes from the eighteenth and nineteenth centuries "fall[] far short of establishing that [the banned activity] is wholly outside the Second Amendment"). In any event, Plaintiffs have demonstrated (Appellees' Br. at 29-40) that those State statutes do not support the government's contention that a residency requirement has always been an acceptable restriction on the fundamental rights guaranteed by the Second Amendment.

In the absence of such a historical foundation, the government can find no solace in the Supreme Court's nod to "longstanding regulations" that are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. If the government were right that as long as there were any historical restrictions on firearm sales then all restrictions are outside constitutional reproach, then the Second Amendment would lose any real meaning at all, because firearm possession could be effectively prohibited through restrictions on such sales. Yet we know the Second Amendment would not permit this. "[W]hatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests

the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635.

## II. THE INTERSTATE HANDGUN SALES BAN IS AN UNCONSTITUTIONAL INTERFERENCE WITH THE RIGHTS GUARANTEED BY THE SECOND AMENDMENT.

Because it is clear that the interstate handgun sales ban impinges on core Second Amendment rights, the analysis must proceed to the second step, which is "to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." *NRA*, 700 F.3d at 194. The Supreme Court has long required "strict judicial scrutiny" if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). "Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional." *Ezell*, 651 F.3d at 703. Moreover, laws representing "'serious encroachments' on 'important corollar[ies] to the meaningful exercise of the core right to possess firearms for self-defense' are substantial burdens that deserve more stringent scrutiny than intermediate scrutiny." *ILAFR*, 961 F. Supp. 2d at 938 (quoting *Ezell*, 651 F.3d at 708).

In *Ezell*, the Seventh Circuit distinguished its prior consideration of the prohibition on possession of firearms by persons convicted of a domestic-violence misdemeanor, where intermediate scrutiny was applied because the claim was not brought by a law-abiding citizen as in *Heller* and did not involve the central self-defense element. 651 F.3d at 708. The Court found that a higher level of scrutiny was appropriate for review of a ban on firing ranges within Chicago:

> Here, in contrast, the plaintiffs *are* the "law-abiding, responsible citizens" whose Second Amendment rights are entitled to full solicitude under *Heller*, and their claim comes much closer to implicating the core of the Second Amendment right. The City's firing-range ban is not merely regulatory; it *prohibits* the "law-abiding, responsible citizens" of Chicago from engaging in target practice in the controlled environment of a firing range. This is a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense.

*Id.* Here, too, Plaintiffs are "law-abiding, responsible citizens" who are qualified to purchase and licensed to sell a handgun, but who are simultaneously prohibited from doing so by the interstate handgun sales ban. The District Court found (ROA.476-78) that the ban must be analyzed with a heightened level of scrutiny, and concluded that strict scrutiny is appropriate. While NSSF supports this conclusion for the reasons set forth above and those articulated by Plaintiffs (Appellees' Br. at 46-49), it is clear that the ban is unconstitutional regardless of the precise level of heightened scrutiny that is applied.

The interstate handgun sales ban was passed in 1968 in an era when the Second Amendment was believed by many – incorrectly – to pose no significant hurdle to prohibitions and significant restrictions on law-abiding individuals acquiring or keeping firearms, especially handguns. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197; Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213; *see also, e.g.*, *Lewis v. United States*, 445 U.S. 55, 65 n.8 (1980) (citing *United States v. Miller*, 307 U.S. 174 (1939), as having held that "the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia'"). The government would obviously prefer a return to that era. After *Heller*, however, it is clear that the federal government cannot sweep so broadly as to ban all firearm acquisition and possession simply to ensure that certain categories of unqualified buyers cannot purchase a firearm. Yet, that is what Congress did with respect to the interstate handgun sales ban.

The government and *amici curiae* offer a number of justifications for the ban, arguing principally that (1) the interstate handgun sales ban is necessary for a State to enforce its own laws regarding handgun ownership by its citizens; (2) there is no real burden here because the firearm buyer can purchase firearms in his or her own State; and (3) the ban is necessary to combat firearms trafficking. None of

these justifications is supported by the record or sufficient to justify the erosion of Second Amendment rights caused by the interstate handgun sales ban.

### A. Speculation That Interstate Handgun Sales Undermine Enforcement of State Firearms Laws Does Not Justify the Ban.

The primary justification cited by the government for the interstate handgun sales ban is the pre-*Heller* Congressional findings that were part of the basis for the passage of the Omnibus Crime Control and Safe Streets Act of 1968 and the Gun Control Act of 1968. For example, the government notes a 1968 report citing testimony that "'indicate[d] that large numbers of criminals and juveniles' purchased firearms out of state 'in order to circumvent the laws of their respective jurisdictions.'" (Appellants' Br. at 3 (quoting S. Rep. No. 90-1097, at 80 (1968)).) These Congressional findings fail to provide a justification for the interstate handgun sales ban as it is reviewed today. Other provisions of the 1968 laws and the subsequently enacted Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993) (the "Brady Act"), undermine the stated rationale for the ban.

1. <u>Criminals and Juveniles Crossing State Lines.</u> The stated concern that criminals and juveniles can escape restrictions on their ability to purchase firearms by crossing state lines is met in at least two ways that do not require the infringement of the Second Amendment rights of law-abiding, responsible citizens. First, the Gun Control Act of 1968 expanded the categories of prohibited persons

who are not qualified to purchase firearms <u>anywhere</u> in the United States.  Thus, it

became illegal for licensed retailers to sell or transfer firearms to anyone the FFL

knows or has reasonable cause to believe is a person who (i) has been convicted in

any court of a crime punishable by imprisonment for a term exceeding one year;

(ii) is a fugitive from justice; (iii) is an unlawful user of or addicted to any

controlled substance; (iv) has been adjudicated as a mental defective or committed

to a mental institution; (v) is an alien illegally or unlawfully in the United States;

(vi) has been discharged from the Armed forces under dishonorable conditions;

(vii) having been a citizen of the United States, has renounced U.S. citizenship;

(viii) is subject to a court order that restrains the person from harassing, stalking, or

threatening an intimate partner or child of such intimate partner; or (ix) has been

convicted in any court of a misdemeanor crime of domestic violence.  18 U.S.C.

§ 922(d).  It is also illegal for persons in any of those categories to ship, possess or

receive firearms.  18 U.S.C. § 922(g).

Second, the Brady Act requires licensed retailers to perform background

checks on individuals before a firearm can be purchased, unless a valid exception

applies, *e.g.*, a state permit to purchase firearms.  In the immediate aftermath of the

enactment of the Brady Act, the FFL was required, among other things, to provide

notice to the law enforcement officer of the place of residence of the buyer and

wait up to five business days for a response from the chief law enforcement officer

regarding whether the transfer to the potential buyer would violate federal, state or local law.  18 U.S.C. § 922(s).  Thereafter, the federal government put in place the National Instant Criminal Background Check System ("NICS").  18 U.S.C. § 922(t); 28 C.F.R. §§ 25.1-25.11.  Under NICS, a licensed retailer is required to wait up to three business days for the system to respond, and unless notified that the transfer would violate federal law *or State law*, the sale may take place.  18 U.S.C. § 922(t)(1), (2).

Consistent with the overall statutory framework, licensed retailers are required to fill out a Firearms Transaction Record – ATF Form 4473 – for every transaction.  This form requires a name, address, date of birth, government-issued photo identification, NICS transaction number (received after completion of the background check signifying that the transaction will not violate federal or State law), and an affidavit stating that the purchaser is eligible to purchase a firearm under federal law.[4]  27 C.F.R. § 478.124.  The FFL who verifies the identity of the buyer must also sign and keep a copy of the form for at least 20 years after the date of the sale or disposition.  *See* 27 C.F.R. § 478.129(b).  Further, FFLs must keep a permanent registry of all firearms sales in an ATF-approved "bound book" or

---

[4] Form 4473 is available at http://www.atf.gov/forms/download/atf-f-4473-1.pdf.  After completing the required ATF Form 4473, FFLs contact NICS – maintained by the FBI – to request a background check with the Form 4473's descriptive information.

computerized equivalent.  27 C.F.R. §§ 478.22, 478.121, 478.125.  The ATF is allowed to inspect these records as part of a criminal investigation or upon a trace request.  18 U.S.C. § 923(g)(1); 27 C.F.R. § 478.25a.  In addition, licensed retailers must report the sale of multiple handguns within five consecutive business days to the ATF and the state police or local law enforcement agency where the sale occurred.  18 U.S.C. § 923(g)(3).

The government and *amici curiae* complain that reliance on NICS is unjustified because States may be limited in their ability to provide information to the database, potentially limiting the effectiveness of the background check.  In the same pre-*Heller* thinking used to justify the interstate handgun sales ban in the first place, their answer is simple – the Second Amendment must yield.  But surely a right "deeply rooted in this Nation's history and tradition" and one "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed," *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotation marks omitted), cannot so easily be cast aside.  *See McDonald*, 561 U.S. at 778 (making clear that the rights guaranteed by the Second Amendment are fundamental constitutional rights).

Thus, even if States are unwilling to make the NICS background check system as fulsome as it might be, that cannot be used as a rationale for limiting the Second Amendment rights of law-abiding citizens who are qualified to purchase

firearms but who are prevented from doing so simply because they want to exercise their rights in the national marketplace and outside their States of residence. *Cf. Carey*, 431 U.S. at 691 (rejecting argument that the challenged statute should stand because it "facilitates enforcement of the other provisions of the statute," finding "the prospect of additional administrative inconvenience has not been thought to justify invasion of fundamental constitutional rights"). As the District Court correctly concluded (ROA.482-85), while the government arguably presented evidence that criminal acquisition of handguns remains a problem today, it failed to show that in the era of federal background checks the interstate handgun sales ban served any meaningful purpose in the prevention of crime, especially in light of its restriction on the exercise of recognized constitutional rights by law-abiding citizens. *See also Heller*, 554 U.S. at 636 (acknowledging the problem of handgun violence, but refusing "to pronounce the Second Amendment extinct" and recognizing that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table"). The government's attempted justification for the ban falls far short of satisfying the "strict judicial scrutiny" required for a law that "impinges upon a fundamental right" embodied in the Constitution. *San Antonio Indep. Sch. Dist.*, 411 U.S. at 17.

Even under intermediate scrutiny, the government "must show at least" that the interstate handgun sales ban "serves important governmental objectives" and is

"substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (internal quotation marks omitted). The challenged law "must be reasonably adapted to achieve an important government interest." *Nat'l Rifle Ass'n of Am., Inc. v. McGraw*, 719 F.3d 338, 348 (5th Cir. 2013). And even where the government's interest is substantial, the regulation must "directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (internal quotation marks omitted). Where, as here, the government is arguing that the ban serves to preclude criminals from crossing state lines to avoid state and local firearm laws, it "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 771. In addition, the government must show that the law is "no more extensive than necessary to serve that interest," *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486 (1995), or at least that it does not "burden substantially more [protected conduct] than necessary" to further its interests. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

The interstate handgun sales ban bars all sales of handguns to anyone not a resident of the licensed retailer's State, *regardless* of whether the proposed buyer is a responsible, law-abiding citizen or a criminal. To justify this sweeping prohibition, the only current evidence offered by either the government or *amici*

*curiae* is trace data, from which they argue that there is an ongoing problem with criminal acquisition and trafficking of firearms. Yet that "evidence" reflects a system in which the interstate handgun sales ban has been in place *since 1968*, proving that the ban is not a reasonable fit for the problem the government seeks to address. Instead, particularly with the implementation of NICS, it unnecessarily burdens law-abiding, responsible citizens who have a fundamental right to acquire handguns.

2. <u>Licensed Retailers' Assumed Inability to Comply with Other States'</u> <u>Law.</u> The government notes that different States may have additional procedures for firearms purchases "such as training and special permits," and that "[i]t is the individual dealer's responsibility to ensure that all of these requirements are satisfied." (Appellants' Br. at 8-9.) The government argues that the interstate handgun sales ban is an appropriate means to ensure enforcement of state and local law. (Appellants' Br. at 30.) *Amicus curiae* The Brady Center to Prevent Gun Violence (the "Brady Center") makes explicit what is merely implied in the government's argument, claiming that "[i]t is reasonable to conclude that out-of-state dealers will not be able to monitor and comply with those varied regulations." (Brady Center Br. at 4.) But why is this a reasonable assumption, and how can such an assumption form the basis for eviscerating constitutional rights?

Certainly Congress did not believe that such an assumption was valid. While Congress prohibited handgun sales by a licensed retailer to a resident of another State, it enacted a different rule as to rifles and shotguns. For those firearms, the licensed retailer may transfer the rifle or shotgun to a resident of another State if (1) they meet in person and (2) "the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States …." 18 U.S.C. § 922(b)(3). Moreover, Congress imposed a presumption that the FFLs "have had actual knowledge of the State laws and published ordinances of both States." *Id*. In addition, ATF compiles *State Laws and Published Ordinances – Firearms*, which collects the firearm laws of all States, the District of Columbia and U.S. Territories, and provides it to FFLs, as well as making it available online at https://www.atf.gov/file/58536/download. "[D]esigned to help FFLs comply with Federal and State firearms laws," ATF notes that the compilation can be used to help licensed retailers "in making lawful over-the-counter sales of rifles and shotguns to out-of-State residents—transactions that must meet the legal requirements of both [the FFL's] State of residence and the purchaser's State of residence." Bureau of Alcohol, Tobacco, Firearms and Explosives, *State Laws and Published Ordinances – Firearms* (31st ed. 2010-2011), at i.

The government asks the Court to ignore the fact that Congress recognized licensed retailers could and would be expected to apply the laws of other States

with respect to rifles and shotguns and simply to assume that those same licensed retailers would be incapable of doing likewise with respect to handguns. There is no legitimate basis for a distinction, other than the government's present-day disdain for handguns. But the Supreme Court precluded such discrimination against handguns, recognizing that they are the overwhelming weapon of choice for law-abiding citizens and deserving of full constitutional protection under the Second Amendment. *Heller*, 554 U.S. at 629.

**B.** **Law Abiding Citizens of One State Cannot be Barred from Exercising their Constitutional Rights in Forty-Nine Other States.**

Perhaps the government's most oft-repeated refrain is that there is no real burden here because law-abiding, qualified handgun purchasers are not barred from buying the handguns they want in their States of residence. But the fact that qualified buyers can buy handguns from licensed retailers in their home States (and licensed retailers can sell directly to in-state buyers) is irrelevant to the question of whether law-abiding, qualified buyers can be prohibited from acquiring handguns from licensed retailers in the other 49 States (and licensed retailers from selling directly to qualified out-of-state buyers). Constitutional rights are ones that individuals carry with them wherever they go. These rights are not checked at the state border to be reacquired once the individual returns home. No one would seriously contend, for example, that the right to free speech exists only in one's State of residence. To rule otherwise here would imply that Second Amendment

rights are somehow lower class rights than other rights guaranteed by the founders

in the Bill of Rights. As with all other constitutional rights, the Second

Amendment is not and cannot be geographically limited, so this argument too must

fall.

In *Ezell*, the Seventh Circuit addressed those aspects of the City ordinance

that required training at a firing range, but prohibited operation of any firing ranges

within the Chicago city limits. The district court had ruled that "for at least

some—perhaps many—Chicago residents, complying with the range-training

requirement did not appear to pose much of a hardship at all," but indeed "might

actually be easier for some…." *Ezell*, 651 F.3d at 697. The Seventh Circuit

rejected this sort of approach:

> This reasoning assumes that the harm to a constitutional
> right is measured by the extent to which it can be
> exercised in another jurisdiction. That's a profoundly
> mistaken assumption. … It's hard to imagine anyone
> suggesting that Chicago may prohibit the exercise of a
> free-speech or religious-liberty right within its borders on
> the rationale that those rights may be freely enjoyed in
> the suburbs. That sort of argument should be no less
> unimaginable in the Second Amendment context.

*Ezell*, 651 F.3d at 697.

Thus, when a district court in Illinois addressed that portion of the Chicago

ordinance that prohibited the sale of firearms within the City, it also was ruled

unconstitutional. Once again, the City argued, like Defendants-Appellants here,

that "these ordinances do not ban acquisition, but merely regulate *where* acquisition may occur." *ILAFR*, 961 F. Supp. 2d at 938 (emphasis in original). And as in *Ezell*, the district court held that "the fact that Chicagoans may travel outside the City to acquire a firearm does not bear on the validity of the ordinance *inside* the City." *Id*. at 939 (emphasis in original); *cf. Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) (with respect to the First Amendment, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place") (internal quotation marks omitted).

In addition, as the Seventh Circuit recognized, "the constitutional right of armed self-defense is broader than the right to have a gun in one's home. The first sentence of the *McDonald* opinion states that 'two years ago, in [*Heller*], we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense….'" *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (quoting *McDonald*, 561 U.S. at 749-50). Noting that *Heller* spoke of the "right to possess and carry weapons in case of confrontation," 554 U.S. at 592, the Seventh Circuit recognized that "[c]onfrontations are not limited to the home." *Moore*, 702 F.3d at 935-36 (striking down Illinois law prohibiting the carrying of firearms in public). If the right to bear arms for self-defense extends outside the home, as it undoubtedly does, then there is no basis to yield that right at the State line, nor is

there a basis to stop the right to acquire the handguns necessary to exercise that constitutional right at the State line.

### C. Speculation About the Effect of the Interstate Handgun Sales Ban on Firearm Trafficking Cannot Justify Interference with the Exercise of an Individual's Second Amendment Rights.

Both the government and supporting *amici* argue that because some portion of the firearms that are recovered in each State comes from outside the State, the interstate handgun sales ban is justified. *Amicus curiae* The Law Center to Prevent Gun Violence (the "Law Center") claims that "FFLs are a major source of trafficked firearms," (Law Center Br. at 5), while the Brady Center argues that "in 2013, 47,773 firearms were exported from one State to another and then used in a violent crime" (Brady Center Br. at 22). The argument that the interstate handgun sales ban is necessary to address firearms trafficking misses the mark, and its very premise is illogical.

The interstate handgun sales ban has been in place since 1968. Thus, even assuming that trace data shows that people are buying firearms in States with less stringent State controls and bringing them into States with more stringent controls, this proves only that the interstate handgun sales ban has not addressed the problem the government identifies. Instead, it precludes law-abiding, responsible citizens from purchasing handguns under a system where the licensed retailer would ensure compliance with the laws of both the State of purchase and the State

of the buyer's residence.[5]  Simply stated, the interstate handgun sales ban is not a good fit in addressing firearm trafficking and cannot withstand constitutional scrutiny on this basis.

The arguments regarding out-of-state purchases of handguns also ignore the passage of time between the initial retail sale by a licensed retailer and the point where the firearm is recovered and a trace initiated.  According to the ATF's trace data report for 2013, the national average "time-to-crime" was 11.08 years. (Bureau of Alcohol, Tobacco, Firearms & Explosives, *Firearms Trace Data – 2013*, *available at* https://www.atf.gov/about/firearms-trace-data-2013 ("*2013 Trace Data*").)  In other words, the *average* length of time from when a licensed retailer makes the first retail sale of a firearm, after a background check, and it is recovered and traced was over 11 years.  *Id.*  In today's mobile society, as people freely move among the States, it can hardly be surprising that in the course of more than a decade, firearms purchased in one State may find their way to a different State.

Neither the government nor *amici curiae* provide any basis to lay the blame for the movement of traced firearms from one State to another at the feet of

_____

[5] As Plaintiffs point out (Appellees' Br. at 52-53), to the extent striking down the interstate handgun sales ban would leave a gap in federal law, extending the current treatment of long guns to handguns is a reasonable alternative, and one that NSSF would likely support.

licensed retailers or explain how this perceived problem is addressed by precluding licensed retailers from making legitimate sales to law-abiding citizens in a national market. To the contrary, the district court reviewing the Chicago ban on firearm sales in the city limits noted that "[a]ccording to a survey of convicted felons proffered by the City itself, '[l]egitimate firearms retailers play a minor and unimportant role as direct sources of the criminal handgun supply.'" *ILAFR*, 961 F. Supp. 2d at 942 (quoting James D. Wright & Peter H. Rossi, Armed and Considered Dangerous 229 (2d ed. 2008)).[6]

Moreover, the Brady Center's use of 2009 and 2013 trace data (Brady Center Br. at 22-26) as "evidence" sufficient to justify the interstate handgun sales ban is particularly misplaced. As noted above, the Brady Center asserts that in 2013, there were 47,733 "crime guns" exported from one state to another and used in "violent crime." (Brady Center Br. at 22.) This number appears to be nothing more than the difference between the total number of firearms traced by ATF in the United States in 2013 where a source state was identified and the number of

---

[6] Indeed, a study using data from the 2004 Survey of Inmates in State Correctional Facilities found that "nearly all (96.1%) offenders who were legally prohibited from possessing a firearm acquired their gun from a supplier not required to conduct a background check." Katherine A. Vittes, Jon S. Vernick, Daniel W. Webster, *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 Injury Prevention 26, 29 (2013), http://injuryprevention.bmj.com/content/19/1/26.full.pdf+html. In other words, "[o]nly 3.9% of individuals disqualified based on current federal or state prohibitions … obtained their gun from a licensed firearms dealer." *Id.* at 30.

firearms sourced from the same state where they were recovered.  The problems

with this simplistic analysis are many, and it cannot justify the infringement on

Second Amendment rights caused by the interstate handgun sales ban.

First, firearms traced by ATF are not all "used in violent crime," and indeed

are not all guns used in crime of any sort.  In the 2013 ATF report for California,

for example, of the 32,343 total traces, virtually half were categorized as

"possession of weapon" or "weapon offense," and there were more than twice as

many firearms categorized under "found firearm" and "firearm under

investigation" as there were for firearms categorized as used in "aggravated

assault" or "homicide."  *2013 Trace Data (California)*, *available at*

https://www.atf.gov/file/3246/download.  Second, the ATF report does not

correlate the firearms involved in violent crime with either the firearms sourced

from outside the state or with traces for handguns versus rifles, even though in

California, for example, rifles and shotguns made up at least a third of all firearms

traced.  *Id*.

Indeed, despite the assertions that the interstate handgun sales ban is

necessary because States like California can otherwise manage their intrastate

firearm sales to control crime, every State in the 2013 ATF Trace data report is its

own number one source for firearms traced within that State.[7] *2013 Trace Data, supra.* Thus, for California, of the 19,625 traced firearms where the source State was known, 14,001 of them came from California. *Id.* Simply stated, these firearm traces fall far short of justifying the interstate handgun sales ban.

Even if trace data could suggest that there are potentially bad dealers in some areas of the country (which it cannot[8]), the interstate handgun sales ban is a drastic overreaction to that issue. The district court reviewing Chicago's ban on firearm sales within the city rejected this argument:

> [T]he potential threat that *some* otherwise-legitimate businesses may break the law cannot justify the drastically overinclusive step of banning the entire *category* of legitimate businesses. The City's concern over the subset of firearms dealers who sell to straw purchasers can be addressed by other, more focused approaches, such as law enforcement operations that target dealers who would sell to straw purchasers.

---

[7] The only exceptions reflected in the 2013 report were Puerto Rico, the U.S. Virgin Islands, and the District of Columbia. Given that the average "time-to-crime" in the District was 13.94 years, well above the national average, that the sale of firearms was generally banned in the District before *Heller,* and that even today there are no licensed retailers within the District who stock and sell firearms, it is hardly surprising that the District was not the largest source for firearms recovered in the District and traced.

[8] As ATF has long acknowledged, a "*crime gun trace alone does not mean that an FFL or firearm purchaser has committed an unlawful act.*" Bureau of Alcohol, Tobacco and Firearms, *Crime Gun Trace Reports (1999)*, at 4 (Nov. 2000) (emphasis in original), *available at* https://www.atf.gov/file/5441/download.

*ILAFR*, 961 F. Supp. 2d at 940-41 (emphasis in original).  Nor is it any answer to argue, as the Law Center does (Law Center Br. at 5-6), that the ATF is underfunded and ineffective and cannot be relied upon to supervise the licensed retailers, because the interstate handgun sales ban "do[es] not really address the ATF's effectiveness … [and] does not offer more resources to the ATF …." *ILAFR*, 961 F. Supp. 2d at 944; *see also Moore*, 702 F.3d at 939 (rejecting empirical efforts to establish a "pragmatic defense" of the Illinois ban on carrying guns in public because "the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts").

In this case, the District Court recognized (ROA.477-78) that the interstate handgun sales ban is not restricted to isolated groups who may be thought to present a particular risk of using handguns in an illegal manner, but instead is imposed indiscriminately to prohibit every legal handgun purchaser and licensed retailer across the country from participating in a national handgun market.  As a result, the District Court correctly found (ROA.485-86, 488, 490) that the ban is not substantially related to the goals that supposedly led to its implementation, and as a result, violates the rights protected by the Second Amendment, as well as the Due Process Clause of the Fifth Amendment.

## CONCLUSION

For the foregoing reasons, as well as those in the Brief for the Appellees, this Court should affirm the District Court's decision.

Dated:  August 24, 2015

Respectfully submitted,

/s/ Michael L. Rice
Michael L. Rice
Simon, Ray & Winikka LLP
500 N. Akard, Suite 2860
Dallas, Texas 75201
Telephone:  (214) 871-2292

Of Counsel:

Lawrence G. Keane
Kristin W. Roscoe
The National Shooting Sports
    Foundation, Inc.
Flintlock Ridge Office Center
11 Mile Hill Road
Newtown, Connecticut 06470

*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

The undersigned certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Rule of Appellate Procedure 29.  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 6984 words.

The undersigned further certifies that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Word for Mac 2011 in 14-point Times New Roman font.


Dated:  August 24, 2015　　　　　　　　/s/ Michael L. Rice　　　　　　　
　　　　　　　　　　　　　　　　　　　Attorney of Record for *Amicus Curiae*

CERTIFICATE OF SERVICE

I certify that on August 24, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will send notice of such filing to the registered CM/ECF users who have appeared in this case.

/s/ Michael L. Rice
Attorney of Record for *Amicus Curiae*