## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

FREDRIC RUSSELL MANCE, JR; TRACEY AMBEAU HANSON;
ANDREW HANSON; CITIZENS COMMITTEE FOR THE
RIGHT TO KEEP AND BEAR ARMS,

Plaintiffs-Appellees,

v.

LORETTA LYNCH, U.S. ATTORNEY GENERAL; THOMAS E. BRANDON,
Acting Director, Bureau of Alcohol, Tobacco, Firearms & Explosives,

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Civil Action No. 4:14-cv-539

## REPLY BRIEF FOR APPELLANTS

BENJAMIN C. MIZER
  *Principal Deputy Assistant Attorney
  General*

JOHN R. PARKER
  *Acting United States Attorney*

MARK B. STERN
  (202) 514-5089
MICHAEL S. RAAB
  (202) 514-4053
TARA S. MORRISSEY
  (202) 353-9018
  *Attorneys, Appellate Staff
  Civil Division, Room 7261
  U.S. Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C. 20530*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION AND SUMMARY ................................................................. 1

ARGUMENT ..................................................................................................... 3

I.    THE IN-STATE SALES REQUIREMENTS ARE
CONSISTENT WITH THE SECOND AMENDMENT ................................. 3

    A.    The Requirements Are Constitutional At Step One ................... 3

    B.    If This Court Proceeds To Step Two, Intermediate
Scrutiny Applies .............................................................................. 9

    C.    The In-State Sales Requirements Are Reasonably
Adapted To Important Government Interests ........................... 18

II.    THE IN-STATE SALES REQUIREMENTS ARE
CONSISTENT WITH THE FIFTH AMENDMENT ..................................... 25

CONCLUSION ................................................................................................. 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                 Page(s)

*Bonidy v. U.S. Postal Serv.,*
  790 F.3d 1121 (10th Cir. 2015) ........................................................... 16, 24, 25

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ................................................................................. 23

*Carey v. Population Servs. Int'l,*
  431 U.S. 678 (1977) ............................................................................. 15, 17

*Dearth v. Lynch,*
  791 F.3d 32 (D.C. Cir. 2015) ............................................................. 7

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ....................................... 2, 4, 5, 6, 9, 10, 13, 16

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) .............................................................. 13

*Griswold v. Connecticut,*
  381 U.S. 479 (1965) ............................................................................. 15

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ......................................................... 12, 17

*Kachalsky v. County of Westchester,*
  701 F.3d 81 (2d Cir. 2012) ................................................................. 15

*Kimel v. Florida Bd. of Regents,*
  528 U.S. 62 (2000) ............................................................................... 26

*Kwong v. Bloomberg,*
  723 F.3d 160 (2d Cir. 2013) ............................................................... 14

*McDonald v. City of Chicago, Ill.,*
  561 U.S. 742 (2010) ............................................................................. 4

*National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,*
  *Firearms, & Explosives,* 700 F.3d 185 (5th Cir. 2012) ..................... *passim*

*National Rifle Ass'n of Am., Inc. v. McCraw,*
719 F.3d 338 (5th Cir. 2013) ............................................................ 3, 22, 24, 25

*Reliable Consultants, Inc. v. Earle,*
517 F.3d 738 (5th Cir. 2008) ..................................................................... 15, 18

*United States v. Decastro,*
682 F.3d 160 (2d Cir. 2012) ...................................................... 1, 2, 11, 12, 18

*United States v. Marzzarella,*
614 F.3d 85 (3d Cir. 2010) ......................................................... 5, 12, 13, 17

*Virginia v. American Booksellers Ass'n,*
484 U.S. 383 (1988) .............................................................................. 15

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) .............................................................................. 17

*Williams-Yulee v. Florida Bar,*
135 S. Ct. 1656 (2015) .......................................................................... 22

*Woollard v. Gallagher,*
712 F.3d 865 (4th Cir. 2013) ................................................................. 16

**Statutes:**

18 U.S.C. § 922(b)(3) ................................................................................ 21

18 U.S.C. § 922(k) .................................................................................... 12

18 U.S.C. § 922(t)(1)(A) ........................................................................... 15

18 U.S.C. § 922(t)(1)(B) ........................................................................... 15

18 U.S.C. § 922(t)(1)(C) ........................................................................... 15

18 U.S.C. § 923(g)(1)(A) ........................................................................... 15

**Regulations:**

27 C.F.R. § 478.129(b) .............................................................................. 15

28 C.F.R. § 25.4 ....................................................................................... 20

D.C. Mun. Regs., tit. 24, § 2320.3(f) (2013).........................................................25

**Legislative Material:**

S. Rep. No. 89-1866 (1966)...............................................................23, 24, 27

**Other Authorities:**

ATF, U.S. Dep't of Justice, Firearms Transaction Record Part I—
    Over-the-Counter (Revised Apr. 2012), *available at*
    https://www.atf.gov/file/61446/download ...............................................15

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*,
    11 Tex. Rev. L. & Pol. 191 (2006) ...........................................................7

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

───────────────

FREDRIC RUSSELL MANCE, JR; TRACEY AMBEAU HANSON;
ANDREW HANSON; CITIZENS COMMITTEE FOR THE
RIGHT TO KEEP AND BEAR ARMS,

Plaintiffs-Appellees,

v.

LORETTA LYNCH, U.S. ATTORNEY GENERAL; THOMAS E.
BRANDON, Acting Director, Bureau of Alcohol, Tobacco, Firearms &
Explosives,

Defendants-Appellants.

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Civil Action No. 4:14-cv-539

───────────────

REPLY BRIEF FOR APPELLANTS

───────────────

## INTRODUCTION AND SUMMARY

This case does not concern an "interstate handgun transfer ban."  Pls.' Br. 7,

10-13, 17-18, 29, 34, 41, 46-47, 49, 53, 59-60.  The challenged laws do not "prohibit[]

. . . a national handgun market," *id.* at 1, nor do they ban interstate sales; they merely

require that a "licensed gun dealer in the purchaser's home state" participate in

interstate transactions.  *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012).  The

entire national market of handguns remains available to plaintiffs, regardless of their residence, so long as an in-state dealer finalizes the sale. *See id.*

Plaintiffs' asserted injury confirms that the laws are far from a "ban" on interstate sales. Plaintiffs do not allege that they are unable to acquire out-of-state handguns. They simply complain that they "face higher costs" in doing so. Pls.' Br. 11; *see also id.* at 11-13. The heart of their complaint is that they must pay a transfer fee of $125, plus shipping costs, to receive the gun of their choice from anywhere in the country. *See id.* at 11-13. That is not a ban; it is a transaction cost.

Despite the Supreme Court's guidance that "conditions and qualifications on the commercial sale of arms" are "presumptively lawful," *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008), the district court applied strict scrutiny to strike down the laws. This Court reserves strict scrutiny for laws that "encroach on the core of the Second Amendment," which this Court has identified as the right "'to use arms in defense of hearth and home.'" *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195, 205 (5th Cir. 2012) (quoting *Heller*, 554 U.S. at 635). The in-state sales requirements are well outside this "core" right, *id.* at 195, if they implicate the Second Amendment at all, *see id.* at 196 ("[A] longstanding, presumptively lawful regulatory measure . . . would likely fall outside the ambit of the Second Amendment"). They do not prohibit the possession, carrying, or use of a firearm by anyone, anywhere, whether inside or outside the home. And they impose

no restriction on the purchase of handguns in the very state where one's "hearth and home" is located. This Court's precedents required the district court to apply nothing more than intermediate scrutiny.

The in-state sales requirements easily satisfy intermediate scrutiny, because they reasonably advance the government's important interests in preventing handgun crime and ensuring the effectiveness of state and local firearms regulations. Requiring purchasers to receive handguns in their state of residence allows states to ensure enforcement of their own laws regarding the purchase and possession of handguns, and it reduces the risk that buyers will cross state lines to circumvent the handgun laws of their home states. Although plaintiffs suggest that there may be "less restrictive . . . alternatives," Pls.' Br. 58, intermediate scrutiny does not require the government to "employ the least restrictive means to achieve its goal." *National Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 349 (5th Cir. 2013). In any event, plaintiffs' proposed alternatives are not equally effective, and thus could not be a basis for invalidating the laws even under strict scrutiny.

## ARGUMENT

## I.   THE IN-STATE SALES REQUIREMENTS ARE CONSISTENT WITH THE SECOND AMENDMENT.

### A.   The Requirements Are Constitutional At Step One.

At step one of this Court's analysis, the Court asks "whether the conduct at issue falls within the scope of the Second Amendment right." *National Rifle Ass'n of*

*Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) (*ATF*). As we argued in our opening brief, the in-state sales requirements fall outside the scope of the Second Amendment because they are the very sort of "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms" that the Supreme Court deemed "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008); *see also* Gov't Br. 17-22. Plaintiffs argue that the in-state sales requirements do not satisfy this first step because they implicate the "right to acquire" firearms and because the requirements are not longstanding. Plaintiffs are mistaken on both counts.

1. Plaintiffs' discussion of the "right to acquire handguns" (Pls.' Br. 23-29) is misplaced. Just as the Second Amendment does not confer an absolute "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626, it also does not establish an absolute right to acquire firearms anywhere, or "in any manner whatsoever," *id*. The Supreme Court has made quite clear—twice—that "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26; *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (plurality opinion); *ATF*, 700 F.3d at 193 n.6 ("The Court's decision to repeat this passage in *McDonald* underscores its importance . . . .").

Sales conditions and qualifications necessarily implicate a purchaser's ability to acquire firearms. Nevertheless, this Court has strongly suggested that such laws fall

outside the scope of the Second Amendment. *See ATF*, 700 F.3d at 196 ("[A] longstanding, presumptively lawful regulatory measure—whether or not it is specified on *Heller*'s illustrative list—would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework."); *id.* at 204 (stating that the Court was "inclined to uphold the challenged federal laws at step one," but proceeding to step two "in an abundance of caution").

Plaintiffs' suggestion (Pls.' Br. 25-26) that every "condition[] and qualification[] on the commercial sale of arms" must be analyzed at step two is contrary to *Heller* and *ATF*. At step one, a court may consider the "nature and extent of the imposed condition," Pls.' Br. 25-26 (quoting *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), to determine whether it is the sort of "presumptively lawful" regulation described in *Heller*. *See* Gov't Br. 18-19 (describing nature and extent of regulations). In this case, the challenged laws merely impose a condition on interstate handgun sales: A buyer may purchase a handgun from an out-of-state dealer, but an in-state dealer must finalize the sale. Unlike the examples cited by plaintiffs (Pls.' Br. 42), the in-state sales requirements are in no sense a "ban" on interstate handgun sales; they merely specify the manner in which interstate handgun sales must occur. *See ATF*, 700 F.3d at 206 (concluding that a federal "age qualification on commercial firearm sales" is "[f]ar from a total prohibition on handgun possession and use," but rather "resemble[s] 'laws imposing conditions and qualifications on the commercial sale of

arms,' which *Heller* deemed 'presumptively lawful'") (quoting *Heller*, 554 U.S. at 626-27 & n.26).

**2.** Plaintiffs dismiss the relevance of numerous state laws that underscore the longstanding nature of residency-based restrictions, advancing several arguments. Plaintiffs first urge this Court to adopt a new rule at step one of its analysis: They argue that founding-era evidence is required to consider a regulation "longstanding," citing out-of-circuit decisions. Pls.' Br. 32 (contending that the government must show "an on-point 1791 enactment" or "some evidence that the Framers would have accepted such a restriction"). But this Court has unmistakably rejected this notion, concluding that "*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *ATF*, 700 F.3d at 196. Founding-era evidence is relevant, *see id.* at 200-02, but it is not required, *id.* at 196. "After all," this Court explained, "*Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage." *Id.* The in-state sales requirements are of a similar vintage, dating from 1909 to 1939. *See* Gov't Br. 20.

Plaintiffs also argue that state laws are irrelevant because the Second Amendment was not understood to apply to the states at the time of the laws' enactment. Pls.' Br. 35. Their position is flatly inconsistent with *ATF*, which considered the laws of "twenty-two States and the District of Columbia." 700 F.3d at 202. This Court explained that at least 12 of those states "had Second Amendment

analogues in their respective constitutions at the time they enacted these regulations." *Id.* at 202 n.14. Similarly, here, 12 of the 16 states with residency-based restrictions had Second Amendment analogues at the time they enacted the restrictions. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 193-204 (2006); *see also ATF*, 700 F.3d at 202 n.14.

Plaintiffs scrutinize the substance of the state laws, arguing that they are not perfectly analogous to the in-state sales requirements. Pls.' Br. 37-38. But as this Court has explained, "precise . . . analogue[s]" are not required. *ATF*, 700 F.3d at 196. Plaintiffs concede that in the early 20th century, two states—Missouri and Michigan—restricted handgun purchases to residents. Pls.' Br. 38-39. They recognize that the laws may have allowed states to conduct more "effective background checks" for residents, *id.* at 39—a rationale that continues to apply today. *See* Gov't Br. 34-37; *infra* pp. 19-20. Plaintiffs also acknowledge that North Carolina and Oregon required residents to obtain a purchase permit from a local official, but speculate that these states also may have extended permits to non-residents. Pls.' Br. 37. *But see Dearth v. Lynch*, 791 F.3d 32, 42 (D.C. Cir. 2015) (Henderson, J., dissenting) (noting that North Carolina permits "were available only to residents of North Carolina"). Even if plaintiffs were correct, the bottom line is that these states required their residents to obtain purchase permits in their home state. Similarly, the in-state sales requirements also demand a connection between prospective purchasers and their state of residence.

The same is true for the 1918 Montana law, which required citizens to obtain a permit from their county of residence before purchasing "any firearm or weapon" out of state. Act of Feb. 20, 1918, ch. 2, §§ 1-3, 8, 1918 Mont. Laws 6, 6-9 (reproduced at GRE60, ROA.395). This law ensured that Montana would play a role in interstate handgun purchases. While the challenged laws require in-state dealers to finalize an interstate sale, rather than demanding that states approve the sale up front (*see* Pls.' Br. 38), Montana's law supports the longstanding nature of laws requiring states' involvement in their residents' firearms purchases. In addition to this law, Montana also imposed a residency requirement for individuals who desired "to carry or bear concealed or otherwise a pistol or revolver." Act of March 3, 1919, ch. 74, § 5, 1919 Mont. Acts. 147, 148 (reproduced at GRE54, ROA.214).

Plaintiffs argue (Pls.' Br. 35-36) that this Court should ignore the numerous state laws regulating the carrying of handguns, as opposed to the sale or purchase of handguns. But plaintiffs overlook the fundamental resemblance between the two types of laws: Like the in-state sales requirements, these early state laws regulated firearms on the basis of whether an individual resided in the state in which the firearm was purchased or carried. Indeed, in *ATF*, this Court recognized the relevance of firearms "use" laws when considering the constitutionality of "purchase" laws. 700 F.3d at 202 (considering state laws relating to "the purchase *or use*" of firearms to minors in connection with challenge to the federal prohibition on the commercial sale of handguns to persons under the age of 21) (emphasis added). These laws, along

with the other laws cited by the government, demonstrate that the in-state sales requirements are the very sort of "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms," that may be upheld at step one of this Court's analysis. *Heller*, 554 U.S. at 626-27 & n.26; *see also ATF*, 700 F.3d at 196, 204.

## B. If This Court Proceeds To Step Two, Intermediate Scrutiny Applies.

If this Court proceeds to analyze the constitutionality of the challenged laws under a means-end analysis, it should uphold the laws under intermediate scrutiny. The district court's decision to apply strict scrutiny conflicts with this Court's case law and has no support in Second Amendment jurisprudence.[1]

1. Even assuming that the in-state sales requirements implicate a Second Amendment right, this Court has made clear that strict scrutiny does not apply to every such law. *ATF*, 700 F.3d at 198. Laws such as the in-state sales requirements, which "do[] not encroach on the core of the Second Amendment," are reviewed under intermediate scrutiny. *Id.* at 195; *see also* Gov't Br. 22-28. Plaintiffs resist this conclusion, arguing that the in-state sales requirements "plainly threaten[] the Second

---

[1] Plaintiffs profess confusion over the government's proposed standard of review. Pls.' Br. 21-23. Consistent with this Court's Second Amendment jurisprudence, the government does not argue that rational-basis review applies. *See ATF*, 700 F.3d at 195, 197; *see also* Gov't Br. 22 ("Intermediate Scrutiny Is The Proper Standard Of Review."). Nor does the government invoke the Second Circuit's test by arguing that the laws do not impose a substantial burden. *See ATF*, 700 F.3d at 195 ("[T]he appropriate level of scrutiny depends on . . . the degree to which the challenged law burdens the right.") (internal quotation marks omitted); *cf.* Pls.' Br. 44 (arguing that the laws impose a "very substantial burden").

Amendment right at its core," Pls.' Br. 46, but they fail to explain how purchasing handguns through an in-state dealer impedes their ability "to use arms in defense of hearth and home," *ATF*, 700 F.3d at 205 (quoting *Heller*, 554 U.S. at 635). Plaintiffs still may purchase, possess, and use handguns, including those that are sold out-of-state; they simply must arrange for out-of-state handguns to be transferred to an in-state dealer to finalize a sale.

This Court's decision in *ATF* confirms that intermediate scrutiny applies. Gov't Br. 24-25. In *ATF*, this Court held that intermediate scrutiny "[u]nquestionably" applied to laws restricting the ability to acquire firearms, 700 F.3d at 205, and upheld federal prohibitions on the commercial sale of handguns to persons under the age of 21, *id.* at 188. Plaintiffs offer two distinctions, neither of which is persuasive. First, plaintiffs argue that the prohibitions in *ATF* still allowed individuals to receive handguns "on the unregulated private market, or through family transfers," whereas here the in-state sales requirements "apply[] to *all* handguns, however acquired, if they are acquired beyond the borders of one's state." Pls.' Br. 49. But the in-state sales requirements are equally (if not more) limited, because *all* handguns remain available for purchase from *all* dealers in the buyer's home state—or from anywhere in the country if they are first transferred to an in-state dealer. Second, plaintiffs argue that the in-state sales requirements "do[] not have a temporary effect" because "[w]herever one lives, one is denied the right to directly acquire handguns in the rest of the country." *Id.* (internal quotation marks omitted).

But the practical effect of the requirements is necessarily temporary, because the requirements prevent the immediate possession of handguns only when individuals are situated outside their state of residence. When individuals return to their state of residence, they can receive their handgun of choice from an in-state dealer. And, of course, when individuals are in their state of residence, they can purchase a handgun from any available dealer. Just as intermediate scrutiny "[u]nquestionably" applied in *ATF*, 700 F.3d at 205, it also applies here.

**2.** Plaintiffs and their *amici* ignore the Second Circuit's decision in *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012), which is the only appellate decision to address the constitutionality of the in-state sales requirements. *See* Gov't Br. 25-26. In *Decastro*, the court concluded that the in-state sales requirement in § 922(a)(3) "only minimally affects the ability to acquire a firearm," and thus declined to apply strict (or even intermediate) scrutiny. 682 F.3d at 164. The court's analysis of the relevant burden refutes plaintiffs' claim that the in-state sales requirements strike at the core of the Second Amendment. As the court explained, the in-state sales requirements "do[] nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything." *Id.* at 168. Far from imposing a ban on interstate sales, the laws simply require that an out-of-state handgun be "transferred to a licensed gun dealer in the purchaser's home state." *Id.* The court concluded that "[i]n light of the ample alternative means of acquiring firearms for self-defense purposes, § 922(a)(3) does not impose a substantial burden

on the exercise of Decastro's Second Amendment rights." *Id.* As *Decastro* demonstrates, the in-state sales requirements impose a minimal burden that does not implicate the core of the Second Amendment. Therefore, only intermediate scrutiny applies.

Other courts, too, have overwhelmingly declined to apply strict scrutiny to Second Amendment challenges involving laws that do not implicate the core right of self-defense in the home. *See* Law Center to Prevent Violence (Law Ctr.) Amicus Br. 26 (collecting cases). Their reasoning applies with equal force here. For example, in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*), the D.C. Circuit held that intermediate scrutiny "is the more appropriate standard for review of gun registration laws." *Id.* at 1257. The D.C. Circuit explained that registration requirements "do not severely limit the possession of firearms," and "none of the District's registration requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose." *Id.* at 1257-58 (internal quotation marks and alterations omitted). Like the gun registration laws in *Heller II*, the in-state sales requirements do not prevent individuals from possessing firearms anywhere or for any purpose.

In a case repeatedly cited by plaintiffs, the Third Circuit applied intermediate scrutiny to uphold 18 U.S.C. § 922(k), the federal prohibition on possessing handguns with an obliterated serial number. *Marzzarella*, 614 F.3d at 87, 97. The court contrasted § 922(k) with the District of Columbia's handgun ban in *Heller*, which "did

12

not just regulate possession of handguns; it prohibited it, even for the stated fundamental interest protected by the right—the defense of hearth and home." 614 F.3d at 97. "[Section] 922(k) does not come close to this level of infringement," the court concluded, because "[i]t leaves a person free to possess any otherwise lawful firearm he chooses—so long as it bears its original serial number." *Id.* So too, here, the in-state sales requirements are drastically different from the handgun ban in *Heller*, and they leave individuals free to purchase any handgun of their choosing, so long as they retrieve the gun from an in-state dealer. Intermediate scrutiny applies.

Plaintiffs and *amici* rely (Pls.' Br. 45-46; Nat'l Shooting Sports Found. (NSSF) Amicus Br. 11, 22-23) on the Seventh Circuit's decision in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), which concerned an entirely different kind of restriction. In *Ezell*, a Chicago ordinance established a permitting process that required one hour of range training, yet prohibited firearm ranges within city limits. *Id.* at 691. The ordinance thus required Chicago residents to travel outside the city to satisfy the prerequisites for possessing a gun. *Id.* at 697-98. In sharp contrast, the in-state sales requirements allow individuals to purchase handguns from any dealer in their state of residence, requiring no travel at all to exercise the core Second Amendment right "to use arms in defense of hearth and home." *ATF*, 700 F.3d at 205 (quoting *Heller*, 554 U.S. at 635).

**3.** Plaintiffs repeatedly overstate the nature and degree of the burden imposed by the in-state sales requirements, arguing that the laws "abolish[] all interstate

handgun transfers." Pls.' Br. 28. But plaintiffs do not allege that they are unable to purchase their handgun of choice, nor do they claim that they are unable to purchase a handgun from anywhere in the country. Their complaint is that they must pay a transfer fee of $125 plus shipping costs. *Id.* at 11-13. That is hardly a substantial burden, and it surely does not implicate the core of the Second Amendment. *See Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013) (holding that a firearms licensing fee of just over $100 per year is not "anything more than a marginal, incremental or even appreciable restraint on one's Second Amendment rights") (internal quotation marks omitted); Pls.' Br. 22 n.7 (acknowledging that the licensing fee in *Kwong* is nothing more than a marginal burden "because it only makes handgun possession more expensive"); Gov't Br. 26.

Plaintiffs insist that the government "do[es] not accurately describe the scope of the violation." Pls.' Br. 42. Plaintiffs "do not merely complain" about the transaction fee, they say; "[p]laintiffs also complain about reduced competition and choice, higher prices, lost sales, and other incidents of abolishing the national market for a consumer product." *Id.* at 42-43 (internal quotation marks omitted). Even if plaintiffs had presented evidence of such harms—and they have not—these harms all boil down to cost. In this case, that cost is a transaction fee of $125 plus shipping. The mere fact that in-state dealers charge a transfer fee is not evidence that dealers exercise an "absolute veto on competition from out of state." Nat'l Rifle Ass'n (NRA) Amicus Br. 20. In exchange for this fee, in-state dealers take a number of

steps to ensure that the sale satisfies federal and state law. In-state dealers are responsible for collecting, reviewing, and completing the transferor's section of the required federal form, Form 4473, which requires them to verify the purchaser's identification, *see* 18 U.S.C. § 922(t)(1)(C), initiate the background check process, *see id.* § 922(t)(1)(A), obtain and document the results of the background check, *see id.* § 922(t)(1)(B), and certify to their belief that the sale is lawful.[2] The dealer must retain the form for at least 20 years after the sale or disposition of the firearm. *Id.* § 923(g)(1)(A); 27 C.F.R. § 478.129(b). There is no evidence that dealers have abused the in-state sales requirements to impede competition by charging unwarranted or exorbitant fees.

**4.** Unable to point to any judicial decision that applies strict scrutiny to similar Second Amendment challenges, plaintiffs instead rely on analogies to other constitutional provisions. *See* Pls.' Br. 28-29, 43, 47-49 (citing, *inter alia*, *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988); *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008)); *see also* NRA Amicus Br. 15-19. Legal principles relating to other constitutional rights may be instructive, *see, e.g.*, *ATF*, 700 F.3d at 197-98, but they cannot be imported wholesale into Second Amendment jurisprudence. *See Kachalsky v. County of Westchester*, 701 F.3d 81, 91 (2d Cir. 2012) ("We are hesitant to

---

[2] ATF, U.S. Dep't of Justice, Firearms Transaction Record Part I—Over-the-Counter (Revised Apr. 2012), *available at* https://www.atf.gov/file/61446/download.

import substantive First Amendment principles wholesale into Second Amendment jurisprudence.  Indeed, no court has done so.") (emphasis omitted); *see also Woollard v. Gallagher*, 712 F.3d 865, 883 n.11 (4th Cir. 2013).  The Second Amendment involves unique considerations.  As the Tenth Circuit recently explained, "[t]he risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test," such as "the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others."  *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) (concluding that intermediate scrutiny applies to laws regulating firearms outside the home).  To the extent that speech and firearms both have the potential to inflict harm, the risks are dramatically different in kind and degree.  *Heller* acknowledged these differences by approving of laws preventing felons or the mentally ill from possessing firearms, *see* 554 U.S. at 626, even though such individuals are generally entitled to possess books and religious articles and to speak and exercise religion without restriction. Moreover, *Heller* approved of "conditions and qualifications on the commercial sale of arms," *id.* at 626-27—an exception that simply does not apply in other contexts.  This exception cannot be reconciled with plaintiffs' argument (*e.g.*, Pls.' Br. 28-29) that conditions of firearms sales should be analyzed in the same manner as restrictions on the sale of books, contraceptives, and sexual devices.

Even assuming that First Amendment principles directly apply, intermediate scrutiny is the proper standard. In the First Amendment context, intermediate scrutiny applies to regulations of the time, place, and manner—rather than the content—of speech. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Applying this framework, the in-state sales requirements would qualify as "manner" restrictions, because they merely specify the manner in which an individual may purchase an out-of-state firearm. *See Heller II*, 670 F.3d at 1262 (treating prohibition of semi-automatic rifles and large-capacity magazines as a "manner" restriction subject to intermediate scrutiny because the prohibition "does not effectively disarm individuals or substantially affect their ability to defend themselves"); *Marzzarella*, 614 F.3d at 97 ("Because § 922(k) was neither designed to nor has the effect of prohibiting the possession of any class of firearms, it is more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights."). Under this doctrine, intermediate scrutiny applies.

Plaintiffs' right-to-privacy analogy is similarly unavailing. Both *Carey* and *Reliable Consultants* involved burdens that were more severe than that alleged here, and thus demonstrate why intermediate scrutiny applies. In *Carey*, a New York law eliminated a majority of the most convenient and private retail outlets for purchasing contraceptives. 431 U.S. at 689 & n.7. Here, by contrast, the in-state sales requirements allow individuals to purchase a handgun from any dealer in their state of

residence, "which is presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168.

This Court's decision in *Reliable Consultants* involved a more severe burden than that in *Carey*. The Court held unconstitutional a state-wide ban on selling, giving, lending, or distributing personal sexual devices. *Reliable Consultants*, 517 F.3d at 740. The Court concluded that the law "heavily burdens" the "exercise of the constitutional right to engage in private intimate conduct in the home," because individuals are "unable to legally purchase a device in Texas," or even to loan or receive one as a gift. *Id.* at 744. By contrast, the in-state sales requirements do not ban handgun sales, and they expressly *allow* sales in one's state of residence, thereby ensuring that individuals can exercise their Second Amendment rights where they matter most—in the home.

## C. The In-State Sales Requirements Are Reasonably Adapted To Important Government Interests.

Plaintiffs concede that the government has an important—indeed, compelling—interest in regulating handgun sales in the interest of public safety. Pls.' Br. 50. And plaintiffs do not dispute that the government has "an interest in curtailing interstate handgun trafficking that violates state laws." *Id.* at 50-51; *see also id.* at 58. Invoking strict-scrutiny principles, plaintiffs argue that the in-state sales requirements are "not a narrowly-tailored solution," and that "far less restrictive yet no less effective alternatives are already in place." *Id.* at 58. But intermediate scrutiny

is not so demanding—it requires only that a law be "reasonably adapted to an important government interest." *ATF*, 700 F.3d at 207. The in-state sales requirements easily satisfy this standard. *See* Gov't Br. 28-37. In any event, plaintiffs' arguments are flawed under any level of scrutiny.

1. Plaintiffs do not meaningfully defend the district court's primary justification for striking down the in-state sales requirements—that the government failed to prove that the requirements are necessary under the current national background check system. GRE30-34, ROA.481-85; GRE37, ROA.488. As the government and *amici* have shown, the national background check system does not eliminate the need for the in-state sales requirements, and the system's weaknesses underscore the importance of these laws. Gov't Br. 34-36; Brady Ctr. to Prevent Gun Violence (Brady Ctr.) Amicus Br. 7-17; Law Ctr. Amicus Br. 5. Plaintiffs do not dispute that the current system is flawed; they argue only that it is possible for an effective system to exist. *E.g.*, Pls.' Br. 58 (noting the "feas[i]bility of adequate background check systems"). Plaintiffs do not disagree with the premise that "states do not adequately update the federal background check database," and instead argue that states could simply "allow[] out-of-state dealers to access [their] background check system[s]." *Id.* at 54; *see also id.* at 52 (arguing that "modern communications and computerized databases wholly enable national access to . . . state background check databases"). But this is no answer, because a state's decision to contribute records to the national background check system, or to make records available to out-

of-state sources, is voluntary. *See* 28 C.F.R. § 25.4; Pls.' Br. 54 (acknowledging that states could "simply refus[e] to operate or assist in the operation of any background check system"). Congress is not required to refrain from taking action in the hope that someday, all states will make their records easily accessible and understandable to the federal government and to every other state. Moreover, out-of-state dealers still would be responsible for determining whether a sale complies with a host of other state laws, such as whether a particular firearm is lawful in a state, or whether the purchaser has satisfied all state requirements for purchasing or possessing a firearm. *See* Gov't Br. 34-35.

**2.** The in-state sales requirements responded to the problem of individuals crossing state lines to circumvent state handgun laws. *See* Gov't Br. 30-31. Congress learned that in many states, such as the District of Columbia, Massachusetts, and Michigan, high numbers of crime guns were purchased in neighboring states with less stringent gun safety laws. *Id.* Today, even with the in-state sales requirements, handgun trafficking remains a serious problem—one that the district court's ruling, if upheld, will only exacerbate. As *amici* demonstrate, there is overwhelming evidence that handguns flow from less-regulated states to more highly regulated states. *See* Law Ctr. Amicus Br. 7; Brady Ctr. Amicus Br. 21-27.

Plaintiffs and their *amici* dismiss the role of the in-state sales requirements in preventing handgun trafficking, but they do not dispute the basic premise that handguns flow from less-regulated states to more highly regulated states. Pls.' Br. 54;

NSSF Amicus Br. 19, 24-29. The assertion that this flow pattern "proves only that the interstate handgun sales ban has not addressed the problem," NSSF Amicus Br. 24, defies common sense. The in-state sales requirements undoubtedly deter many buyers from taking advantage of more relaxed laws in other states, and eliminating this deterrent surely would intensify the problem. Dealers across the country likely know and understand the nationwide rule that they cannot sell a handgun directly to an out-of-state resident, *see* 18 U.S.C. § 922(b)(3), but it is far less certain that even the most well-intentioned, sophisticated dealers could understand and enforce every handgun law in every U.S. jurisdiction. The district court's ruling, if upheld, would invite residents of highly regulated states to take advantage of out-of-state dealers' lack of familiarity with the laws in other states. *See* Gov't Br. 34-35 (describing state laws that are not verified by the federal background check system). Buyers may be inclined to find dealers in states with more relaxed licensing and inspection requirements, *see* Law Ctr. Amicus Br. 8-10; Brady Ctr. Amicus Br. 7-8, or in states that do not prosecute conduct related to illegal gun sales and trafficking, *see* Law Ctr. Amicus Br. 10-12. The in-state sales requirements guard against such circumvention by requiring the involvement of an in-state dealer.[3]

**3.** Plaintiffs propose two "less restrictive alternatives" to the in-state sales requirements: (1) require dealers to know and apply the laws of every other state in

---

[3] Invalidating § 922(a)(3) also would eliminate the government's primary means of combatting interstate firearms trafficking that occurs through non-dealers.

the country, or (2) allow direct out-of-state sales to residents of "localities . . . whose strict pre-transfer licensing requirements make circumvention impossible."  Pls.' Br. 17, 55-59.  But intermediate scrutiny requires only that a law be "reasonably adapted to its [important] objective"; the government "need not employ the least restrictive means to achieve its goal."  *National Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 349 (5th Cir. 2013).  Moreover, plaintiffs' proposed alternatives would not effectively achieve the government's goals, and thus could not invalidate the laws even under strict scrutiny.  *See Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1671-72 (2015).

**a.**  As the government and *amici* have demonstrated, state handgun laws are varied, complex, and constantly changing.  *See* Gov't Br. 36-37; Law Ctr. Amicus Br. 14-17; Brady Ctr. Amicus Br. 8-15.  Like the district court, plaintiffs assume that federal firearms dealers have an extraordinary ability to understand and apply the handgun laws of every U.S. jurisdiction as accurately and effectively as they enforce their own state's laws.  Pls.' Br. 55-56.  Plaintiffs' analogy to the practice of law is inapt.  Not even attorneys, with all of their legal training, are charged with knowing and upholding all of the laws of every state; attorneys generally must be barred in the states where they practice.  Selling firearms in one state does not qualify a dealer to interpret the laws of every other state.  Dealers do not receive training on the firearms laws of every jurisdiction, nor would such training be feasible.  The availability of an outdated, 500-page compilation of the text of state firearms laws, *see* NSSF Amicus Br. 20, does not materially change matters; a lawyer is not qualified to practice law in

any state simply because he or she has access to Westlaw. Plaintiffs' proposal to require dealers to comply with the laws of every state is not an effective alternative to the in-state sales requirements.

Plaintiffs respond by arguing that "[f]ederal law already charges [dealers] selling rifles and shotguns with adherence to the laws of other jurisdictions," and "[i]f Mance can follow an out-of-state rifle law, he can follow an out-of-state handgun law." Pls.' Br. 55. This is a variation of the National Rifle Association's argument that Congress's decision not to include long guns renders the in-state sales requirements "underinclusive[]" and "raises serious doubts about whether the government is in fact pursuing the interest in invokes." NRA Amicus Br. 25 (internal quotation marks omitted). But it makes no difference that Congress declined to extend the in-state sales requirements to long guns. As this Court explained in *ATF*, "[i]t is well-settled that 'a statute is not invalid under the Constitution because it might have gone farther than it did, [and] that a legislature need not strike at all evils at the same time.'" 700 F.3d at 211 (quoting *Buckley v. Valeo*, 424 U.S. 1, 105 (1976)). Rather, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Id.* (quoting *Buckley*, 424 U.S. at 105). In seeking to prevent crime and handgun trafficking, Congress concluded that "the legislation should especially concern itself with the particular type of weapon that is predominantly used by the criminal," and it thus targeted the handgun, "the most formidable and most frequently used tool of the criminal." S. Rep. No. 89-1866, at 4

(1966); *see also* Gov't Br. 32-33. The handgun continues to pose a disproportionate threat to public safety. *See* Gov't Br. 33. Here, as in *ATF*, "Congress designed its scheme to solve a particular problem," and its "intended scheme reasonably fits that objective." 700 F.3d at 211. Therefore, the in-state sales requirements survive intermediate scrutiny. *See id.*

**b.** Plaintiffs also propose that "the Government could at a minimum authorize interstate transfers to residents of localities, such as Washington, D.C., whose strict pre-transfer licensing requirements make circumvention impossible." Pls.' Br. 58-59. This alternative suffers from the same flaw as the first; it presumes that all dealers in every location will know that a particular state requires a pre-transfer license. Even if plaintiffs are correct that "any Maryland gun dealer knows not to transfer a firearm to a District of Columbia resident who lacks a registration certificate for that firearm," *id.* at 52, the same cannot be said for a dealer across the country who has never transferred a gun to a D.C. resident. In any event, the government is not required to carve out legislative exceptions for every new state law that possibly reduces the risk of circumvention. *Cf. Bonidy*, 790 F.3d at 1128 (declining to require "an alternative system involving piecemeal exceptions and individual waivers" rather than a "single bright-line rule"). The in-state sales requirements provide dealers with a clear, workable rule that directly advances the government's interests. *See McCraw*, 719 F.3d at 349.

**4.** Plaintiffs' as-applied challenge fares no better than their facial challenge. On appeal, plaintiffs' only basis for asserting an as-applied challenge is that but for the in-state sales requirements, D.C. law would allow residents to purchase handguns directly from out-of-state dealers. Pls.' Br. 53; *see also* D.C. Mun. Regs., tit. 24, § 2320.3(f) (2013). Plaintiffs' "as-applied challenge" is a repackaged version of their argument that the in-state sales requirements should not apply to states with pre-licensing requirements, and it fails for the reasons discussed above. *See Bonidy*, 790 F.3d at 1128 (rejecting as-applied challenge that sought "piecemeal exceptions and individual waivers").

## II. THE IN-STATE SALES REQUIREMENTS ARE CONSISTENT WITH THE FIFTH AMENDMENT.

As demonstrated in our opening brief, the district court's equal-protection analysis was flawed on many levels, including its assumption that the in-state sales requirements discriminate between similarly situated individuals, and its conclusion that strict scrutiny applies. Gov't Br. 38-41. Plaintiffs do not meaningfully defend the district court's decision to apply strict scrutiny. They concede that non-state residents are not a suspect class, Pls.' Br. 59, and they appear to concede that strict scrutiny does not apply if there is no Second Amendment violation, *id.* at 60; *see also ATF*, 700 F.3d at 212 (applying rational-basis review where "the challenged laws do not impermissibly interfere with Second Amendment rights" and do not implicate a suspect class); *McCraw*, 719 F.3d at 350 ("Because the state scheme does not

impermissibly interfere with Second Amendment rights or disadvantage a protected class, it does not trigger strict scrutiny.") (internal quotation marks and citations omitted).

Instead, plaintiffs focus on arguing that the in-state sales requirements "fail[] rational basis review." Pls.' Br. 60. But rational-basis review is a deferential standard: "'When conducting rational basis review,' a court 'will not overturn' the legislation 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational.'" *ATF*, 700 F.3d at 212 (quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 84 (2000)) (alterations omitted). As discussed above and in our opening brief, the in-state sales requirements are reasonably adapted to important government interests, and thus easily satisfy rational-basis review. *See supra* pp. 18-25; Gov't Br. 28-38; *ATF*, 700 F.3d at 212 (concluding that federal age restrictions survive rational-basis review "[f]or the same reasons that the challenged laws are reasonably adapted to an important state interest").

Plaintiffs argue that the in-state sales requirements are irrational "on a non-circumvention rationale, when there are no local laws to circumvent because the transaction is fully legal in both the buyer and seller's home jurisdiction." Pls.' Br. 60. Plaintiffs apparently would allow out-of-state dealers to determine whether a transaction complies with the laws of another state; but Congress rationally

determined that this approach would not sufficiently address the problem of interstate handgun trafficking. *See supra* pp. 22-24. Plaintiffs also argue (Pls.' Br. 60) that it is irrational to impose more stringent requirements for handguns than for long guns. As we have discussed, however, Congress had a sound reason for targeting handguns, "the weapon most susceptible to criminal use." S. Rep. No. 89-1866, at 4; *see also supra* pp. 23-24; Gov't Br. 32-33, 37. In sum, plaintiffs have failed to show that it was irrational for Congress to require in-state dealers to participate in interstate handgun sales.

## CONCLUSION

For the foregoing reasons, and those stated in our opening brief, the judgment of the district court should be reversed.

Respectfully submitted,

BENJAMIN C. MIZER
  *Principal Deputy Assistant Attorney General*

JOHN R. PARKER
  *Acting United States Attorney*

MARK B. STERN
  (202) 514-5089
MICHAEL S. RAAB
  (202) 514-4053
TARA S. MORRISSEY
  (202) 353-9018
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7261*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*

SEPTEMBER 2015

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that the foregoing brief was prepared using Microsoft Word 2010 and complies with the type and volume limitations set forth in Rule 32 of the Federal Rules of Appellate Procedure. I further certify that the font used is 14 point Garamond, for text and footnotes, and that the computerized word count for the foregoing brief (excluding exempt material) is 6,741.

I further certify that 1) all required privacy redactions have been made; 2) the electronic submission is an exact copy of the paper copy; and 3) the document is free from viruses and has been scanned by Symantec Endpoint Protection, version 12.1.5.

  /s/ Tara S. Morrissey
Tara S. Morrissey
Tara.S.Morrissey@usdoj.gov
Counsel for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2015, I filed the foregoing Brief by causing a digital version to be filed electronically via the ECF system. The participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Tara S. Morrissey*
Tara S. Morrissey
Tara.S.Morrissey@usdoj.gov
Counsel for Appellants